**In re Paula LICKMAN, Debtor.**

**Marie E. Henkel, Trustee, Plaintiff,**

**v.**

**Paula Lickman et al., Defendants.**

**Bankruptcy No. 98–02632–6C7.
Adversary No. 01–170.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

July 25, 2003.

Gerald J. D'Ambrosio, Delray Beach, FL, for debtor.

*MEMORANDUM OF DECISION*

C. TIMOTHY CORCORAN, III,
Bankruptcy Judge.

This adversary proceeding presents significant issues involving a debtor and her confederates' repeated efforts to thwart the trustee's administration of the debtor's bankruptcy estate. They took their actions in derogation of settled principles of law to the substantial harm and detriment of the bankruptcy estate. They have severely prejudiced all creditors of this estate. The trustee seeks injunctive relief and sanctions. The court concludes that injunctive relief and sanctions are appropriate.

### I.

### A.

*Introduction.*

This adversary proceeding is the latest installment in a saga that has been ongoing for more than four years and that has played out in the Pennsylvania state courts, the federal district courts in the Eastern District of Pennsylvania and the Middle District of Florida, and the bankruptcy court in the Middle District of Florida. This court has entered several decisions in this bankruptcy case and assumes familiarity with those decisions.[1]

Virtually all of the litigation in this bankruptcy case has, at its core, involved a dispute as to who should have ownership and control over one asset: a 15 percent interest in a probate estate and putative claims against the executrix of that probate estate, Marcy Shain ("Shain" or "executrix"), pending in the Pennsylvania probate court ("probate asset").

The debtor and her confederates—a friend, Robert Dizak or Robert Daniels ("Daniels")[2], and her attorneys, Gerald J. D'Ambrosio ("D'Ambrosio"), and James F. Wiley, III ("Wiley")—have aggressively pursued the debtor's claim of entitlement to the probate asset by making telephone calls, writing letters, filing disciplinary complaints with The Florida Bar, and placing newspaper advertisements in an effort to pressure the trustee and her counsel to abandon the probate asset; by taking an adverse position in the bankruptcy case and its related proceedings in an effort to hinder and delay the trustee's administration of the probate asset; by making and prosecuting collateral claims for legal relief in the Pennsylvania state and federal courts against the trustee and her counsel on account of the trustee's administration of the probate asset; and by continuing all of these efforts despite final judicial determinations that the debtor's legal positions are meritless. The plaintiff contends that, in taking these actions, the defendants have violated the automatic stay, this court's order granting the trustee's motions for sanctions entered on October 18, 1999, 28 U.S.C. § 959, and the *Barton* doctrine. The plaintiff seeks injunctive relief and monetary damages in the amount of $181,798.69, plus costs.

The court conducted the trial of this adversary proceeding over a period of three days. At trial, the court heard testimony from six witnesses and received into evidence nearly 200 exhibits. After con-

1. *Henkel v. Lickman (In re Lickman),* 288 B.R. 151 (Bankr.M.D.Fla.2003); *Henkel v. Lickman (In re Lickman),* 288 B.R. 291 (Bankr. M.D.Fla.2002); *Henkel v. Lickman (In re Lickman),* 286 B.R. 821 (M.D.Fla.2002); *Henkel v. Lickman (In re Lickman),* 284 B.R. 299 (Bankr.M.D.Fla.2002); *Henkel v. Lickman (In re Lickman),* 282 B.R. 709 (Bankr.M.D.Fla. 2002); *In re Lickman,* 273 B.R. 691 (Bankr. M.D.Fla.2002).

2. It is undisputed that Daniels and Dizak are the same person (App. I No.).

sidering all of the testimony, particularly the demeanor and credibility of the witnesses, the exhibits admitted at trial, pleadings and stipulations filed by the parties, other facts as established as a matter of record in the court file, and written arguments of the parties, including the authorities cited by the parties, the court determines the facts and issues as more specifically delineated below as required by F.R.B.P. 7052.

### B.

### *Chronology of Events.*

The record is voluminous. In addition, the record has been somewhat muddied by the abandon with which the defendants have cited in their papers alleged "facts" that are not supported by the record. The court has therefore prepared a chronology that sets out all of the events that have occurred in the debtor's bankruptcy case and elsewhere as established by the record.

The chronology is attached to this decision as Appendix I. It is an integral part of this decision. To the extent there is testimony or evidence in the record that is contrary to what is contained in the appendix, the court does not credit that testimony or evidence.

### C.

### *Phase I: March 1998—April 2001.*

On March 27, 1998, the debtor filed a case under Chapter 7 of the Bankruptcy Code (App. I No. 1).[3] The trustee determined that there were no assets to be administered and the case was closed shortly after the court entered a discharge of the debtor's debts (App. I Nos. 6 and 7).

The debtor discharged approximately $38,000 in unsecured debt (App. I No. 1).

Unknown to the trustee, the debtor's aunt died during the 180–day period following the debtor's Chapter 7 bankruptcy filing (App. I No. 3). The aunt's will left the debtor a 15 percent interest in her estate (App. I No. 4). The debtor and her brother, Stephen Lickman ("the Lickmans"), were immediately at odds with their cousin, Shain, the major beneficiary and executrix of the probate estate, with respect to Shain's financial dealings on behalf of the decedent before and during probate (App. I No. 10). The Lickmans commenced litigation in the Pennsylvania probate court against the executrix alleging malfeasance (App. I No. 13).

Daniels and the debtor had a romantic relationship and were then living together (App. I No. 11). Daniels and the debtor were both legally sophisticated. Daniels had published a legal periodical for many years, and the debtor had worked as a paralegal (App. I Nos. 1 and 21). Daniels actively participated in the debtor's litigation against the executrix and paid some of the debtor's legal fees (App. I Nos. 14, 15, and 22).

Neither the debtor nor the executrix notified the Chapter 7 trustee of the debtor's interest in the probate estate (App. I Nos. 12 and 17). Counsel for the executrix, Larry S. Segal ("Segal"), communicated to the debtor and her counsel the necessity of notifying the trustee of the probate asset (App. I No. 17). When the debtor had failed to notify the trustee by the time to file the executrix' preliminary accounting with the probate court, Segal notified the trustee of the debtor's interest in the probate estate (App. I No. 25).

---

**3.** App. I No. 1 refers to Event No. 1 in the chronology, Appendix I. This form of citation is used throughout this decision.

When it became apparent that the trustee might reopen the debtor's bankruptcy case to administer the probate asset, Daniels sought and obtained counsel to represent the debtor's interests in the bankruptcy court (App. I Nos. 20, 23, and 27). Daniels selected D'Ambrosio, a bankruptcy attorney whom Daniels had known for more than 20 years and with whom he shared office space (App. I No. 21). Daniels asked D'Ambrosio to assist him in writing letters to the trustee to dissuade her from administering the probate asset (App. I No. 20). Daniels was not himself admitted to The Florida Bar. Indeed, Daniels allegedly was convicted in New York of a felony for the unauthorized practice of law and is currently seeking admission to The Florida Bar (App. I No. 20).

On August 16, 1999, the court entered an order reopening the debtor's bankruptcy case to permit the Chapter 7 trustee to administer the probate asset for the benefit of the debtor's unsecured creditors (App. I No. 32). Shortly thereafter, the court approved the trustee's employment of Lynnea Concannon ("L. Concannon") as trustee's counsel (App. I No. 38). Lynnea Concannon was assisted by her associate, Sean Concannon ("S. Concannon") (App. 1 No. 38). The trustee also employed special counsel, William O'Connell ("O'Connell"), to represent the estate's interests in the Pennsylvania probate action (App. I Nos. 60 and 113).

Had the debtor cooperated with the trustee in administering the probate asset at this point, the bankruptcy estate would have incurred attorney's fees in the range of $900 to $2,000 (App. I No. 32). Even after the payment of all administrative expenses, the trustee would have been able to make a substantial distribution to the debtor's unsecured creditors. The debtor, however, did not cooperate.

Instead, Daniels, the debtor, and D'Ambrosio waged an aggressive campaign to dissuade the trustee and her counsel from administering the probate asset. They initiated a barrage of telephonic and written communications to the trustee and her counsel (App. I Nos. 29, 30, 31, 36, 40, 41, 42, 43, 52, 53, 56, 57, 58, 64, 67, 88, 89, and 94). In these communications, Daniels, the debtor, and D'Ambrosio took the position that it would be burdensome to the estate to administer the probate asset because the debtor's claims against the executrix were speculative and would be difficult to collect from the executrix who resided in Israel (App. I Nos. 29, 30, 31, 36, 40, 41, 42, and 43). Daniels, the debtor, and D'Ambrosio urged the trustee and her counsel to abandon the probate asset. They also made direct or implicit threats of adverse consequences to the trustee and her counsel if the trustee did not cease administering the probate asset (App. I Nos. 29, 30, 36, 40, 42, 43, 52, 53, 58, 64, 88, 89, and 94).

During this time, D'Ambrosio fraudulently represented to the trustee and her counsel that Daniels was formally associated with his office as an assistant or associate attorney authorized to speak on behalf of the debtor (App. I Nos. 45 and 107). Daniels also fraudulently held himself out to the trustee and her counsel as D'Ambrosio's employee or associate authorized to speak on behalf of the debtor (App. I Nos. 41, 75, 103, and 104).[4] Daniels drafted and typed many of the letters that D'Ambrosio sent to the trustee and her counsel in addition to making telephone calls (App. I No. 24).

---

4. Apparently this was not the first time that Daniels fraudulently represented himself as representing the debtor. His name appears on the service list on at least one order entered by the Pennsylvania probate court as "Robert Daniels, Esq." (App. 1 No. 15).

As a consequence of Daniels', the debtor's, and D'Ambrosio's early pressure tactics to force abandonment of the probate asset, the trustee filed an adversary proceeding seeking a determination that the probate asset was property of the estate (App. I No. 44). Although D'Ambrosio initially represented the debtor in her reopened bankruptcy case, he quickly withdrew after the court entered an order directing his compliance with L.B.R.2090–1 and noting that the clerk's records did not reflect that D'Ambrosio was a member of the bar of the U.S. District Court for the Middle District of Florida (App. I Nos. 35 and 46). Soon after D'Ambrosio's withdrawal, the debtor filed a pro se motion to revoke the order reopening her bankruptcy case (App. I No. 48).

In the meantime, the debtor continued to assert an interest in the probate asset and continued to prosecute her litigation against the executrix pending in the Pennsylvania probate court (App. I Nos. 33, 59, and 65). In response to the Lickmans' attacks on the executrix, Segal filed a motion in the Pennsylvania probate court to invoke the in terrorem clause of the decedent's will to eliminate the Lickmans' interests in the probate estate (App. I No. 39). When the trustee learned of the debtor's attacks on the executrix and the executrix' motion to eliminate the debtor's interest in the probate asset, the trustee filed in the bankruptcy court two emergency motions for sanctions against the debtor and Segal (App. I No. 47).

On October 14, 1999, this court conducted a lengthy evidentiary hearing of the trustee's motions for sanctions (App. I No. 74). Gary L. Armstrong ("Armstrong"), a personal friend of the debtor, entered his appearance as debtor's counsel at that hearing (App. I No. 73).

At the conclusion of the hearing, the court found that the probate asset was property of the bankruptcy estate (App. I No. 76). The court determined that the debtor and executrix' counsel had violated the automatic stay by taking actions in the Pennsylvania probate court (App. I No. 76). The court made it clear that the trustee was the party who would administer the probate asset regardless of the ultimate value of that asset to the estate (App. I No. 76). The court enjoined the debtor from taking any further actions to exercise control over the probate asset and determined that the debtor and the executrix counsel's actions in Pennsylvania taken in violation of the automatic stay were void (App. I Nos. 78 and 79). Although the court did not award monetary sanctions against the debtor, it issued a strong warning to the debtor to curb her actions and reserved jurisdiction to revisit the issue in the future (App. I No. 77).

On October 18, 1999, the court entered an order memorializing its ruling ("October 18, 1999, sanctions order")(App. I No. 82). The debtor took an appeal of this order but did not seek a stay pending appeal (App. I No. 85).

On October 27, 1999, the trustee filed a motion for summary judgment of her adversary complaint to determine property of the estate on the basis that the court had determined the issue in the trustee's favor at its hearing of the trustee's sanctions motions (App. I No. 87). The court scheduled a hearing of the trustee's motion for summary judgment for December 1999 (App. I No. 92).

Immediately thereafter, Armstrong filed the debtor's motion to compel the trustee to abandon the probate asset (App. I No. 93). In her motion, the debtor asserted that her claims against the executrix would be "burdensome to the estate and of inconsequential (if any) value and benefit to the estate * * * * [because] the Debtor's interest in the decedent's estate ha[d] far

less value than the cost of recovering the speculative funds." (App. I No. 93).

By this point, it was clear to Daniels, the debtor, and D'Ambrosio that their informal attempts to dissuade the trustee from administering the probate asset had failed. The trustee was beginning to administer the probate asset with the concurrence of the bankruptcy court. The court had scheduled a hearing on the issue of the estate's entitlement to the probate asset. Moreover, the trustee had obtained an order from the bankruptcy court that enjoined the debtor from interfering with the trustee's administration of the probate asset. Daniels, the debtor, and D'Ambrosio decided, therefore, to bring additional pressure to bear on the trustee and her counsel.

To this end, Daniels made telephone calls to trustee's counsel that were increasingly vituperative and threatening (App. I No. 103). At one point, Daniels promised that he would "make fools" of the trustee and her counsel and would ensure that the debtor's bankruptcy case would be prohibitively costly to administer (App. I No. 43).

The debtor filed baseless complaints with The Florida Bar against the trustee and L. Concannon and S. Concannon, her counsel, (App. I Nos. 98 and 101). The gravamen of the debtor's complaints related to actions that the trustee and her counsel had taken in administering the probate asset.[5]

D'Ambrosio sent letters that contained threats of legal action on account of the trustee's and her counsels' actions taken while administering the probate asset (App. I Nos. 88, 89, and 94).

In December 1999, D'Ambrosio substituted in the bankruptcy case for Armstrong as debtor's counsel, in the meantime having been admitted to the bar of the U.S. District Court for the Middle District of Florida (App. I No. 105). He immediately sought to continue the December hearing of the trustee's motion for summary judgment on the complaint to determine that the probate asset was property of the estate (App. I No. 108). Although the court did not continue the hearing, it conducted the hearing as a preliminary hearing and scheduled a further hearing for February 2000 (App. I No. 109).

D'Ambrosio then filed on the debtor's behalf a flurry of papers adverse to the trustee. He filed motions to dismiss in two pending adversary proceedings and a motion for sanctions against trustee's counsel for alleged discovery failures (App. I Nos. 111 and 117). He also filed an emergency motion for relief from stay seeking to modify the automatic stay to permit the debtor to continue her litigation against the executrix in the Pennsylvania probate court (App. I No. 116). In addition, he filed the debtor's application for administrative expense which sought $17,000 in repayment of the debtor's purported legal expenses incurred in connection with the Lickmans' litigation against the executrix in the Pennsylvania probate court before the bankruptcy court reopened the debtor's bankruptcy case (App. I No. 114).[6]

On January 14, 2000, the trustee filed a notice of sale of the probate asset to Shain, in her individual capacity, for an agreed

---

5. The Florida Bar ultimately concluded that the debtor's complaints did not justify further investigation and closed its files (App. I Nos. 98 and 152).

6. The debtor and D'Ambrosio repeatedly sought to use the debtor's alleged claim for administrative expense as a bargaining chip to dissuade the trustee from administering the probate asset (App. I Nos. 31, 36, and 40).

price of $23,500 (App. I No. 118).[7] In the notice, the trustee stated that she believed the sale price to be fair and reasonable given the contentious posture of the probate estate, the costs of litigation in a distant forum (including the expense of determining whether the putative claims against the executrix were well-founded), the likelihood of success, the delay that litigation would entail, and the ability to collect if litigation were to be successful. The trustee noticed the debtor and all creditors of the sale and provided an opportunity to bid or object (App. I No. 118).

Despite being afforded an opportunity to do so, the debtor did not bid on the probate asset (App. I No. 118). Instead, she filed objections to the trustee's notice of sale on her own behalf and through counsel (App. I No. 121 and 122). In her objections, the debtor abandoned the mantra that Daniels, she, and D'Ambrosio had repeatedly urged to the trustee, her counsel, and the court—that the debtor's putative claims against the executrix were essentially without realizable value to the estate—and did a complete about face. The debtor now insisted that her putative claims against the executrix had substantial value, that collection of that value was secured by a bond posted in the probate estate, and that the trustee, as a fiduciary of the debtor, was obligated to recover that value by continuing the debtor's litigation against the executrix (App. I No. 121). In addition, the debtor alleged that the proposed sale violated public policy and was procured through fraud and collusion (App. I No. 122). The court added the debtor's motions, the trustee's notice of sale, and the debtor's objections to the February 2000 hearing.[8]

The court conducted the February 2000 hearing over two days and received testimony and evidence, most of which related to the issue of whether the trustee's sale of the probate asset to the alleged wrongdoer was reasonable and in the best interests of the estate (App. I No. 125). Armstrong and D'Ambrosio vehemently and aggressively represented the debtor's interests during the hearing (App. I No. 125). At the conclusion of the hearing, the court approved the trustee's notice of sale and overruled the debtor's objections (App. I No. 131). The court also granted summary judgment in favor of the trustee on her complaint to determine that the probate asset was property of the estate (App. I No. 131). The court denied the debtor's motions to compel abandonment and for relief from stay and the debtor's motions filed in the two pending adversary proceedings (App. I No. 131).

The court entered its orders on the matters determined at the February 2000 hearing between February 24 and February 28, 2000 (App. I Nos. 133, 134, 135, and 136). The debtor did not perfect her appeal of the court's order approving the sale (App. I Nos. 137 and 142). The order was

---

7. The trustee attributed no value to the debtor's putative claims against the executrix. Accordingly, the sales price represented the value of the debtor's interest in the undistributed assets of the probate estate. The sales price was slightly less than the amount set forth in the executrix' preliminary account because the trustee had determined through investigation that $23,500 was a more accurate valuation of the liquid and illiquid stocks that comprised the corpus of the probate estate (App. I No. 118). Although it is unclear from the record to what extent mounting legal fees incurred by the probate estate in its litigation with the Lickmans had negatively impacted the net worth of the probate estate at that time, it is clear that the probate estate was being adversely impacted by that litigation.

8. The court did not then schedule a hearing of the debtor's application for administrative expense.

thus a final order as to the trustee, Shain, the debtor, and all creditors.

On April 3, 2000, the district court dismissed the debtor's appeal of the October 18, 1999, sanctions order for the debtor's failure to file a brief (App. I No. 153). The debtor took an appeal of the district court's order to the court of appeals (App. I No. 162).

The district court's order dismissing the debtor's appeal was three pages in length and listed in its caption the district court case number; the bankruptcy court case number; and the parties, "Paula Lickman, Appellant vs. Marie E. Henkel, Trustee, Appellee" (App. I No. 153). The district court case number and the "vs." appeared on the same line of text (App. I No. 153). The district court order dismissed the appeal pending before it and directed the clerk to close the case (App. I No. 153).

The clerk of the district court served the order dismissing the appeal on the clerk of the bankruptcy court, trustee's counsel, D'Ambrosio, and possibly Armstrong (App. I No. 154, 155, 156, and 158). In any event, Armstrong obtained a copy of the district court order and faxed it to Daniels or Lickman, or both of them (App. I No. 157).

Either Daniels or Lickman, or both of them, then altered the district court order by deleting from the caption the line of text containing the district court case number and the "vs." so that the order appeared to direct the bankruptcy court clerk to close the debtor's bankruptcy case rather than to direct the district court clerk to close the appellate case ("altered district court order")(App. I No. 161). The altered district court order also had

Armstrong's fax legend on the bottom of its first page (App. I No. 161).

Either Daniels or the debtor, or both of them, altered the district court order to facilitate their planned actions in the Pennsylvania courts. They had been unsuccessful in achieving their objective in the bankruptcy court—to preserve the debtor's interest in the probate asset, particularly the putative claims against the executrix. Even worse, the bankruptcy court had entered orders that enjoined the debtor from proceeding in the Pennsylvania courts. Daniels and the debtor hoped that closing the debtor's bankruptcy case would negate these adverse determinations against the debtor. At a minimum, Daniels and the debtor believed that their future efforts would be immeasurably easier if the debtor could proceed in the Pennsylvania probate court without hindrance by the trustee, trustee's counsel, or the bankruptcy court.[9]

This was important to Daniels and the debtor because the Pennsylvania probate court's trial of the Lickmans' motion to remove the executrix and substitute the debtor was scheduled for May 2000 (App. I No. 83). Daniels and the debtor hoped that a successful resolution of that trial would position the debtor to launch a renewed attack on Shain and to recover or recoup the debtor's interest in the probate asset.

On April 24, 2000, therefore, D'Ambrosio filed the debtor's "notice of filing" asking the court to take notice of the district court's order entered on April 3, 2000, that "directed that the [bankruptcy] case be closed." (App. I Nos. 160 and 161).

---

**9.** Although Daniels and the debtor's strategy is patently obvious from the record, it was premised on an erroneous view of the law. As the court notes in Section II.C., *infra*, 28 U.S.C. § 959 and the *Barton* doctrine apply even after a bankruptcy case is closed and thus would have precluded Daniels and the debtor's planned actions in the Pennsylvania courts regardless of whether the debtor's bankruptcy case was pending or closed.

D'Ambrosio attached a copy of the altered district court order to his notice with the knowledge that it had been altered and in the hopes that the bankruptcy court would close the debtor's bankruptcy case in reliance on the altered district court order (App. I Nos. 160 and 161). D'Ambrosio filed the notice to assist and facilitate Daniels' and the debtor's planned and pending actions in Pennsylvania (App. I Nos. 160 and 161).

A week later, the debtor filed in a pending adversary proceeding her response to the trustee's motion to reschedule trial. That response requested that her bankruptcy case be closed (App. I Nos. 166). The debtor attached a copy of the altered district court order in which she circled the caption that contained the bankruptcy case number only and the last paragraph directing the clerk to close the case (App. I No. 166). The debtor filed the altered district court order with the knowledge that it had been altered and to assist and facilitate Daniels' and her planned and pending actions in Pennsylvania (App. I No. 166).

The court did not act on either of these papers because they did not present a request for relief as required by F.R.B.P. 9013. In May 2000, the Pennsylvania probate court conducted its trial of the Lickmans' motion to remove the executrix and substitute the debtor as well as the executrix' motion to invoke the in terrerom clause against the Lickmans (App. I No.

171). At the conclusion of the trial, the Pennsylvania probate court took the matter under advisement (App. I No. 171).

In March 2000, D'Ambrosio filed motions to withdraw as the debtor's attorney, citing the debtor's inability to pay additional attorney's fees and the apparent futility of seeking relief in the bankruptcy court (App. I No. 150).[10] The court denied these motions after notice and hearing (App. I No. 167).

In April 2001, the court of appeals affirmed the district court's order dismissing the debtor's appeal of the October 18, 1999, sanctions order (App. I No. 196). The October 18, 1999, sanctions order was thus a final order as to the debtor and the trustee.

By the end of Phase I, the trustee had conclusively and finally determined that the probate asset was property of the estate and had administered the probate asset by selling it to Shain (App. I No. 118). In reaching this point, the bankruptcy estate had incurred $46,299.45 in attorney's fees and costs for services to the estate (App. I Nos. 30, 33, 34, 35, 36, 37, 38, 43, 44, 46, 48, 50, 52, 53, 55, 57, 60, 86, 88, 89, 90, 93, 94, 96, 100, 101, 102, 105, 106, 112, 114, 116, 117, 118, 120, 142, 145, 150, and 160).

It appeared that the only remaining matters in the debtor's bankruptcy case were the allowance of claims and distribution of the estate to creditors.

---

**10.** Contrary to the provisions of F.R.B.P. 2016(b), D'Ambrosio never filed a statement of compensation (App. I No.). D'Ambrosio, Wiley, and Armstrong each testified that they did not have a written agreement with the debtor for the payment of attorney's fees (App. I Nos. 27, 70, and 190). If the trial testimony of D'Ambrosio, Wiley, and Armstrong were accepted on its face, it would appear that each attorney performed extensive services on behalf of the debtor in con-

tentious and lengthy litigation with the trustee and/or the executrix for little of no compensation.

To the contrary, at least as to D'Ambrosio, the record in its totality supports the conclusion that he received and/or was owed compensation for his services (App. I No. 27). The record also supports a conclusion that Daniels paid and/or promised to pay attorney's fees to D'Ambrosio for his services to the debtor (App. I No. 27).

### D.

*Phase II: Early 2001—Present.*

Daniels, the debtor, and D'Ambrosio had exhausted all of their legal remedies to redress the adverse rulings of the bankruptcy court determining that the probate asset was property of the debtor's bankruptcy estate and approving its sale to Shain. Daniels and the debtor, however, were unfazed. Daniels again went looking for someone to assist his and the debtor's efforts to recover or recoup the value of the probate asset. Daniels obtained on behalf of the debtor the services of Wiley, a Pennsylvania attorney specializing in attorney malpractice (App. I No. 189 and 190).

Daniels and the debtor initially planned to prosecute malpractice claims against the debtor's Pennsylvania attorneys (App. I No. 189). They soon modified the plan, however, to include collateral attacks on the sale of the probate asset and on the trustee and her counsel for their administration of the probate asset (App. I No. 190).

In an effort to assist this new strategy, Daniels placed in a legal periodical several advertisements that sought ammunition with which to attack the integrity of the Orlando bankruptcy court (App. I No. 194). Daniels also actively participated in the planning and drafting stages of this phase (App. I No. 191, 192, and 193). Wiley relied extensively on Daniels and the debtor for information concerning the debtor's bankruptcy case and made little or no attempt to verify the information by reviewing the court record or consulting with D'Ambrosio (App. I No. 192).

Wiley first withdrew the Lickmans' motion to remove the executrix and substitute the debtor that had been pending underadvisement in the Pennsylvania probate court for almost a year after it was tried (App. I No. 195). He then sought and obtained in the Pennsylvania probate court a determination in the Lickmans' favor of the executrix' motion to eliminate the Lickmans as beneficiaries of the probate estate (App. I No. 195).

Wiley next filed in the Pennsylvania probate court the Lickmans' motion to void and declare unenforceable the trustee's sale agreement (App. I No. 200). Daniels drafted all or substantially all of this motion (App. I No. 200). The motion contained complaints about the trustee's sale of the probate asset and also quoted the language contained in the bankruptcy court's October 18, 1999, sanctions order enjoining the debtor from taking any action to interfere with the trustee's administration of the probate asset (App. I No. 200).

The Lickmans' motion attacking the trustee's sale of the probate asset triggered an immediate response by trustee's counsel who sent a letter to Wiley citing the court's October 18, 1999, sanctions order and demanding that Wiley withdraw the motion (App. I No. 201). On June 8, 2001, Wiley sent a letter to the probate court stating his inability to withdraw the motion and asking the court's advice as to how to proceed (App. I No. 203). Shortly after, the Pennsylvania probate court dismissed the Lickmans' motion to void or declare unenforceable the trustee's sale agreement without prejudice to their right to challenge the validity of the sale agreement at a future date (App. I No. 206).

This sequence of events confirmed for Daniels, the debtor, and Wiley the trustee's continued intention to defend and protect in the Pennsylvania probate court the bankruptcy estate's entitlement to the probate asset. Accordingly, the debtor and D'Ambrosio resumed their efforts to close the debtor's bankruptcy case. On June 11, 2001, D'Ambrosio filed the debtor's motion

to close the debtor's bankruptcy case (App. I No. 204). Notably, this motion did not refer to, rely on, or attach the altered district court order (App. I No. 204).

Having failed to obtain immediate relief in the Pennsylvania probate court, Daniels, the debtor, and Wiley sought an alternative means of recovering or recouping the value of the probate asset for the debtor's benefit. On June 15, 2001, Wiley filed in the Pennsylvania federal district court the debtor's complaint seeking compensatory and punitive damages from the trustee, trustee's counsel, the executrix, and executrix' counsel ("Pennsylvania damages action") (App. I No. 207). The debtor's complaint asserted claims of civil conspiracy, abuse of process, and intentional interference of the debtor's right to access to judicial process (App. I No. 207). The complaint contained specific references to the bankruptcy court's October 18, 1999, sanctions order (App. I No. 207 and 208). Although the complaint did not name the bankruptcy judge as a party, it alleged that the bankruptcy judge had "knowingly assisted" the trustee and her counsel in "their conspiratorial schemes" (App. I No. 208). Daniels drafted the complaint, and Wiley signed and filed it without substantial modification (App. I No. 208).

It is worthy of note that Daniels had boasted to S. Concannon that he could draft a complaint against an attorney that compelled the attorney's professional liability carrier to deny coverage (App. I No. 103). A review of the complaint Daniels drafted and Wiley filed reveals that this is precisely what Daniels sought to do.

On June 20, 2001, the trustee filed an emergency motion for sanctions against Daniels, the debtor, D'Ambrosio, and Wiley for willful violations of the automatic stay (App. I No. 211). The trustee attached to her motion a copy of the debtor's complaint filed in the Pennsylvania damages action (App. I No. 207). The trustee also filed an objection to the debtor's application for administrative expense (App. I No. 213).

On June 22, 2001, the bankruptcy court entered sua sponte an order of recusal. The order was signed by both bankruptcy judges in the Orlando division of the Middle District of Florida (App. I No. 212). The chief judge then assigned the debtor's bankruptcy case to the undersigned judge (App. I No. 214). The court directed the parties to file responses to all pending motions and scheduled an evidentiary hearing for August 2001 (App. I No. 217).

Notwithstanding the trustee's motion for sanctions, Daniels, the debtor, and Wiley continued to prosecute actively the debtor's Pennsylvania damages action (App. I Nos. 216 and 218). The trustee's clear intention to oppose this action, however, meant that their efforts were going to be both time-consuming and expensive to prosecute. Wiley had been providing his legal services on a contingency fee basis without any written retainer agreement (App. I No. 190). In an apparent effort to fund the debtor's Pennsylvania litigation, Wiley filed in the Pennsylvania probate court the Lickmans' motion seeking a partial distribution from the probate estate to the debtor in the amount of $10,000, asserting as a basis the debtor's inability to pay Wiley's fees (App. I No. 224).[11]

On August 2, 2001, the trustee filed a notice of withdrawal of her motion for sanctions indicating her intention to seek the same relief against the defendants through an adversary proceeding (App. I No. 223). The trustee then filed this adversary proceeding on August 8, 2001

---

11. The Pennsylvania probate court ultimately denied the motion finding that the debtor had no standing in the probate estate (App. I No. 338).

(App. I No. 227). In her complaint, the trustee sought monetary and injunctive relief on theories that the defendants had violated the automatic stay, the October 18, 1999, sanctions order, 28 U.S.C. § 959, and the *Barton* doctrine, among others (App. I No. 227).[12]

About the same time, Wiley filed on the debtor's behalf in the Pennsylvania federal district court a second civil action (App. I No. 225). Daniels drafted all or substantially all of this complaint (App. I No. 225). This action sought declaratory relief that the trustee's sale of the probate asset was void or unenforceable ("Pennsylvania declaratory relief action") (App. I No. 225). Although the complaint did not specifically reference the bankruptcy court's October 18, 1999, sanctions order, it contained general references to the October 14, 1999, evidentiary hearing at which the court made its ruling memorialized in that order (App. I No. 225).

On August 10, 2001, this court conducted an evidentiary hearing of all motions then pending in the debtor's bankruptcy case. At that time, neither the court nor the trustee and her counsel knew of the recent filing of the Pennsylvania declaratory relief action. At the conclusion of the hearing, the court took under advisement the debtor's application for administrative expense and the trustee's objection (App. I No. 229).[13] Upon D'Ambrosio's request, the court abated the debtor's motion to close her bankruptcy case (App. I No.

230). Daniels accosted the trustee in the parking lot after the hearing and thrust at her process for the newly-filed Pennsylvania declaratory relief action (App. I No. 231).

The trustee's complaint for injunctive and compensatory relief filed in the bankruptcy court in this adversary proceeding was a potential impediment to Daniels', the debtor's, and Wiley's continued prosecution of the Pennsylvania damages and declaratory relief actions. Accordingly, Wiley prepared to file a request for temporary restraining order in the Pennsylvania damages action to enjoin the trustee from prosecuting in the bankruptcy court this adversary proceeding against the defendants (App. I No. 245).

Upon learning of Wiley's intention to seek this relief, the trustee filed an emergency request for temporary restraining order without notice or hearing (App. I Nos. 245, 246, and 247). On September 6, 2001, the court issued a temporary restraining order that enjoined the debtor and Wiley from taking or prosecuting any actions against the trustee or her counsel or to void the trustee's sale of the probate asset (App. I No. 247). The court also scheduled a hearing on the trustee's motion for preliminary injunction (App. I No. 247).

Despite actual notice of this court's temporary restraining order, Wiley submitted to the Pennsylvania federal district court his request for temporary restraining or-

---

12. The trustee also alleged non-core claims for contempt and abuse of process. The court is abstaining from determining those claims, and they are therefore not included in this decision (App. 1 Nos. 306, 307, and 308).

13. On February 21, 2002, the court determined the trustee's objection to the debtor's application for administrative expense in the trustee's favor and disapproved the debtor's application (App. I No. 320). The debtor did not take a timely appeal of this order (App. I

No. 323). Following the entry of the order, Daniels filed in the Florida state court a civil action against the undersigned judge and the district judge who had handled the appeal of the October 18, 1999, sanctions order (App. I No. 324). The action was removed to federal court in the Southern District of Florida and dismissed. Case No. 02–80310–CIV–ZLOCH. The court of appeals affirmed the dismissal. Case No. 02–16523.

der (App. I No. 248). When Wiley informed the Pennsylvania district court of the bankruptcy court's temporary restraining order, the Pennsylvania district court convened a telephonic hearing (App. I Nos. 248 and 251). At that hearing, the Pennsylvania district court signaled its reluctance to act in derogation of the bankruptcy court's temporary restraining order (App. I No. 251).

When it became apparent to Wiley that the district court would not grant his request for relief, Wiley sought to preserve the benefit of having filed the Pennsylvania damages action (App. I No. 251). Upon Wiley's request, the Pennsylvania district court dismissed the Pennsylvania damages action without prejudice and without a running of the statute of limitations (App. I No. 252). The Pennsylvania district court, however, ordered that the damages action was considered to be active and the parties were to continue with discovery and settlement discussions (App. I No. 252).

Wiley soon thereafter voluntarily dismissed the Pennsylvania declaratory relief action (App. I No. 232).

Having been temporarily stymied by this court's entry of the temporary restraining order, Daniels, the debtor, D'Ambrosio, and Wiley needed to take another tack. Accordingly, D'Ambrosio filed in the bankruptcy court the debtor's motion to remove the trustee and the debtor's "certification" in support of the motion (App. I Nos. 249 and 250). In her "certification", the debtor made a plethora of vitriolic accusations against the trustee, her counsel, and the court that were unsupported and unfounded (App. I No. 250).

On September 12, 2001, D'Ambrosio, Wiley, and trustee's counsel attended a telephonic hearing in the bankruptcy court of a motion to continue the hearing on the trustee's motion for preliminary injunction (App. I Nos. 255, 258, and 259). During that hearing, D'Ambrosio and Wiley, on behalf of themselves and the debtor, agreed to the entry of a preliminary injunction that continued the terms of the temporary restraining order until the court determined the merits of this adversary proceeding (App. I No. 259). They also agreed to trial dates in November 2001 (App. I No. 259).

The next day, the court entered an agreed preliminary injunction that enjoined the debtor and Wiley from taking or prosecuting any actions against the trustee or her counsel or to void the trustee's sale of the probate asset. The court also entered an order scheduling a trial of this adversary proceeding and consolidating it for trial with the debtor's motion to remove the trustee (App. I No. 261).

The court's entry of its preliminary injunction and the fixing of a date certain for trial prompted the defendants to move more aggressively to eliminate or impede the trustee's and her counsels' ability to interfere with Daniels', the debtor's, and Wiley's pending and planned actions in Pennsylvania. Daniels, the debtor, and D'Ambrosio filed motions to dismiss the trustee's complaint (App. I Nos. 263 and 272). The debtor and D'Ambrosio filed motions for relief from the order granting preliminary injunction (App. I No. 278). Finally, Daniels, the debtor, and D'Ambrosio filed motions to disqualify the undersigned judge citing bias (App. I Nos. 282 and 283). The court denied each of these motions (App. I Nos. 265, 286, and 288).

Daniels sought reconsideration of the court's order denying his motion to dismiss the trustee's complaint (App. I No. 274). In accordance with established practice, Daniels sent a courtesy copy of his motion to the undersigned judge (App. I No.

280).[14] The courtesy copy contained material that was not included in the original motion filed with the clerk in Orlando (App. I No. 280). The additional material stated that the U.S. Attorney in Orlando, Florida, had opened a criminal investigation of the trustee's and her counsel's actions in this bankruptcy case (App. I No. 280). The additional material cautioned the court that it might "well find itself in an extremely embarrassing situation for having rush [sic] to the aid of these criminals." (App. I No. 280). On October 12, 2001, the court entered an order disclosing this ex parte communication from defendant Daniels and directing Daniels to cease all further ex parte communication with the court (App. I No. 281).[15] The court also denied Daniels' motion for relief from order denying motion to dismiss (App. I No. 277).

The trial date was approaching, and the defendants' options were narrowing. Daniels, the debtor, and D'Ambrosio readied themselves to make a last ditch effort to impede, delay, or avert the trial. First, D'Ambrosio filed a motion to withdraw as debtor's counsel, citing as the basis the conflict of interest inherent in being named in this adversary proceeding as a co-defendant with his client (App.I. No. 284).[16]

The court entered a preliminary order on D'Ambrosio's motion to withdraw providing the debtor with an opportunity to file an objection to the relief requested, failing which the court would grant the motion (App. I No. 287). The order specifically provided that the entry of an order allowing D'Ambrosio to withdraw would not constitute grounds for the continuance of the trial (App. I No. 288).

Although the debtor filed a response within the time allowed, she interposed no objection to D'Ambrosio's withdrawal but instead argued the merits of the adversary proceeding (App. I No. 292). The court thereafter entered an order granting D'Ambrosio's motion to withdraw and restating that D'Ambrosio's withdrawal would not constitute grounds for the continuance of the trial (App. I No. 293). The debtor did not seek reconsideration of this order (App. I No. 293).

Shortly thereafter, Daniels placed in a legal periodical several more advertisements seeking ammunition with which to attack the integrity of the Orlando and Tampa bankruptcy courts (App. I Nos. 295 and 317).

As of October 29, 2001, the bankruptcy estate had incurred an additional $68,804.81 in attorney's fees and costs for services to the estate (App. I Nos. 187, 194, 198, 200, 202, 204, 207, 212, 214, 224, 225, 227, 235, 236, and 249). There were additional attorney's fees and costs of $66,694.43 for services provided on the trustee's and her counsels' behalf (App I No. 207).

By this point, Daniels early promise to the trustee that the debtor's bankruptcy case would be too costly to administer had come to pass. The bankruptcy estate was hopelessly insolvent and the probate asset

---

14. To avoid unnecessary delays, the parties submitted to the undersigned's chambers in Tampa courtesy copies of all papers filed with the clerk in Orlando.

15. In flagrant disregard of this order, Daniels continued to send ex parte papers to the undersigned judge during the pendency of this adversary proceeding, usually following the court's entry of an order adverse to the debtor's position. These communications contained allegations and commentary that were intended to intimidate the court (App. I Nos. 319, 343, and 388).

16. The alleged conflict obviously existed from the moment that the trustee first sought sanctions against the debtor and D'Ambrosio in June 2001 (App. I No. 211).

woefully inadequate to pay administrative claims. Unsecured creditors had no likelihood of receiving any distribution.

On November 13, 2001, the court conducted a telephonic final pretrial conference (App. I No. 303). Daniels and the debtor did not attend the conference (App. I Nos. 303 and 304).[17] Daniels and the debtor also did not comply with the mandatory pretrial disclosures as required by the court's trial scheduling order and F.R.Civ.P 26(a) and (f), incorporated by F.R.B.P. 7026 (App. I No. 306).

The next day the court entered a final pretrial order that established the issues to be tried, dismissed Daniels' counterclaim, disposed of pending motions, and continued the preliminary injunction until the court determined the adversary proceeding on its merits (App. I Nos. 306, 307, and 308). The order also provided that Daniels and the debtor would be limited at trial to calling witnesses and offering evidence that were listed or admitted by other parties at trial, who had previously testified or that had been admitted in prior proceedings before the court, or whose testimony or evidence was otherwise contained in the court record (App. I No. 306).

Less than a week before trial, the debtor filed a motion seeking a continuance in order to obtain counsel (App. I No. 302). The debtor asserted in her motion that she needed "weeks, if not months to locate substitute counsel . . . ." (App. I No. 302). Alternatively, the debtor proposed to withdraw her motion to remove the trustee if the trustee would dismiss the adversary proceeding, waive all fees and commissions, and close the debtor's bankruptcy case (App. I No. 302). The court denied the debtor's request for continuance (App. I No. 308). About the same time, Daniels and Wiley filed identical papers in which they refused to "consent to the entry of any order in the above-captioned non-core proceeding by this court . . . ." (App. I Nos. 296 and 309).[18]

Four days before trial, the debtor filed a notice of withdrawal of her motion to remove the trustee (App. I No. 310). She cited as the basis her inability to prosecute the motion without the benefit of counsel (App. I No. 310). On the same day, Daniels filed a motion in limine to dismiss this adversary proceeding (App. I No. 311). In his motion, Daniels asserted that the bankruptcy court was "acting ultra vires" and in derogation of a district court order (App. I No. 311). Daniels supported his motion with the altered district court order with knowledge that the order had been altered, to frustrate the trial of this proceeding, and to facilitate his and the debtor's planned and pending actions in Pennsylvania (App. I No. 312).

On the first day of trial, Daniels took the extraordinary step of filing in the district court—in the debtor's dismissed appeal to which he was not a party—a motion for an order against the trustee to show cause why she should not be held in contempt for prosecuting this adversary proceeding in derogation of a district court order (App. I No. 313).[19] Daniels supported his motion with a copy of the altered district court order with the knowledge that it had been

---

17. Indeed, the debtor changed her telephone number and instructed Wiley not to disclose her cellular phone number to the trustee, her counsel, or the court (App. I No. 304).

18. By the date Wiley filed his paper, the court had specifically held that the matters to be determined were squarely within its core jurisdiction and had abstained from determining all non-core matters (App. I No. 308).

19. Although Daniels represented in the motion that the debtor had read and joined in the request for relief, the debtor did not sign the motion (App. I No. 313).

altered, to frustrate the trial of this proceeding, and to facilitate his and the debtor's planned and pending actions in Pennsylvania (App. I No. 312).

On November 20, 2001, the district court entered an order to show cause as to why Daniels should not be held in contempt for misleading the district court by submitting in support of his motion an order that had been altered. The district court otherwise took no action on Daniels' motion (App. I No. 315).

At the beginning of the trial of this adversary proceeding, the court first considered the debtor's notice of withdrawal of her motion to remove the trustee. The court treated the notice as a motion to dismiss the contested matter initiated by the debtor's motion to remove the trustee pursuant to F.R.Civ.P. 41(a)(2), incorporated by reference in F.R.B.P. 7041, and made applicable by F.R.B.P. 9014. The plaintiff requested that the court dismiss with prejudice the debtor's motion to remove the trustee.[20] Following argument by the parties, the court granted the motion to dismiss and denied the debtor's motion to remove the trustee with prejudice (App. I No. 314).

The court then conducted the trial of this adversary proceeding over a three day period between November 19 and November 28, 2001. At the conclusion of the trial, the court took the matter under advisement (App. I No. 314). Immediately following the trial, Daniels filed a motion to strike as an exhibit the altered district court order that he had attached to his motion to show cause filed in district court (App. I No. 318).[21]

The parties next filed post-trial briefs and memoranda in support of their positions (App. I No. 316). The plaintiff also filed a motion to strike Daniels' and the debtor's post-trial submissions because the submissions contained purported factual recitations that were not part of the record or evidence and that were also precluded by the court's final pretrial order (App. I No. 316).

The parties have continued to litigate actively in this adversary proceeding following the conclusion of the trial. In particular, Daniels, the debtor, and Wiley have continued their efforts to recover or recoup the debtor's interest in the probate asset.

In May 2002, the debtor filed a second complaint with The Florida Bar against S. Concannon on account of his representation of the trustee in her administration of the probate asset (App. I No. 326). In June 2002, Wiley filed in the Pennsylvania probate court the Lickmans' second motion to attack the enforceability of the trustee's sale of the probate asset to Shain (App. I No. 329). Wiley also filed the debtor's motion to amend the complaint in the Pennsylvania damages action (App. I No. 327).

On July 11, 2002, the trustee filed in the bankruptcy court a motion for sanctions against the debtor and Wiley on account of their continued actions in the Pennsylvania courts taken in violation of the court's preliminary injunction (App. I No. 332). The court scheduled an evidentiary hearing of the trustee's motion for sanctions for August 13, 2002 ("sanctions hearing") (App. I No. 333).

20. The plaintiff made no request for attorney's fees and costs incurred in defending against the motion. As of that date, the estate had incurred $1,569.74, in attorney's fees and costs relating to this motion (App. I No. 249).

21. Of course, the exhibit that Daniels sought to strike is otherwise part of the bankruptcy court record, including its attachment to Daniels' own motion in limine filed in this proceeding (App. I Nos. 154, 161, 166, and 311).

Upon learning of the sanctions hearing, Wiley immediately sought in the Pennsylvania probate court a special and permanent injunction to enjoin the bankruptcy court from conducting the hearing (App. I No. 337). The Pennsylvania probate court denied Wiley's request (App. I No. 338).

Wiley then filed in the Pennsylvania superior court the debtor's appeal of the Pennsylvania probate court's order denying his request for special injunction, a motion for stay pending appeal, and an emergency motion for temporary restraining order to enjoin the bankruptcy court and from conducting the sanctions hearing (App. I No. 339 and 340).[22] Wiley also sent a letter to the bankruptcy court in an effort to dissuade it from conducting the sanctions hearing (App. I No. 334).

Wiley represented himself and the debtor at the August 13 sanctions hearing. At the conclusion of the hearing, the court took the matter under advisement (App. I No. 341). On August 19, 2002, the court entered a decision and order in which it determined that the debtor and Wiley had violated its preliminary injunction ("August 19, 2002, sanctions order") (App. I No. 343). The court awarded sanctions to the trustee and directed the debtor and Wiley to withdraw all papers that had been filed in the Pennsylvania courts in violation of the preliminary injunction (App. I No. 343). The debtor and Wiley filed a timely appeal of this order but did not seek a stay pending appeal (App. I No. 345).

Shortly after the entry of the August 19, 2002, sanctions order, Daniels reported that he filed with the Judicial Council a complaint of judicial misconduct against the undersigned judge and "[o]thers may be forthcoming." (App I No. 347). He also resumed his placement of advertisements in a legal periodical seeking ammunition to attack the integrity of the bankruptcy court (App. I Nos. 342, 353, 359, 375, and 378).[23] In addition, Daniels filed a second motion for disqualification of the undersigned judge citing bias (App. I No. 347). The court denied Daniels' motion (App. I No. 350).

On October 30, 2002, the debtor filed a motion to dissolve the preliminary injunction (App. I No. 356). The trustee opposed the motion on the grounds that the debtor and Wiley had continued to take actions adverse to the estate and in violation of the preliminary injunction even after the court had sanctioned them and directed them to cease their conduct (App. I No. 360). After carefully considering written submissions of the parties, the court denied the motion (App. I No. 363). The debtor and Wiley filed a timely appeal of this order (App. I Nos. 369 and 370).

Following the entry of this order, the debtor filed a second motion for disqualification of the undersigned judge citing bias (App. I No. 377). The court denied the debtor's motion (App. I No. 381).

On November 27, 2002, the plaintiff filed a motion for order of contempt against the debtor and Wiley for their failure to comply with the preliminary injunction and the August 19, 2002, sanctions order (App. I No. 361). In her motion, the trustee alleged that the debtor and Wiley had failed to pay the sanctions award and to withdraw papers that had been filed in the Pennsylvania courts in violation of the preliminary injunction (App. I No. 361). The trustee also alleged that the debtor and Wiley had continued to violate the preliminary injunction in derogation of the Au-

---

**22.** The Pennsylvania Superior Court did not act on these papers prior to the sanctions hearing (App 1 No. 346).

**23.** As time passed, Daniels became more pointed and direct in his attempt to intimidate the undersigned judge. (App. I Nos. 319, 324, 342, 344, 347, 353, 359, 371, 375, 378, and 390).

gust 19, 2002, sanctions order (App. I No. 361). Upon consideration of the motion and the parties' written submissions, the court determined that the relief requested by the plaintiff exceeded its authority (App. I Nos. 364, 365, 368, 371, 374, 376, and 377). Accordingly, the court entered an order directing the clerk to transmit the plaintiff's motion for contempt to the district court (App. I No. 382). That matter is presently pending in the district court.

In January 2003, the district court consolidated the debtor's and Wiley's appeals relating to the court's entry and continuation of the preliminary injunction and its August 19, 2002, sanctions order (App. I No. 373). On May 5, 2003, the district court entered an order affirming the bankruptcy court's August 19, 2002, sanctions order and its order denying the debtor's motion to dissolve preliminary injunction (App. I No. 391). Both the debtor and Wiley filed notices of appeal of the district court's order to the court of appeals (App. I No. 392).

Although the additional expenses incurred by the estate at and after the November 2001 trial in defending itself from the unlawful and baseless attacks by Daniels, the debtor, and Wiley are unknown and beyond the scope of this decision, it is obvious to any observer that they are substantial. This court can only determine here the amounts through October 2001, leaving for future determination in an appropriate matter or proceeding the amounts incurred by the estate after that time.

### E.

#### Jurisdiction.

The court has jurisdiction of the parties and the subject matter pursuant to the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq., 28 U.S.C. §§ 1334 and 157(a), and the standing order of reference entered by the district court. The proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b). The court's orders and judgment are subject to appellate review under 28 U.S.C. § 158.

### II.

The court must determine three issues in this adversary proceeding.[24] First, the court must determine whether the defendants violated the automatic stay. Second, the court must determine whether the defendants violated this court's October 18, 1999, sanctions order. As to each, the court must also determine whether any such violation caused damage to the bankruptcy estate justifying the imposition of sanctions. Third, the court must determine whether the defendants violated 28 U.S.C. § 928 and the *Barton* doctrine justifying the imposition of a permanent injunction.

### A.

#### Did the defendants violate the automatic stay?

The plaintiff contends that the defendants acted in concert to commit numerous violations of the automatic stay. The plaintiff asserts that the defendants violated the automatic stay by sending letters and making telephone calls to the trustee and her counsel, filing papers in the bankruptcy case and in other courts, filing disciplinary complaints with The Florida Bar, placing advertisements in *The Florida Bar News,* and initiating and prosecuting ac-

---

**24.** The court is abstaining from determining the trustee's claims for contempt and abuse of process and preserving them for future determination in another forum (App. I No. 308).

tions in Pennsylvania[25]—all intended to usurp control over estate property by intimidating, dissuading, or precluding the trustee from administering the probate estate asset (App. I Nos. 29, 30, 31, 33, 36, 41, 42, 43, 44, 48, 52, 53, 56, 64, 67, 88, 89, 93, 94, 96, 98, 101, 103, 111, 112, 114, 115, 116, 117, 121, 122, 123, 124, 150, 160, 161, and 166). The plaintiff seeks sanctions for these alleged violations and measures the sanctions she requests by the attorney's fees and costs the estate has incurred in defending against the defendants' actions.

The defendants argue that the automatic stay is not applicable to their actions.

1. *Does the automatic stay protect the estate against actions taken in the bankruptcy court?*

■ The defendants contend that the automatic stay does not preclude action taken in the bankruptcy court itself. They argue, therefore, that papers or pleadings filed in the bankruptcy case or in adversary proceedings cannot violate the automatic stay.

■ "The [automatic] stay ensures that all claims against the debtor will be brought in a single forum, the bankruptcy court." *In re Flack,* 239 B.R. 155, 162 (Bankr.S.D.Ohio 1999). "The [bankruptcy] 'case' is the basis for taking control of all pertinent interests in property, dealing with that property, determining entitlements to distributions, the procedures for administering the mechanism, and discharging the debtor." *Menk v. LaPaglia*

*(In re Menk),* 241 B.R. 896, 908 (9th Cir. BAP 1999).

■ Generally, the automatic stay, therefore, does not protect the debtor or property of the debtor's estate from actions taken in the bankruptcy case itself. The plaintiff, therefore, can establish no violation of the automatic stay as to actions taken by the defendants in this bankruptcy case and its adversary proceedings (App. I Nos. 44, 48, 93, 96, 111, 112, 114, 116, 117, 121, 122, 123, 124, 150, 160, 161, and 166).[26] Accordingly, the plaintiff has not established a claim for sanctions measured by attorney's fees and costs in the amount of $36,503.82 relating to the defendants' actions in Phase I and II taken in the bankruptcy case and its adversary proceedings (App. I Nos. 34, 36, 37, 38, 44, 46, 48, 50, 55, 60, 86, 90, 93, 96, 100, 102, 105, 106, 112, 114, 116, 117, 118, 120, 142, 145, 150, 160, 187, 198, 202, 207, 212, 214, 224, 235, 236, and 249).

2. *Does the automatic stay protect against actions taken by the defendants outside the bankruptcy court?*

■ "An examination of the legislative history of 11 U.S.C. § 362 reveals that 'the automatic stay is one of the fundamental protections provided by the bankruptcy laws.'" 3 *Collier on Bankruptcy,* ¶ 362.06 at 362–76 (15th ed. rev.2003). "Congress intended this provision to be liberally construed to fortify the protections of the automatic stay." *Flack,* 239 B.R. at 162. "The bankruptcy court has exclusive juris-

25. Although the court previously determined that the debtor violated the automatic stay by taking actions in the Pennsylvania probate court prior to October 1999, it reserved the issue of damages arising from those violations. The court also did not consider or determine whether the debtor's violations of the automatic stay were taken in concert with other actors or part of a pattern of conduct (App. I No. 77).

26. The plaintiff has not asserted any other claim in this adversary proceeding that would permit a recovery for the defendants' actions taken in the bankruptcy estate. For example, the plaintiff has made no claim for sanctions pursuant to F.R.B.P. 9011 or 28 U.S.C. § 1927.

diction to impose sanctions for violation of the automatic stay." *In re Benalcazar,* 283 B.R. 514, 521–23 (Bankr.N.D.Ill.2002).

■ "The automatic stay has dual purposes. It protects the debtor from its prepetition creditors by stopping 'all collection efforts, all harassment, and all foreclosure actions' ...." It similarly "protects all creditors by ensuring that the estate will be preserved against attempts by other creditors to gain an unfair advantage with respect to the payment of claims." *Martino v. First National Bank of Harvey (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 435 (N.D.Ill.1995).

The defendants contend that the automatic stay was not applicable to any of the actions at issue here because the defendants took those actions after the debtor received her discharge. In support of their argument, defendants cite Section 362(c)(2) of the Bankruptcy Code which terminates the automatic stay with respect to certain acts upon the entry of discharge.

■ The defendants' argument, however, ignores the provisions of Section 362(a)(3) and (c)(1) of the Bankruptcy Code. Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Section 362(c)(1) specifically provides that the automatic stay continues to protect estate assets until "such property is no longer property of the estate."

■ "The trustee ... takes control of all property of the estate in order to ... assure an equitable distribution of the property among creditors. This requires that no entity seek to interfere with these tasks by taking possession of or exercising control over property of the estate." 3 *Collier on Bankruptcy,* ¶ 362.06 at 362–76 (15th ed. rev.2003). Accordingly, "[t]he stay applies to attempts to obtain control

over tangible and intangible property. It also protects causes of action that are vested in the trustee." 3 *Collier on Bankruptcy,* ¶ 362.03[5] at 362–21 (15th ed. rev. 2003).

In *B.N.T. Terminals, Inc. v. Citibank,* 125 B.R. 963, 971 (Bankr.N.D.Ill.1990), the court emphasized the integral importance of the automatic stay as it relates to property of the estate:

> The court will not tolerate unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of control over, or permitting the dismemberment of property of the estate outside the provisions of the [Bankruptcy] Code. To do so would make a nullity of § 362 and what it attempts to accomplish as well as invite horrendous fraud upon the court.

■ Moreover, the automatic stay indefinitely protects property of the estate that has not been scheduled, as was the case with the probate asset. *Havelock v. Taxel (In re Pace),* 67 F.3d 187, 191 n. 7 (9th Cir.1995) [Property of the estate that was not scheduled prior to closing bankruptcy estates "was not 'abandoned' and therefore remained property of the estates *in custodia legis,* and continued as such until disposed of by the trustee(s)."]. *See also Compass Bank for Savings v. Billingham (In re Graves),* 212 B.R. 692, 696 (1st Cir. BAP 1997) [holding that abandoned property becomes part of the bankruptcy estate subject to the automatic stay upon the reopening of the bankruptcy case, absent a specific limitation in the order reopening].

■ It is plain, therefore, that the automatic stay applied to acts taken by the defendants outside the bankruptcy court in Phase I, prior to the time the trustee sold the probate asset, to assert or usurp control over the probate asset (App. I Nos. 29, 30, 31, 36, 37, 40, 41, 42, 43, 52, 53, 56, 57,

58, 64, 67, 88, 89, 94, 98, 101, 115, 129, and 152). Moreover, the automatic stay applied to acts taken by the defendants outside the bankruptcy case in Phases I and II, after the sale of the probate asset, because those acts were designed to and in fact did attack the estate's right to possession of the proceeds of the sale of the probate asset (App. I Nos. 194, 195, 197, 200, 207, 208, and 225). *B.N.T. Terminals*, 125 B.R. at 968 ["cash proceeds realized from the sale [of real property] constituted no more than a change in form of estate property"].

■ Finally, the defendants argue that, even if the automatic stay continued to protect the probate asset proceeds, it is inapplicable to the probate asset itself after the trustee sold the probate asset to Shain and converted the estate's interest into proceeds. The defendants contend, therefore, that actions taken in the Pennsylvania probate court to wrest control of the probate asset from Shain are not within the ambit of the automatic stay.

In support of this argument, the defendants point to O'Connell's withdrawal from the Pennsylvania probate case and his representation that "the trustee has no further interest in the probate estate or any litigation related thereto." (App. I No. 163). They argue that this withdrawal is evidence that the trustee herself conceded that she had no remaining interest in the probate asset after it was sold to Shain.

While it is true that O'Connell withdrew from the probate case after the sale of the probate asset was completed, that withdrawal was premised on the fact that the sale was final as to the trustee, Shain, the debtor, and creditors of the bankruptcy estate. The defendants have refused to accept the sale of the probate asset as final, however, and have continued to attack it collaterally in the Pennsylvania probate and federal district courts. Thus, the

defendants have rejected the factual predicate upon which O'Connell founded his withdrawal—the finality of the trustee's sale of the probate asset—while, at the same time, seeking to hold the trustee and her counsel to their withdrawal from the probate case. The inconsistency of the defendants' position is obvious.

The defendants also rely upon the sale agreement itself as support for their argument that their efforts in Phase II were directed solely towards the probate asset rather than the proceeds of the sale of that asset. For example, Wiley assured the bankruptcy court that the debtor's petition to void or make unenforceable the sale agreement "could have no effect upon the bankrupt estate for the obvious reason that the 'assignment of interest', unlike if the sale were reversed upon appeal from the bankruptcy court to the district court, *makes no provision* for the return of the $23,500 sale price." (App. I Nos. 256 and 257) (Emphasis added).

This argument is an example of the way in which the defendants consistently and deliberately misconstrue and distort applicable law. The defendants cite the very agreement they seek to void or undo as the basis for the supposed protection afforded to property of the estate. In the event the Pennsylvania court voids or declares unenforceable the trustee's agreement to sell the probate asset, however, the agreement could not control whether the proceeds were subject to return because its terms would be unenforceable or void.

Instead, as the court made clear in *In re Lickman*, 282 B.R. 709, 719 (Bankr. M.D.Fla.2002), principles of contract law would establish a claim for the return of the probate sale proceeds, and the executrix as fiduciary of the probate estate would be obligated to pursue that claim.

Thus, the defendants' attempts to attack collaterally the sale in the Pennsylvania state and district courts—regardless of whether those attacks are directed at the sale itself or the proceeds of that sale—clearly puts estate property (the proceeds of the sale) at risk. The automatic stay is plainly applicable in these circumstances.

Thus, the defendants' actions in sending letters and making telephone calls to the trustee and her counsel, filing disciplinary complaints with *The Florida Bar News,* and initiating and prosecuting actions in Pennsylvania are all prohibited by the automatic stay. It is important to note, however, that these actions violate the automatic stay because the totality of the circumstances in this case presents a unique and particularly egregious pattern of conduct that may not be applicable in other circumstances.

█ As to bar disciplinary complaints, the court is particularly mindful of the right of any member of the public to make complaint to The Florida Bar. In this case, however, the debtor made unfounded complaints to The Florida Bar solely as a means of asserting or obtaining rights to property of the bankruptcy estate. In these very particular circumstances, where the complaints have been determined to be without merit by The Florida Bar and when they were made for improper and illegitimate purposes, those complaints violate the automatic stay.

3. *Did the defendants violate the automatic stay by seeking to assert or usurp control over the probate asset?*

█ To establish a violation of the automatic stay, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that:

(1) a bankruptcy petition was filed;

(2) the defendants received notice of the petition;

(3) the defendants' actions were in willful violation of the automatic stay;

(4) the plaintiff is an "individual"; and

(5) the plaintiff suffered damages as a consequence of the defendants violations of the automatic stay.

*Flack,* 239 B.R. at 163.

█ In addition, because the plaintiff seeks to establish liability of the defendants jointly and severally, the plaintiff must also establish that:

(6) the defendants acted in concert in taking the acts about which complaint is made.

a. *Did the debtor file a bankruptcy petition?*

It is undisputed that the debtor filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code on March 27, 1998. Accordingly, the plaintiff has established this element as to all defendants.

b. *Did the defendants receive notice of the debtor's bankruptcy petition?*

The plaintiff contends that each of the defendants had notice of the debtor's pending bankruptcy case when they took the actions complained of in this proceeding. The defendants do not address this element in their post-trial briefs.

█ "Knowledge of the bankruptcy petition has been held to be the legal equivalent of knowledge of the automatic stay." *In re Lile,* 103 B.R. 830, 837 (Bankr.S.D.Tex.1989), *quoting Wagner v. Ivory (In re Wagner),* 74 B.R. 898, 903 (Bankr.E.D.Pa.1987). Notice of the bankruptcy petition "does not have to come through formal means." *Flack,* 239 B.R. at 163. For example, in *Flack* the court held that the debtor's telephone call informing the defendants of her bankruptcy filing constituted reasonable actual notice of the bankruptcy petition. *Id.* at 164.

The evidence and testimony in this proceeding establishes that each of the defendants knew of the bankruptcy case before they took the actions about which complaint is made. The debtor, D'Ambrosio, and Daniels had actual knowledge of the debtor's bankruptcy petition and the probability that her case would be reopened by August 13, 1999 (App. I Nos. 1 and 20). Similarly, Wiley had actual knowledge of the debtor's bankruptcy petition and the reopening of the case by May 24, 2001 (App. I No. 200). These dates preceded or were contemporaneous with the defendants' actions at issue in this proceeding.

c. *Did the defendants act in willful violation of the automatic stay?*

■ To establish wilfulness, the plaintiff must show that the defendants "intentionally committed the violative act." *Jove Engineering, Inc. v. Internal Revenue Service,* 92 F.3d 1539, 1555 (11th Cir.1996). *See also Lile,* 103 B.R. at 836 ["The term 'willful' has been construed to mean deliberate or intentional."]. The plaintiff does not need to show a specific intent to violate a court order but merely an intention to take the action about which complaint is made. *In re Xavier's of Beville, Inc.,* 172 B.R. 667, 671 (Bankr.M.D.Fla.1994). For example, in *In re Atlas,* 183 B.R. 978, 981 (Bankr.S.D.Fla.1995), the court found that willfulness was established by the filing of a complaint against the trustee outside the bankruptcy court without leave of the bankruptcy court.

The plaintiff contends that the defendants deliberately and intentionally sent letters and made phone calls to the trustee and her counsel, filed disciplinary complaints with The Florida Bar, placed newspaper advertisements in legal periodicals, initiated actions in the Pennsylvania federal district court, and filed papers in the Pennsylvania state and district courts with knowledge of the debtor's bankruptcy petition and the pendency of her case.

■ The defendants do not dispute that their actions were intentional and deliberate rather than inadvertent. They assert, however, that they were acting in good faith and in furtherance of their legitimate legal rights with a reasonable belief that the automatic stay did not apply. The motivation or belief of the party charged with violating the automatic stay, however, is irrelevant to the requirement that the action be taken willfully. In *Jove Engineering,* 92 F.3d at 1555, the court made clear that willfulness is established by the intentional commission of "the violative act, regardless of whether the violater specifically intended to violate the stay". *See also Flack,* 239 B.R. at 162 ["To establish a willful violation, it must be shown that the party knew of the bankruptcy filing and then took some action, without regard to whether the party had specific intent to violate the stay or acted in good faith based upon a mistake of law or a legal dispute regarding its rights."]; *Xavier's of Beville,* 172 B.R. at 671 ["A violation of the automatic stay is willful if the action is done deliberately; no specific intent to violate a court order is necessary."].

The court also notes that the legal theory upon which the defendants rely to support their position that they did not violate the automatic stay lacks "sound authority and is outrageous in these circumstances." *In re Kinney,* 51 B.R. 840, 847 (Bankr. C.D.Cal.1985). The defendants have repeatedly argued that their actions are justified because the executrix engaged in prohibited self-dealing when she purchased the debtor's putative claims against her. Ignoring for the moment that the debtor is collaterally estopped from making this argument, the court notes that the defendants misstate the law.

"The prohibition against self-dealing is absolute in order to avoid the possibility of fraud and to avoid the temptation of self-interest, and the rule applies irrespective of whether the [executrix] acted good faith or bad faith." 90 *Corpus Juris Secundum* Trusts § 336 (ed. rev. 2002). The executrix's self-dealing, however, "may be acquiesced in, or ratified by, the beneficiary as to estop him or her from repudiating it, provided the beneficiary is given a perfectly honest and complete disclosure of all the facts known to the trustee and no undue or inequitable advantage has been obtained." In other words, the "rule preventing [an executrix] from making a profit for himself or herself may be abrogated by an express or implied waiver, and [an executrix] may retain a personal profit gained from the [self-dealing] if he or she made [the transaction] with full knowledge, consent, and approval of the beneficiaries." *Id.* at § 335.

That is exactly what happened in this case.[27] The trustee held the debtor's interest in the Tibey Pfeiffer probate estate. The court entered final orders that divested the debtor of her interest in the probate asset and her ability to pursue claims in the probate court. The trustee was empowered (and required) to administer the probate asset for the benefit of the bankruptcy estate.

The trustee sold the debtor's interest to Shain after having conducted an investigation of the debtor's putative claims against Shain and evaluating the range of recovery, the probability of recovery, and the time and expense required to litigate those claims to judgment. The trustee determined that the sale price of the asset represented a reasonable value for that asset, including the debtor's putative claims against the executrix, because the claims were speculative and would require considerable resources and time to investigate and litigate with a concomitant diminution of the probate asset. The trustee also determined that, even if she were to litigate the debtor's claims against the executrix successfully, there would be difficulties in collecting any judgment.

The court reached the same conclusion following a lengthy and hotly contested evidentiary hearing. The court found that the trustee's sale agreement satisfied the conditions set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1549 (11th Cir.1990), and approved the sale.

The trustee was well aware that, in entering into the sale agreement, she was selling to the purported wrongdoer all of the debtor's interest in the Tibey Pfeiffer estate, including any claims against the executrix. This knowledge was reflected in the notice of sale (App. I No. 118). The trustee sold the probate asset to Shain with knowledge and consent—and with court approval. The defendants, therefore, can make no legitimate claim of self-dealing against the executrix.

For these reasons, each of the defendants acted intentionally in taking the actions at issue in this proceeding, and their "defenses" fail to justify their actions.

Indeed, "[w]hen reasonable, actual notice [of a bankruptcy petition] is received, it becomes [the defendant's] responsibility to ensure the stay is not violated . . . ." *Flack,* 239 B.R. at 163. "Once a party is put on notice of a bankruptcy filing, he is under a duty to seek further information which should reveal the appli-

---

**27.** For purposes of this discussion only, the court accepts the defendants' argument that Shain's purchase of the probate asset advan-taged her financially in some way, a fact that is otherwise not supported by the record in this case.

cability and scope of the automatic stay." *Lile,* 103 B.R. at 837. "The [defendant] takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court." *Id.*

Thus, the defendants had an affirmative obligation to seek clarification from the bankruptcy court as to the scope of the automatic stay before proceeding with any of the actions that they took outside the bankruptcy court. Similarly, they had an affirmative obligation to take action to correct the violations upon learning of the automatic stay. What the defendants did in contrast was *to continue* their unrelentless attacks *notwithstanding* being told at each turn by the bankruptcy court's rulings—affirmed when appealed—that their actions were unjustified and unlawful.

Daniels, of course, worked largely behind the scenes throughout these events, masking his personal interest in the probate asset by fraudulently holding himself out as an associate of D'Ambrosio. In addition, he created and designed the legal strategy that he, the debtor, D'Ambrosio, and Wiley implemented. He did not seek clarification from the bankruptcy court as to any action that he took.

D'Ambrosio filed a motion on the debtor's behalf to modify the automatic stay to pursue the debtor's claims against the executrix (App. I No. 116). He filed this motion, however, after his actions taken in violation of the automatic stay had failed. D'Ambrosio did not file the motion to seek clarification from the court but as a means to reach a result that he had not achieved through his actions taken in violation of the automatic stay. When the court denied the motion, D'Ambrosio did nothing to ameliorate his earlier actions taken in violation of the automatic stay.

The debtor was similarly unimpressed with the bankruptcy court's denial of the motion for relief from stay. Notwithstand-ing the entry of the court's order, she continued to assert rights in the probate asset through collateral attacks on the sale of the probate asset and on the trustee and her counsel for their administration of the probate asset.

Wiley made no effort to seek clarification or relief from the bankruptcy court before commencing actions in violation of the automatic stay. To the contrary, Wiley relied exclusively upon Daniels and the debtor for information about the debtor's bankruptcy case and made no attempt to corroborate that information by enquiring of the debtor's bankruptcy attorney or reviewing the debtor's bankruptcy court record (App. I Nos. 191, 192, 193, 200, 207, 208, and 225).

Even when the plaintiff's attorney warned Wiley that his actions violated the automatic stay, Wiley sought to preserve the benefit of those actions rather than to correct the violation. Wiley excuses his failure to dismiss or withdraw his papers filed in the Pennsylvania state and federal courts by pointing out he could not do so without court approval (App. I No. 203). He offers no reason, however, why he could not seek that approval. Rather than affirmatively dismissing his papers, he sought "guidance" from the Pennsylvania courts through more informal means.

Although Wiley paid lip service to the automatic stay in his notifications to the Pennsylvania courts, he sought to advance the debtor's interests rather than to mitigate the harm caused to the bankruptcy estate by his actions. Wiley's manipulative actions are seen most clearly when, with actual notice of this court's temporary restraining order, he violated that order by seeking temporary injunctive relief against the trustee and her counsel in the Pennsylvania damage action while informing the district court of this court's tempo-

rary restraining order as if that insulated him from the consequences of his square violation of both the automatic stay and this court's order (App. I Nos. 248, 251, and 252). Wiley's corrective actions, such that they were, were insufficient given the totality of the circumstances and the history of the case.[28]

In these circumstances, the defendants' actions were thus substantially more egregious than those of a simply misguided party who acts without having first sought stay relief. The defendants continued their course of conduct even after this court informed them that their conduct was wrongful.

It is therefore clear that each of the defendants acted willfully in violating the automatic stay.

d. *Is the trustee an individual within the meaning of Section 362 of the Bankruptcy Code?*

 Section 362(h) of the Bankruptcy Code provides a remedy to an "individual" who has been damaged by a violation of the automatic stay. There is a split of authority as to whether a trustee is an individual within the meaning of Section 362(h) and thus eligible for damages under that section. Those courts that have answered the question in the negative have done so in reliance on the plain meaning of the statute. *See e.g., Sosne v. Reinert & Duree, P.C. (Just Brakes Corporate Systems, Inc.),* 108 F.3d 881, 885 (8th Cir. 1997); 67 F.3d at 193. For example, in *Pace,* the court reasoned that "the individual's status as trustee precludes any finding that the trustee suffered any damages as an individual, because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, *viz,* the

bankruptcy estate, and not by the trustee as a natural person." *Id.*

Other courts have answered the question in the affirmative, making an exception to the plain meaning rule, because "the literal application of [the] statute [would] produce a result demonstrably at odds with the intention of the drafters." *Garofalo's Finer Foods,* 186 B.R. at 439, quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). *See e.g., Cuffee v. Atlantic Business & Community Development Corp.,* 901 F.2d 325, 329 (3d Cir.1990); *Shimer v. Fugazy (In re Fugazy Express, Inc.),* 124 B.R. 426, 432 (S.D.N.Y.1991); *Nigro v. Oxford Development Co. (In re M.J. Shoearama, Inc.),* 137 B.R. 182, 190–91 (Bankr.W.D.Pa.1992); *In re M & J Feed Mill, Inc.,* 112 B.R. 985, 989–90 (Bankr.W.D.Mo.1990) [awarding trustee damages and punitive damages under Section 362(h)]; *Brodsky v. Independent Cement Corp. (In re Marine Pollution, Inc.),* 99 B.R. 210, 217–18 (Bankr. S.D.N.Y.1989) [awarding trustee damages and punitive damages under Section 362(h)]. In *Garofalo's Finer Foods,* the court reasoned:

> [T]here are many situations in which a creditor willfully violates the automatic stay by acting to take possession of estate property. Under section 704(a), the trustee is obligated to recover the property for the benefit of the estate .... If the trustee incurs legal expenses in recovering such property and cannot recover his fees from the party that violated the stay, either the estate will be depleted by the amount of the trustee's costs of recovery or the trustee will not be reimbursed for those costs. Either of these results is clearly undesirable.

---

**28.** Alternatively, even if Wiley's corrective actions mitigated the damage to the bankruptcy estate, that mitigation is reflected in the sanc-tions calculation set forth in Section II.A.3.e., *infra.*

By adopting a broader definition of "individual" ..., the court avoids these undesirable results while at the same time ensuring that the goal Congress certainly sought to create (i.e. the enforcement of the automatic stay) and the incentive it created to achieve that goal (i.e. the possible recovery of attorney's fees) are properly preserved.

*Id.* at 439.

The issue of whether a trustee can recover damages as an individual pursuant to Section 362(h) is with one exception, however, more a matter of semantics than of legal principle. Regardless of how the question is answered, there is no real dispute as to the trustee's ability to recover sanctions for violations of the automatic stay. Those courts that hold the trustee is not an individual within the meaning of Section 362(h)—and thus not entitled to mandatory damages under that section— liberally allow discretionary sanctions measured by damages and attorney's fees under Section 105(a) of the Bankruptcy Code. Section 105(a) "grants courts independent statutory powers to award monetary and other forms of relief for automatic stay violations to the extent such awards are 'necessary or appropriate' to carry out the provisions of the Bankruptcy Code." *Jove Engineering,* 92 F.3d at 1554.

The only circumstance in which it makes a difference whether a trustee is an individual within the meaning of Section 362(h) is when the trustee seeks punitive damages, as is the case here. Section 362(h) contemplates the recovery of punitive damages in certain circumstances. The imposition of punitive damages serves the general public interest in

protecting the sanctity of the automatic stay as opposed to providing compensation for a specific violation. It is reserved for those instances where the violators have "demonstrated egregious, vindictive or intentional misconduct." *Flack,* 239 B.R. at 163. Section 105(a), on the other hand, provides no authority for the imposition of punitive damages for violations of the automatic stay. *Jove Engineering,* 92 F.3d at 1559.

Our court of appeals has not yet ruled on the issue of whether the trustee is an individual within the meaning of Section 362(h). It has, however, considered the analogous question of whether a corporation is an individual under Section 362(h). Relying upon the plain meaning of the statute, it answered that question in the negative. *Id.* at 1560. In reaching its decision, the court of appeals was persuaded in part by the reasoning in *Pace,* 67 F.3d at 187. *Pace,* of course, adopts the plain meaning rule and holds that a trustee is not an individual under Section 362(h). *Id.*

Other courts in Florida have split on the issue. In *Atlas,* 183 B.R. at 981, the court held that the trustee is entitled to recover damages pursuant to Section 362(h). The court also left open the possibility of punitive damages. *Id.* The district court affirmed this decision without any discussion as to whether the trustee is an individual within the meaning of Section 362(h). *Guy v. Dzikowski (In re Atlas),* 222 B.R. 656, 659 (S.D.Fla.1998).[29]

On the other hand, in *Xavier's of Beville,* 172 B.R. at 672, the court relied upon Section 105(a) in assessing damages against a lessor who had taken possession

---

**29.** This decision was also appealed. The court of appeals, however, held that the bankruptcy court's order finding a violation of the automatic stay was not a final judgment because the court deferred its assessment of damages, including attorney's fees and costs. *Guy v. Dzikowski (In re Atlas),* 210 F.3d 1305, 1308 (11th Cir.2000). The court of appeals, therefore, did not address the question presented here.

of property of the estate in violation of the automatic stay. More recently, in *Feltman v. Menada, Inc. (In re Suncoast Towers South)*, 1999 WL 549678 (Bankr. S.D.Fla.), the court held explicitly that the trustee is not an individual within the meaning of Section 362(h) but can recover damages under Section 105(a). *Id.* at *15. The court, however, declined to award damages under Section 105(a) on the facts of that case because it had already compensated the trustee for his damages under alternate legal theories. *Id.*

Although the plaintiff argues that the public interest in upholding the automatic stay on behalf of a bankruptcy trustee is a fundamental principle that should fall within the exception of the plain meaning rule and justifies the trustee's recovery under Section 362(h), the state of the law in the circuit, as gleaned from *Jove Engineering,* seems to be that a trustee is limited to sanctions under Section 105(a) when confronted with a stay violation. The court will therefore limit its consideration to sanctions under Section 105(a) and will exclude reliance on Section 362(h) notwithstanding the defendants' egregious, vindictive, and intentional misconduct that would otherwise warrant punitive damages were Section 362(h) applicable.

e. *Was the plaintiff damaged by the defendants' violations of the automatic stay?*

■■■ The plaintiff seeks sanctions measured by attorney's fees and costs for services relating to the defendants' violations of the automatic stay. To justify compensatory sanctions, the plaintiff must show that the estate has suffered "actual injury as a result of the [defendants'] violation[s] of the automatic stay, and must relate that injury to the damages sought." *In re*

*Sumpter*, 171 B.R. 835, 844 (Bankr.N.D.Ill. 1994).

■■■ The defendants argue that the plaintiff's request for damages is excessive and not supported by expert testimony.

i. *Are the attorney's fees and costs a result of the defendants' stay violations?*

The plaintiff seeks sanctions in the amount of $145,294.82[30] measured by attorney's fees and costs in the following amounts: $17,958.18, representing services performed by court appointed professionals during Phase I; $17,420.32 representing services performed by court appointed professionals during Phase II;[31] $66,694.43 representing services performed by non-court appointed professionals on the trustee's or trustee's counsels' behalf during Phase II; and $43,221.94 representing services performed by court appointed professionals in prosecuting the trustee's motion for sanctions and this adversary proceeding.

The record establishes that the services for which attorney's fees and costs are sought would not have been necessary but for the defendants' actions. Accordingly, the plaintiff has established that the attorney's fees and costs sought are proximately caused and incurred by the defendants' violations of the automatic stay.

Indeed, these attorney's fees and costs do not reflect all of the services the trustee and her counsel were required to perform in response to the defendants' actions. They therefore do not fully compensate the plaintiff for the defendants' acts taken in violation of the automatic stay. The attorney time records offered in support of

---

**30.** This amount is calculated by subtracting $36,503.82 previously disallowed from the plaintiff's request for $181,798.69.

**31.** The court excluded $5,231.75 because there was insufficient evidence to relate these attorneys fees and costs to the defendants' misconduct (App. 1 No. 207).

the plaintiff's damages do not contain time entries relating to every violation of the automatic stay. It is clear, however, that the plaintiff and her counsel were required to—and did—perform services for the benefit of the estate as to each act.

ii. *Are the attorney's fees and costs actual and necessary costs of the estate?*

The amount of $35,378.50 in attorney's fees and costs were incurred by professionals whose employment has been approved by the bankruptcy court.[32] The record establishes that these attorney's fees and costs are actual and necessary costs of the estate. They are thus allowable administrative expenses of the bankruptcy estate pursuant to Section 503(b)(2) of the Bankruptcy Code. *Lickman,* 273 B.R. at 699.

The amount of $66,694.43 in attorney's fees and costs were incurred by attorneys whose employment has not been approved by the bankruptcy court (App. I No. 207). Further, the record is insufficiently developed to allow the court to make a determination that these attorney's fees and costs are actual expenses of the bankruptcy estate. It is unclear to what extent, if any, the trustee or her counsel are obligated to pay these attorney's fees and costs. At least some of these professionals are providing services pursuant to a professional liability insurance policy (App. I No. 207). These attorney's fees and costs are therefore not recoverable by the plaintiff as sanctions.

iii. *Are the attorney's fees and costs reasonable?*

■ It is unclear whether the court is required to determine reasonableness of attorney's fees under Section 330 of the Bankruptcy Code when the fees are

awarded as compensatory sanctions for violations of the automatic stay. *Grossman v. Rock Realty, Inc. (In re LaRoche),* 189 B.R. 22, (Bankr.D.R.I.1995) [imposition of sanctions is within sound discretion of the court, is highly fact driven, and is not governed by Section 330 of the Bankruptcy Code]. It would seem the better approach to do so, however, because the rules provide guidance to the court as to what is compensable and what is not. The court will therefore do so here.

■ The bankruptcy court typically uses the lodestar method in determining attorney's fees. *In re Howell,* 226 B.R. 279, 281 (Bankr.M.D.Fla.1998). "The lodestar method is based on multiplying the reasonable number of hours expended on services by a reasonable hourly rate." *Id.* "After calculating the fee according to the lodestar method, the court may consider other factors to adjust the fee upward or downward." *Id.*

■ These factors are enumerated in *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874, 878–79(11th Cir. 1990), to include:

(1) the time and labor required, (2) the novelty and difficulty of the legal questions, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorney, (10) the undesirability of the case, (11) the nature and length of the professional

---

**32.** The court calculates this amount by adding together attorney's fees and costs relating to

services performed in both Phase I and II.

relationship with the client, and (12) awards in similar cases.

*Id., quoting Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974).

The court has broad discretion in determining the reasonableness of attorney's fees. *Id.* at 878. In addition, the court need not "perform an 'hour-by-hour review' when it is 'impractical and a waste of judicial resources.' " *Howell,* 226 B.R. at 281, *quoting Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir.1994). *See also In re Holub,* 129 B.R. 293, 297 (Bankr. M.D.Fla.1991) [court "should not 'nickel and dime' professionals engaged by Chapter 7 trustees."]. "Likewise, the court should not 'second guess' professionals by substituting its judgment after the fact for that of the professional who was called upon to exercise judgment on the spot." *Id.* The bankruptcy court need not consider expert testimony in determining the reasonableness of attorney's fees. *In re McClanahan,* 137 B.R. 73, 74 (Bankr. M.D.Fla.1992).

The court has carefully and thoroughly reviewed the detailed time records of the trustee's counsel. They detail the services the attorneys performed for the benefit of the estate proximately related to the defendants' violations of the automatic stay. Applying the *Johnson* factors, the court concludes that the attorney's fees sought for those services are eminently reasonable.

It is apparent that the actions of counsel for the trustee were reasonable and moderate reactions to the defendants' actions. There is no duplication or overlap of services. This is particularly true with respect to the trustee's motion for sanctions and this adversary proceeding because all of the work performed in connection with the trustee's motion for sanctions was utilized in the reformation of that motion into the complaint filed in this adversary proceeding. The services provided were not excessive given the difficult circumstances in which the trustee found herself. Similarly, the hourly rates sought are consistent within the community for similar work.

In these circumstances, the estate has been harmed at least to the extent of $17,958.18 in attorney's fees and costs incurred by the estate for services relating to Daniels', the debtor's, and D'Ambrosio's violations of the automatic stay during Phase I, $17,420.32 in attorney's fees and costs incurred by the estate for services relating to Daniels', the debtor's, and Wiley's violation of the automatic stay during Phase II, and $43,221.94 in attorney's fees and costs incurred by the estate for services relating to the trustee's prosecution of the sanctions motion and this adversary proceeding. The court will therefore sanction these defendants in these amounts.

f. *Did the defendants act in concert to violate the automatic stay?*

The plaintiff contends that the defendants acted together to violate the automatic stay and should thus be held jointly and severally liable for the resulting damages. To establish that the defendants acted in concert, the plaintiff must show that the defendants had a "unity of interest and concert of action." *Kinney,* 51 B.R. at 845. In *Kinney,* the court determined that the defendants' multiple bankruptcy filings demonstrated a "common intent to violate the law." *Id.* at 845. In that case, members of the Kinney family had filed serial bankruptcy cases in an effort to obtain the protection of the automatic stay in an effort to forestall the bank's foreclosure of a single parcel of real property. *Id.* The court determined that the defendants' actions had to be "viewed as the acts of one entity, with many individuals carrying out these acts." *Id.*

As in *Kinney*, the totality of the evidence and testimony supports the conclusion that the defendants had a unity of purpose—to reserve or return to the debtor the probate asset, including the debtor's putative claims against the executrix. The totality of the evidence also supports the conclusion that the defendants acted together to achieve that purpose.

In Phase I, Daniels, the debtor, and D'Ambrosio worked together, under Daniels' direction, to discourage and undermine the trustee's administration of the probate asset.[33] Section I.C. above and the applicable events in Appendix I comprehensively illustrate and support the way in which these three defendants acted together during this phase. Daniels', the debtor's, and D'Ambrosio's willingness to use an altered court order in furtherance of their shared objective is especially telling evidence of their unity.

In Phase II, Daniels, the debtor, and Wiley worked together, under Daniels' direction, to attack collaterally the trustee's administration of the probate asset and to recoup or recover the asset.[34] Section I.D. above and the applicable events in Appendix I comprehensively illustrate and support the way in which these three defendants acted together during this phase.

In defense of the plaintiff's concert of action claim, D'Ambrosio and Wiley made much at trial of the fact that they had had no communication or contact with each other until both were named defendants in this adversary proceeding. This is irrelevant because D'Ambrosio and Wiley had uniquely different roles that each accomplished at different times through the common denominators of Daniels and the debtor. Regardless, D'Ambrosio and Wiley clearly understood and acted in furtherance of the shared objective in seeking to obtain rights to the probate asset.

The court is mindful of the precept that an attorney is generally not liable for the acts of his client. This is important because counsel should have freedom to advocate zealously on behalf of the client without fear of adverse consequences. That protection, however, exists within specific and ethical boundaries and is lost when counsel interjects himself into the dispute as a co-conspirator. At that point, counsel is no longer exercising independent *judgment but is instead assuming the role of actor in the dispute.*

In reaching its conclusion as to the roles D'Ambrosio and Wiley played in taking the actions at issue here, the court entertained two possibilities. The first was that one or both counsel were the unwitting dupes of Daniels and the debtor and did not understand the import of what they were doing. The second was that one or both counsel acted with a conscious knowledge and appreciation that the actions they were taking on the debtor's behalf were without a valid legal basis and had an improper purpose.

Having had both defendants in court on several occasions and having had an opportunity to observe them and make creditability determinations, the court concludes that both defendants acted with complete understanding of what they were doing and that their actions were for an improper purpose, notwithstanding their protestations to the contrary.

Both D'Ambrosio and Wiley allowed themselves to be manipulated and used for improper purposes by Daniels and the

---

33. There is no evidence that Wiley violated the automatic stay during this phase.

34. Although D'Ambrosio continued to support Daniels', the debtor's, and Wiley's efforts, there is no evidence that D'Ambrosio violated the automatic stay during this phase.

debtor. D'Ambrosio affirmatively and fraudulently misrepresented Daniels as an attorney or assistant associated with him who had authority to act in the debtor's bankruptcy case. Even worse, he filed an altered court document in the debtor's bankruptcy case to achieve an improper purpose. D'Ambrosio's actions were unreasonable and in derogation of his ethical obligations as an officer of the court.

Wiley also allowed himself to be manipulated and used for improper purposes by Daniels and the debtor. Both Daniels and the debtor are legally sophisticated and understand the concept of a final order. Both knew that the October 18, 1999, sanctions order was final, but nevertheless advanced and advocated untenable legal positions in the Pennsylvania state and federal courts for which they had no evidentiary support or for which they were unlikely to obtain evidentiary support. They advanced these positions for an improper purpose, to harass the trustee and cause unnecessary delay in the administration of the bankruptcy case, and to increase the costs of administering the bankruptcy case needlessly.

Wiley filed papers in the Pennsylvania courts on the debtor's behalf advocating these untenable legal positions. He did so without conducting any inquiry into the accuracy of the factual predicate upon which the debtor based her claim. Instead, Wiley relied solely upon what Daniels and the debtor told him. Wiley's reliance on Daniels and the debtor for the factual predicate was unreasonable and in derogation of his ethical duty to verify and investigate the claims he was asserting.

Wiley's uncorroborated reliance on the debtor and Daniels was especially unreasonable because the allegations Wiley made included scurrilous and outrageous allegations against a judge. In those circumstances, Wiley was duty bound to ensure there was a basis in fact to make these allegations. He did not do so but instead mindlessly and recklessly signed papers that contained the ugly accusations of Daniels and the debtor and then filed them in court actions.

Accordingly, the plaintiff has established by a preponderance of the evidence that Daniels', the debtor's, and D'Ambrosio's actions taken in Phase I had a clear nexus and were inextricably intertwined and must thus be viewed as the acts of one entity carried out by the individual defendants. Similarly, the plaintiff has established by a preponderance of the evidence that Daniels', the debtor's, and Wiley's actions taken in Phase II had a clear nexus and were inextricably intertwined and must thus be viewed as the acts of one entity carried out by the individual defendants. Joint and several liability is appropriate in these circumstances for Phase I, and joint and several liability is appropriate in these circumstances for Phase II.

### B.

*Did the defendants violate this court's October 18, 1999, sanctions order?*

The plaintiff contends that Daniels, the debtor, and Wiley violated this court's October 18, 1999, sanctions order by initiating and prosecuting actions in Pennsylvania (App. I Nos. 200, 207, and 225). The plaintiff seeks sanctions for these alleged violations and measures the sanctions she requests by the attorney's fees and costs the estate has incurred in defending against the defendants' actions.

"The court has the power to sanction for willful and intentional violations of its orders when the violations are made in bad faith." *Lickman*, 282 B.R. at 721, *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Glatter v. Mroz (In re Mroz)*, 65

F.3d 1567, 1575 (11th Cir.1995); *Lawrence v. Goldberg (In re Lawrence)*, 279 F.3d 1294 (11th Cir.2002); *In re Graffy*, 233 B.R. 894, 898 (Bankr.M.D.Fla.1999).

The court determined in Section II.A.3. above that Daniels, the debtor, and Wiley violated the automatic stay by filing actions in the Pennsylvania courts for the purpose of asserting rights in property of the estate. The court further determined in Section II.A.3.f. above that Daniels, the debtor, and Wiley acted in concert in taking these actions.

 The plaintiff asserts that Daniels, the debtor, and Wiley also willfully and intentionally violated this court's October 18, 1999, sanctions order by taking those actions. To prevail on this claim, the plaintiff must establish that the defendants had notice of the order, the order was clear as to its terms, and the defendants willfully violated the order in bad faith.

1. *Did Daniels, the debtor, and Wiley have notice of the October 18, 1999, sanctions order?*

The record reflects that Daniels, the debtor, and Wiley had notice of the bankruptcy court's October 18, 1999, order before they took actions about which complaint is made. Armstrong informed Daniels of the bankruptcy court's ruling immediately after the hearing concluded (App. 1 No. 80). Daniels also drafted the papers that Wiley filed in the Pennsylvania courts and included in the earliest paper a direct quote from the October 18, 1999, sanctions order that contained language enjoining the debtor from taking action in the Pennsylvania probate court (App. I No. 200). Wiley signed the papers thereby attesting to his having read the paper that referred to and quoted from the October 18, 1999, sanctions order (App. I No. 200). The debtor, of course, was represented by counsel at the sanctions hearing. Both she and her counsel received copies of the order (App. I No. 74, 75, 76, 77, 78, 79, 80, and 82). Accordingly, Daniels, the debtor, and Wiley had actual notice of the October 18, 1999, sanctions order.

2. *Was the order clear in its terms?*

 The October 18, 1999, sanctions order enjoined all parties in interest "from taking any further action that may affect or impair the bankruptcy estate's interest in the probate estate without prior approval of the Bankruptcy Court." (App. I No. 82). The defendants argue that the October 18, 1999, order is ambiguous because it does not specifically describe the prohibited actions. The defendants' argument is without merit.

The October 18, 1999, sanctions order was entered to prevent and preclude the debtor from interfering with the trustee's administration of the probate asset. The record made in support of the order established that the debtor had actively and affirmatively sought to assert control over the probate asset by filing papers in the probate court. Debtor's counsel vigorously presented the debtor's position at the hearing and underscored for the court the debtor's unwillingness to accept the bankruptcy estate's ownership and control of the probate asset. Counsel so strenuously asserted the debtor's position that the court was compelled to caution the debtor against taking further actions to interfere with the trustee's administration of the probate asset (App. I No. 74).

In these circumstances, the court was required to enter an order that was broad enough to prohibit any action that could interfere with the trustee's administration of the probate asset. The October 18, 1999, sanctions order accomplished this purpose. It identified the estate asset that was protected and prohibited any action

that would adversely affect its administration. Further, the order directed that no action could be taken without prior approval of the bankruptcy court, thereby setting up a procedure by which the debtor could seek to construe, clarify, or amend the order's terms.

In these circumstances, it is plain that the October 18, 1999, sanctions order specifically proscribed the very actions the defendants took. The order is clear as to its terms.

3. *Were Daniels', the debtor's, and Wiley's actions willful and in bad faith?*

■ The plaintiff must also establish that Daniels, the debtor, and Wiley acted willfully and in bad faith. In determining willfulness, the court can consider the entire history of the case. *Lickman,* 282 B.R. at 720, *citing Beck v. Bassett (In re Southeast Banking Corp.),* 204 F.3d 1322, 1331–32 (11th Cir.2000).

The record shows that Daniels, the debtor, and Wiley acted willfully in taking the actions about which the plaintiff complains for the improper purpose of interfering with the trustee's administration of the probate asset. Each of them knew or should have known that the court's October 18, 1999, sanctions order was a final order that prohibited their actions. Each of them acted in conscious disregard of that order.

■ To determine bad faith the plaintiff must show that the "attorney knowingly or recklessly raise[d] a frivolous argument, or argue[d] a meritorious claim for the purpose of harassing an opponent." *Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1320 (11th Cir.2002), *quoting Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998). Similarly, to establish the bad faith of a party the plaintiff may show that the party "delay[ed] or disrupt[ed] the

litigation or hamper[ed] enforcement of a court order." *Id.*

In *Tenneco Packaging,* the court determined that an attorney demonstrated bad faith in filing documents "saturated with invective," filled with "rude, demeaning remarks," and that contained "attacks upon the fitness of opposing counsel as a member of the bar." *Id.* at 1321. The court also noted that the documents were "strewn with generalizations and conclusory comments." *Id.* Similarly, Daniels drafted papers on the debtor's behalf that were replete with pejorative comments and accusations about the trustee, her counsel, and the bankruptcy court and their actions in administering the debtor's bankruptcy estate. Daniels prepared these papers specifically to delay and disrupt the trustee's administration of the probate asset and the distribution of the proceeds of its sale. Daniels prepared these papers on the debtor's behalf with her cooperation and concurrence.

Wiley signed and filed the papers drafted by Daniels in the Pennsylvania court actions. The papers were unfounded and without merit and were thus filed for "no purpose other than to harass and intimidate" the trustee, her counsel, and the bankruptcy court. *Id.* The improper purpose of these papers was evident on their faces. Nor can Wiley excuse his conduct on the basis that Daniels drafted the papers that he signed.

Our court of appeals has made clear that "[a]n attorney should not be an unreflecting conduit through which the opinions or desires of a client or witness are permitted to flow unchecked." *Id.* at 1327. The court cautioned that an attorney may not neglect "to employ his or her professional judgment to consider the plausibility and the appropriateness of what is asserted in the filed document." *Id.* ["[A]n attorney cannot silently acquiesce to a client who

demands that the attorney pursue measures in the litigation that conflict with applicable ethical provisions."].

 Wiley had an ethical obligation to ensure the papers he signed had a valid basis supported by facts for which he had evidence or could obtain evidence. Wiley did not meet this obligation.

Accordingly, the record establishes that Daniels, the debtor, and Wiley violated the October 18, 1999, sanctions order willfully and in bad faith.

4. *Sanctions.*

The plaintiff has established that Daniels, the debtor, and Wiley acted in concert to violate this court's October 18, 1999, sanctions order. The plaintiff seeks sanctions measured by attorney's fees and costs in the following amounts: $17,173.32, representing services performed by court appointed professionals;[35] and $66,694.43, representing services performed by non-court professionals on the trustee's or trustee's counsels' behalf (App. I Nos. 200, 207, and 225).

In Section II.A.3.e.ii. above, the court determined that the plaintiff was not entitled to recover as sanctions attorney's fees and costs of attorneys whose employment has not been approved by the bankruptcy court. The court also determined that the plaintiff was entitled to recover sanctions for attorney's fees and costs of attorneys whose employment has been approved by the bankruptcy court. The court further determined that those attorney's fees and costs were proximately related to Daniels', the debtor's and Wiley's wrongful actions, were actual and necessary costs of the estate, and were supported by the record and reasonable in amount.

In these circumstances, the estate has been harmed at least to the extent of $17,173.32 in attorney's fees and costs incurred by the estate for services relating to Daniels', the debtor's, and Wiley's violations of this court's October 18, 1999, sanctions order. The court will therefore sanction these defendants jointly and severally in this amount.

### C.

*Did the defendants violate 28 U.S.C. § 928 and the Barton doctrine?*

The plaintiff contends that Daniels, the debtor, and Wiley acted in concert to violate 28 U.S.C. § 959 and the *Barton* doctrine[36] by filing papers in the Pennsylvania probate court to void the trustee's sale of the probate asset to Shain, by filing and prosecuting the Pennsylvania damages action, and by filing and prosecuting the Pennsylvania declaratory relief action (App. I Nos. 200, 207, and 225). The central issue in each of these actions was the propriety and validity of the trustee's sale of the probate asset to Shain.

In *Barton v. Barbour*, 104 U.S. 126, 127, 26 L.Ed. 672 (1881), the Supreme Court held that suit cannot be brought against a receiver for his official actions without first obtaining leave of the court in which he was appointed. In *Carter v. Rodgers*, 220 F.3d 1249, 1253 (11th Cir.2000), our court of appeals, following an "unbroken line of cases" that extended the *Barton* doctrine to trustees or other court appointed or approved professionals being sued for acts performed in their official capacities.

The court explained the policy behind requiring a litigant to obtain leave of the

---

**35.** The court excluded $5,231.75 because there was insufficient evidence to relate these attorneys fees and costs to the defendants' misconduct (App. 1 No. 207).

**36.** *Barton v. Barbour,* 104 U.S. 126, 127, 26 L.Ed. 672 (1881).

204

bankruptcy court before initiating an action against a bankruptcy trustee:

> If [the trustee] is burdened with having to defend against suits by litigants disappointed by his actions on the court's behalf, his work for the court will be impeded .... Without the requirement [of leave], trusteeship will become a more irksome duty, and so it will be harder for courts to find competent people to appoint as trustees. Trustees will have to pay higher malpractice premiums, and this will make the administration of the bankruptcy laws more expensive .... Furthermore, requiring that leave to sue be sought enables the bankruptcy judges to monitor the work of the trustees more effectively.

*Carter*, 220 F.3d at 1252–53, *quoting In re Linton*, 136 F.3d 544, 545 (7th Cir.1998).

Thus, *Carter* squarely holds that a litigant must *first* obtain leave from the bankruptcy court before suing a trustee (or her court-appointed counsel) on account of their official acts. *Id.* at 1253. "Consent of the appointing bankruptcy court is required even when the plaintiff seeks to sue in another federal court." *In re Krikava*, 217 B.R. 275, 279 (Bankr. D.Neb.1998). Indeed, consent is required even when the bankruptcy case is closed. *Linton*, 136 F.3d at 545.

Section 959(a) of Title 28, United States Code, provides a limited "carrying on business" exception to the *Barton* doctrine. This exception permits suits against "[t]rustees, receivers or managers of any property, without leave of the court appointing them, with respect to any of their acts or transactions in carrying out the business connected with such property."

Our court of appeals has emphasized that this exception is indeed limited:

> The "carrying on business" exception in section 959(a) is intended to "permit

actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store." *[In re] Lehal Realty Assocs.*, 101 F.3d [272] at 276 [(2d Cir.1996)]. Section 959(a) does not apply to suits against trustees for administering or liquidating the bankruptcy estate.

*Carter*, 220 F.3d at 1254.

The debtor and Wiley contend that their actions do not violate the *Barton* doctrine. They do not contend that the Section 959(a) exception applies, as it obviously does not on these facts. Instead, they argue that, because the actions allege fraud and conspiracy of the trustee and her counsel in the sale of the probate asset, they were ultra vires actions that did not implicate the jurisdiction of the bankruptcy court.

In terms of their theories, the Pennsylvania probate action and the Pennsylvania damages and declaratory relief actions are classic, "run-of-the-mill" *Barton* actions. In them, Daniels, the debtor, and Wiley complain about the plaintiff's service as bankruptcy trustee and her counsels' efforts on the estate's behalf. Daniels', the debtor's, and Wiley's bare claim that the actions of the trustee and her counsels were ultra vires does not change the plain *Barton* nature of the Pennsylvania actions. Nevertheless, nothing about the plaintiff's or her counsels' actions in this case was in fact ultra vires.

Generally, a "trustee is not personally liable on contracts entered into on behalf of the estate." *Schechter v. Illinois Department of Revenue (In re Markos Gurnee Partnership)*, 182 B.R. 211, 217 (Bankr.N.D.Ill.1995). The personal immunity of receivers and trustees, howev-

er, "extends only to matters that are within the scope of their duties in administering the estate." *Id.* "There is no personal immunity for acts that are 'ultra vires' or outside the scope of the trustee's duties." *Id.* Ultra vires actions need not be brought in the bankruptcy court because they "involve only the personal liability of the trustee" and *have no "impact* on the assets available for distribution to claimants of the estate." *Id.* at 222 (Emphasis added).

 In determining whether the trustee's conduct is ultra vires, one must consider whether the trustee's challenged actions were within the scope of their authority and "bind the estate, since ultra vires acts cannot do so." *Id.* at 223. The bankruptcy court has jurisdiction to determine whether the trustee's acts were within the scope of her authority. *Id.* at 224.

 In this case, the trustee's sale of the probate asset was clearly within the scope of her authority. It was done with court approval after notice and hearing. The sale was binding on the trustee, Shain, the debtor, and creditors of the estate. The Pennsylvania actions clearly threatened property of the estate. Accordingly, the trustee's sale of the probate asset was not and cannot be an ultra vires act. Instead, it squarely falls within the ambit and the protections of the *Barton* doctrine.

The plaintiff has plainly established by a preponderance of the evidence that the debtor and Wiley violated the *Barton* doctrine by filing papers in the Pennsylvania probate court to void the trustee's sale of the probate asset and by filing and prosecuting the Pennsylvania damages and declaratory relief actions. For the reasons stated in Section II.A.3.f. above, the plaintiff has also established that Daniels, the debtor, and Wiley acted in concert in taking these actions.

## D.

*Does the defendants' violations of 28 U.S.C. § 929 and the Barton doctrine justify injunction relief?*

 The plaintiff seeks injunctive relief to preclude and prohibit further violations of 28 U.S.C. § 929 and the *Barton* doctrine. The court may enter an injunction pursuant to 28 U.S.C. § 959(a) and Section 105(a) of the Bankruptcy Code upon a showing that the enjoined action would "impede, impair or irreparably interfere with the administration of the estate." *Baptist Medical Center of New York v. Singh (Baptist Medical Center of New York)*, 80 B.R. 637, 644 (Bankr. E.D.N.Y.1987). In fact, "Section 105(a) contemplates injunctive relief in precisely those instances where parties are 'pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate.'" *Id.* at 641, *quoting Manville Corp. v. Equity Security Holders Committee (In re Johns–Manville Corp.)*, 801 F.2d 60, 63 (2d Cir.1986).

In this case, the record overwhelmingly establishes that, absent this court's issuance of a permanent injunction generally containing the terms of this court's preliminary injunction, the defendants will continue to initiate and prosecute collateral attacks on the trustee's sale of the probate asset and on account of the trustee's and her counsels' administration of the debtor's bankruptcy estate. Remarkably, the debtor and Wiley have continued to do so despite the entry of the preliminary injunction and in violation of it. These attacks are without any colorable legal basis and irreparably harm the bankruptcy estate. A permanent injunction is therefore necessary to protect property of the estate and to facilitate the trustee's and her counsels' efforts to complete the administration of the debtor's bankruptcy estate so that it may finally be closed. In view of Daniels'

central role in the actions that have been taken in violation of the *Barton* doctrine, the court will specifically enjoin him in the permanent injunction.

Accordingly, the court will issue a permanent injunction against Daniels, the debtor, and Wiley on the same terms as the preliminary injunction.

### E.

*Is the plaintiff entitled to costs as prevailing party?*

■ F.R.B.P. 7054(b) provides that, except in circumstances not applicable here, "[t]he court may allow costs to the prevailing party . . . ." F.R.B.P. 7054(b) is an adaptation of F.R.Civ.P. 54(d)(1). Under that rule, "prevailing party" has been held to mean "simply that the prevailing party is the party in whose favor judgment was entered, even if that judgment does not fully vindicate the litigant's position in the case." 10 J. Moore, *Moore's Federal Practice* § 54.101[3] at 54–157 (3d ed.2000). In this case, therefore, the plaintiff clearly is the prevailing party.

■ Under F.R.Civ.P. 54(d)(1), costs "shall be allowed as of course to the prevailing party unless the court otherwise directs." Thus, costs are allowed unless the district court exercises its discretion to deny costs. Under F.R.B.P. 7054(b), however, the allowance of costs to the prevailing party requires an affirmative exercise of the court's discretion.

■ As this decision demonstrates in great detail, the debtor's bankruptcy estate represented by the plaintiff has suffered enormous financial damages as a consequence of the defendants' actions. Having already suffered so much at the hands of the defendants, it would be inequitable not to allow the plaintiff statutory costs to help defray a small portion of the expenses of this litigation. Likewise, the court can discern no sound reason to deny an allowance of costs. In these circumstances, therefore, the court will allow costs to the plaintiff as prevailing party. *Official Committee of Unsecured Creditors of Toy King Distributors v. Liberty Savings Bank (In re Toy King Distributors, Inc.),* 256 B.R. 1, 210–11 (Bankr.M.D.Fla. 2000).

### III.

### *Conclusion*

This case exemplifies the harm that can occur when a party—in this case the debtor and her confederates—deliberately interferes with the trustee's administration of the bankruptcy estate. The facts are egregious. The defendants are unapologetic. Indeed, Daniels, the debtor, and Wiley have continued their conduct with utter disregard and disdain for court orders adverse to their positions. In these circumstances, the court is compelled to award sanctions against the defendants. The sanctions awarded fall far short of making the estate whole for the harm perpetrated against it by the defendants. Unfortunately, the law does not permit the court to compensate the estate for all the harm it has suffered and will continue to suffer until the estate is fully administered.

Accordingly, the court will enter judgment contemporaneously in favor of the plaintiff and against the defendants as follows:

1. On account of violations of the automatic stay in Phase I: the sum of $17,958.18 against Daniels, the debtor, and D'Ambrosio, jointly and severally.

2. On account of violations of the automatic stay in Phase II: the sum of $17,420.32 against Daniels, the debtor, and Wiley, jointly and severally.

3. On account of violations of the bankruptcy court's October 18, 1999, sanctions order: the sum of $17,173.32 against Daniels, the debtor, and Wiley, jointly and severally.

4. On account of attorney's fees and costs incurred by the bankruptcy estate through October 31, 2001, in prosecuting the trustee's motion for sanctions and this adversary proceeding: the sum of $43,221.94 against Daniels, the debtor, D'Ambrosio, and Wiley, jointly and severally.

5. The judgment shall provide that the obligations described in paragraph 3 above are duplicative of the obligations described in paragraph 2 above. Therefore, the maximum amount the plaintiff may recover under paragraphs 2 and 3 is $17,420.32. In this way, the plaintiff may not recover twice for the same harm. Otherwise, the obligations described in paragraphs 1 through 4 above are cumulative.

6. The plaintiff shall recover her costs of action against the defendants, jointly and severally, in the manner contemplated by F.R.B.P. 7054(b) and F.R.Civ.P. 54(d)(1) by sworn and detailed bill of costs filed and served within the time set in L.B.R. 7054–1.

7. The judgment will also permanently enjoin each of Daniels, the debtor, and Wiley from taking or prosecuting any actions against the trustee or her counsel or to void the trustee's sale of the probate asset on the same terms as the court's preliminary injunction. The scope of the permanent injunction will be substantially identical to the scope of the court's preliminary injunction. The injunction shall also enjoin efforts to assert dominion and control over estate property.

8. The judgment will also void actions taken by the debtor in Pennsylvania courts in violation of the automatic stay. The injunction will direct the defendants to withdraw and dismiss voluntarily the offending papers they filed there.

9. The judgment will also dismiss with prejudice the debtor's motion to remove the trustee (Main Case Document No. 106).

10. The judgment will dismiss without prejudice Daniels' counterclaim against the plaintiff for malicious prosecution as prematurely and improperly filed or, alternatively, abstain from determining it.

11. The judgment will also abstain from determining all other issues raised in the plaintiff's complaint. The court's abstention shall be without prejudice to the right of the plaintiff to seek a determination of those issues in other courts of competent jurisdiction.

## JUDGMENT AND PERMANENT INJUNCTION

For purposes of this judgment and permanent injunction, the court will refer to the parties in the following manner:

a. The plaintiff, Marie E. Henkel, as trustee of the bankruptcy estate of Paula Lickman, as "plaintiff;"

b. The defendant and debtor, Paula Lickman, as "debtor;"

c. The defendant, Gerald J. D'Ambrosio, as "D'Ambrosio;"

d. The defendant, Robert Dizak, also known as Robert Daniels, as "Daniels;" and

e. The defendant, James F. Wiley, III, as "Wiley."

Based upon the court's Order on Final Pretrial Conference entered on November 14, 2001, and the Memorandum of Decision entered contemporaneously, it is

ORDERED, ADJUDGED, and DECREED that:

1. The plaintiff recover of each of the defendants indicated below the sums indicated below, with interest thereon at the rate of 1.02 percent as provided by law, and her costs of action:

a. On account of violations of the automatic stay in Phase I: the sum of $17,958.18 against Daniels, the debtor, and D'Ambrosio, jointly and severally;

b. On account of violations of the automatic stay in Phase II: the sum of $17,420.32 against Daniels, the debtor, and Wiley, jointly and severally;

c. On account of violations of the bankruptcy court's October 18, 1999, sanctions order: the sum of $17,173.32 against Daniels, the debtor, and Wiley, jointly and severally; and

d. On account of attorney's fees and costs incurred by the bankruptcy estate through October 31, 2001, in prosecuting the trustee's motion for sanctions and this adversary proceeding: the sum of $43,221.94 against Daniels, the debtor, D'Ambrosio, and Wiley, jointly and severally.

2. The obligations described in paragraph 1.c. above are duplicative of the obligations described in paragraph 1.b. above. Therefore, the maximum amount the plaintiff may recover under paragraphs 1.b. and 1.c. above is $17,420.32. Otherwise, the obligations described in paragraphs 1.a. through 1.d. above are cumulative.

3. Daniels, the debtor, and Wiley, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby permanently enjoined and restrained from:

a. prosecuting in any way (1) the action or proceeding pending in the Pennsylvania Orphans' Court to void the bankruptcy sale approved by this court, (2) Civil Action No. 01–CV–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–CV–4014 pending in the United States District Court for the Eastern District of Pennsylvania, including, without limitation, seeking temporary or preliminary relief from either of those courts; and

b. initiating any new action or proceeding in any court, except this court, against the plaintiff and her attorneys on account of their service and actions as trustee in this bankruptcy case and as counsel to the trustee, or to assert dominion or control over property of the estate, or to affect property of the estate.

4. All actions taken by Daniels, the debtor, and Wiley against the plaintiff and her attorneys, to attack and void the sale of the bankruptcy estate's interest in the probate estate of Tibey Pfeiffer, and to assert an interest by the debtor in the probate estate of Tibey Pfeiffer are void and are of no legal force or effect, including those actions taken by the defendants in (1) the probate estate of Tibey Pfeiffer pending in the Pennsylvania Orphans' Court, (2) Civil Action No. 01–CV–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–CV–4014 pending in the United States District Court for the Eastern District of Pennsylvania. Daniels, the debtor, and Wiley are mandatorily enjoined to dismiss voluntarily and to withdraw any and all papers seeking such relief in (1) the probate estate of Tibey Pfeiffer pending in the Pennsylvania Orphans' Court, (2) Civil Action No. 01–CV–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–CV–4014 pending in the United States Dis-

trict Court for the Eastern District of Pennsylvania.

5. The debtor's motion to remove the trustee (Main Case Document No. 106) is dismissed and denied with prejudice.

6. Daniels' counterclaim against the plaintiff for malicious prosecution is dismissed without prejudice as prematurely and improperly filed or, in the alternative, the court abstains from determining the counterclaim.

7. The court abstains from determining all other issues raised in the plaintiff's complaint without prejudice to the right of the plaintiff to seek a determination of those issues in other courts of competent jurisdiction.

## APPENDIX I

*TO MEMORANDUM OF DECISION*

*CHRONOLOGY OF EVENTS*

Unless otherwise indicated, the text printed in *italics* in each event is the court's conclusion or comment concerning that event.

| EVENT NO. | DATE | EVENT |
|---|---|---|
| 1. | 3/27/98 | The debtor, Paula Lickman ("debtor" or "Lickman"), files in the bankruptcy court a pro se petition under Chapter 7 of the Bankruptcy Code. In her schedules, the debtor lists unsecured non-priority debt in the amount of $38,657 (Main Case Documents Nos. 1 and 2).<br><br>*The debtor has "in the past worked as a paralegal and know[s] how to do legal research, Shepardize, draft legal documents etc." At one point, the debtor "was employed by Braniff Airlines where [she] prepared air charter contracts and worked under the supervision of their general counsel."* (Main Case Document No. 107, Plaintiff's Exhibit No. 101, ¶ 9). |
| 2. | 4/21/98 | The Chapter 7 trustee, Marie Henkel ("Henkel" or "trustee") conducts a meeting of creditors pursuant to Section 341 of the Bankruptcy Code (Main Case Document No. 3). |
| 3. | 5/4/98 | The debtor's aunt, Tibey Pfeiffer, dies in Pennsylvania (Main Case Documents Nos. 107 and 118, Plaintiff's Exhibit No. 101). |
| 4. | 5/4/98 | *The debtor is a 15 percent residuary beneficiary under Tibey Pfeiffer's will as is her brother, Stephen Lickman ("Lickmans"). Michael Kalbs, the debtor's cousin, is a 10 percent residuary beneficiary. The debtor's cousin, Marcy Shain ("Shain" or "executrix") is a 60 percent beneficiary* (Plaintiff's Exhibit No. 2). Shain is also the executrix of the probate estate (Main Case Documents Nos. 107 and 118, Defendants' Exhibit No. 7, Plaintiff's Exhibit No. 101). |
| 5. | 5/4/98 | The debtor's 15 percent share of the Tibey Pfeiffer probate estate is comprised of shares of BP Amoco stock, shares in two illiquid partnerships, and a negative cash balance that is to be |

paid out of the BP Amoco stock (Main Case Document No. 118, Plaintiff's Exhibit No. 128).

6. 5/13/98 The trustee files in the bankruptcy court a report of the conclusion of the meeting of creditors and a report of no distribution determining that there are no assets in the bankruptcy estate to be administered for the benefit of creditors (Main Case Documents Nos. 10 and 11).

7. 7/7/98 The bankruptcy court enters a discharge of the debtor's debts (Main Case Document No. 14).

8. 7/98 The Pennsylvania probate court issues letters testamentary to Shain (Main Case Documents Nos. 107 and 118, Defendants' Exhibit No. 7, Plaintiff's Exhibit No. 101).

9. 7/24/98 The bankruptcy court closes the debtor's bankruptcy case (Main Case Document No. 16).

10. Fall 1998 The Lickmans contact the executrix' attorney, David L. Segal ("Segal"), and demand reimbursement from Shain for alleged losses caused by her malfeasance before and during the probate estate (Adv. Proc. 01–170, Document No. 107, Defendants' Exhibit No. 7, Plaintiff's Exhibit No. 101).

11. Fall 1998 The debtor lives with and has a romantic relationship with Robert Daniels ("Daniels" or "Dizak")(Main Case Document No. 110, at 37, lines 20–25, and at 38, lines 1–5, Adv. Proc. 01–170, Document No. 82, at 222, line 4).

*Daniels and Robert E. Dizak are the same person (Adv. Proc. 01–170, Document No. 60, at 14–15, Document No. 82, at 220, line 25, and at 221, lines 1–23, Plaintiff's Exhibit Nos. 140, 141, 143, and 155).*

12. 11/98 The executrix and Segal are aware of the debtor's bankruptcy case but do not inform the bankruptcy court or the trustee of the debtor's interest in the Tibey Pfeiffer probate estate (Defendants' Exhibit No. 15).

13. 12/98 The Lickmans commence litigation against the executrix in the Pennsylvania probate court. Ultimately, the parties settle or abandon this litigation and stipulate to the posting of a bond (Main Case Document No. 118, Plaintiff's Exhibit No. 30).

14. 12/98 Daniels actively participates in the Pennsylvania probate court litigation and gives or loans money to the debtor to pay attorney's fees relating to this litigation (Main Case Documents Nos. 118 and 119, reported at 279 B.R. 691).

15. 12/98 Daniels appears on the service list (as Robert E. Dizak, Esquire) on at least one order entered by the Pennsylvania probate court (Plaintiff's Exhibit No. 30).

16. 1/20/99 The executrix posts in the Pennsylvania probate court a $400,000 bond (Main Case Document No. 99, Debtor's Exhibit No. 9).

17. 8/2/99 Segal sends a letter to the debtor's Pennsylvania attorney, James M. Tyler, indicating that he is preparing a final accounting of the probate estate. The letter suggests that Tyler advise the bankruptcy trustee of the debtor's interest in the probate estate (Plaintiff's Exhibit No. 30).

Neither Tyler nor the debtor notifies the trustee of the existence of the probate asset (Main Case Document No. 118).

18. 8/9/99 Segal files in the Pennsylvania probate court the executrix' second accounting of the probate estate. The accounting reflects that the probate estate has a value of $510,000 and the debtor's residuary share is $76,602.80, $42,500 of which the debtor has received in pre-death advancements, leaving a balance of $34,003.60 (Plaintiff's Exhibit Nos. 2 and 128).

19. 8/9/99 The accounting also reflects that the debtor's interest is encumbered by the interest of the trustee (Plaintiff's Exhibit No. 128).

20. Early 8/99 Daniels discusses with Gerald J. D'Ambrosio ("D'Ambrosio") the possibility that the trustee may seek to reopen the debtor's bankruptcy case to administer the probate asset. Daniels asks D'Ambrosio to "help [Daniels] out—or help [the debtor] out in writing to the trustee." (Adv. Proc. 01–170, Document No. 82, at 220, lines 21–22, and at 222, lines 4–13). Daniels is not a member of The Florida Bar but at some point seeks admission (Adv. Proc. 01–170, Document No. 83, at 255, lines 17–23).

*Daniels (as Robert E. Dizak) was apparently convicted of a felony for the unauthorized practice of law in New York (Adv. Proc. 01–170, Document No. 60, at 14–17, and Document No. 82, at 22–25, and at 220–21).*

21. Early 8/99 D'Ambrosio has known Daniels for more than 20 years, having first met Daniels in connection with Daniels' newspaper, the *New York Defender Digest,* while D'Ambrosio was practicing as a criminal defense attorney in Niagara Falls, New York (Adv. Proc. 01–170, Document No. 82, at 224, lines 5–17).

Daniels is also a tenant or becomes a tenant of D'Ambrosio around this time. Daniels leases office space from D'Ambrosio (Adv. Proc. 01–170, Document No 82 at 224, lines 2–3). Daniels' office is upstairs and D'Ambrosio's office is downstairs but they share a common entrance (Adv. Proc. 01–170, Document No. 82, at 130, lines 4–20 and Document No. 85, at 547, lines 2–14).

*D'Ambrosio's testimony as to his relationship with Daniels was notably evasive and lacking in candor. For example, D'Ambrosio initially testified that he had only recently learned that Daniels and Dizak are the same person (Adv. Proc. 01–170, Document No. 82, at 22–25). Upon further questioning, however, D'Ambrosio admitted to a lengthy acquaintance with Daniels, including the leasing agreement for which D'Ambrosio received payment from Daniels by checks that were made by Dizak (Adv. Proc. 01–170, Document No. 82, at 220–21). When questioned as to whether he knew the Robert E. Dizak that was convicted of a felony for practicing*

law without a license in New York, D'Ambrosio replied that "He was Robert Daniels when I knew him, and I spoke to you as to how I knew him." (Document No. 83, at 254, lines 3–12). In his cross-examination of himself with respect to that testimony, D'Ambrosio stated "Well, number (1), I didn't know Robert Dizak was convicted of any felony for practicing law without a license. My understanding of Mr. Dizak is that he's taken The Florida Bar examination and that he's passed certain parts, and he's now taking the ethics part which I'm sure he has to take and pass. And that's how I know him up here." (Document No. 83, at 255, lines 17–23).

| | | |
|---|---|---|
| 22. | Early 8/99 | Daniels is the person who has "the most knowledge of the approximately six months of litigation that [has been] going on in the Pennsylvania courts . . . ." (Adv. Proc. 01–170, Document No. 83, at 256, lines 9–12). |
| 23. | Early 8/99 | D'Ambrosio agrees to write letters to the trustee on the debtor's behalf on a "strictly pro bono basis" (Adv. Proc. 01–170, Document No. 81, at 37, lines 8–9). |
| 24. | Early 8/99 | D'Ambrosio does not employ a secretary (Adv. Proc. 01–170, Document No. 82, at 130, lines 4–20). D'Ambrosio does not employ Daniels in any capacity (Adv. Proc. 01–170, Document No. 82, at 147, lines 11–15, and at 256, lines 3–8). |

Daniels, however, drafts and types many of the letters that D'Ambrosio sends to the trustee and trustee's counsel (Plaintiff's Exhibit Nos. 1, 2, 16, 131, Adv. Proc. 01–170, Document No. 82, at 226, lines 22–25, at 227, lines 1–5, at 229, lines 1–5, at 234, lines 16–21, and at 240, lines 1–15).

*The court specifically does not credit D'Ambrosio's testimony that Daniels did not draft or type the letters that he sent to the trustee and trustee's counsel. The totality of the evidence in the record supports a contrary finding, particularly given the physical proximity of D'Ambrosio's and Daniels' offices, D'Ambrosio's lack of secretary, the inclusion of the initials "R.D." in many of the letters that D'Ambrosio sends, the informal nature of the retention agreement, and the similarity between papers that Wiley concedes Daniels drafted and papers that D'Ambrosio asserts he drafted himself.*

| | | |
|---|---|---|
| 25. | 8/10/99 | Segal advises the trustee of the debtor's interest in the Tibey Pfeiffer probate estate (Adv. Proc. 01–170, Document No. 81, at 54, lines 20–25, and at 55, lines 1–14). |
| 26. | 8/13/99 | The trustee files in the bankruptcy court a motion to reopen the debtor's bankruptcy case to administer the probate estate asset (Main Case Document No. 17, Defendants' Exhibit No. 9). |
| 27. | 8/13/99 | D'Ambrosio commences his representation of the debtor. He does so without an oral or written retainer agreement with the debtor as to payment for his services (Adv. Proc. 01–170, Document No. 82, at 223, lines 14–23). He does not have a contingent fee agreement (Adv. Proc. 01–170, Document No. 82, at 223, lines 24–25 and at 224, line 1). |

*D'Ambrosio was evasive and less than candid with the court as to his payment arrangements for services performed on behalf of the debtor. When questioned on this issue, he testified, "I didn't know how deep it would be, but I don't have a retainer agreement with [the debtor], and I did it pro bono at the time." Trustee's counsel asked, "Do you have an informal agreement as to fees?" to which D'Ambrosio replied, "None." Trustee's counsel then asked "You've been involved in this case for two years, you've been sued; and you don't have any arrangements—" to which D'Ambrosio answered, "Please don't remind me, Ms. Concannon."*

*Yet, D'Ambrosio and the debtor have represented in countless papers (some of them sworn) filed in this and other courts that the debtor has paid or incurred fees for services performed in this bankruptcy case litigating with the trustee that were presumably paid or owed to D'Ambrosio (Main Case Documents Nos. 49, 72, 90, and 107, Adv. Proc. 99–227, Documents Nos. 20, 37, and 39, Adv. Proc. 99–282, Documents Nos. 6A, 16, and 18, Adv. Proc. 01–170, Document No. 9, Defendants' Exhibit No. 7, Plaintiff's Exhibit Nos. 33, 60, 65, 69, 75, 93, 97, 127, and 137).*

*The court credits these papers to the extent that they support a conclusion that D'Ambrosio was paid or was owed for the services he performed on the debtor's behalf.*

*The court also credits these papers to the extent that they support a conclusion that Daniels paid or promised to pay D'Ambrosio for the services he performed on the debtor's behalf. In reaching this conclusion the court has considered the totality of the record that reflect a history of Daniels paying for legal services on the debtor's behalf, the role that Daniels played throughout these events, and the debtor's financial condition as reflected in her papers.*

| | | |
|---|---|---|
| 28. | 8/99—Forward | D'Ambrosio communicates primarily with Daniels rather than the debtor (Adv. Proc. 01–170, Document No. 77, at 7, lines 9–21). |
| 29. | 8/13/99 | D'Ambrosio sends a letter to the trustee advising her of his retention as debtor's counsel. The letter states that "it appears [no property from the Tibey Pfeiffer] estate will be available to the [debtor]." The letter states, "[i]t clearly now appears that even if surcharges are made and awarded by the Pennsylvania courts, the prospect of any actual recovery is nil, given that [the executrix] is a permanent resident of Israel . . . ." Finally, the letter advises the trustee that the debtor "has reported [counsel for the executrix'] conduct . . . to the disciplinary board in Pennsylvania which has begun an investigation." (Defendants' Exhibit No. 10, Plaintiff's Exhibit No. 1). |

*The letter makes no mention of the $400,000 bond that the executrix has posted in the probate estate.*

| | | |
|---|---|---|
| 30. | Mid 8/99 | D'Ambrosio makes several telephone calls to the trustee to reiterate the statements made in his letters (Adv. Proc. 01–170, Document No. 81, at 37, lines 1–6, at 81, lines 22–25, and at 82, |

lines 1–2). The bankruptcy estate incurs $76 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

31. 8/16/99 D'Ambrosio sends a follow up letter to the trustee stating that, after reviewing the final accounting filed in the probate estate, the debtor's share is "only $8,637.60." The letter "offers" to the trustee the debtor's shares in the illiquid partnerships in exchange for the trustee's payment of the debtor's Pennsylvania attorney's fees in the amount of $16,000 (Defendants' Exhibit No. 10, Plaintiff's Exhibit No. 2).

32. 8/16/99 The bankruptcy court enters an order reopening the debtor's bankruptcy case (Main Case Document No. 18).

*The court credits Sean Concannon's ("S. Concannon") testimony that a bankruptcy estate would generally incur attorney's fees in the range of $900 to $2,000 to administer a probate asset of value comparable to the probate asset in this case if the debtor cooperated with the trustee and did not contest the trustee's administration of the asset (Adv. Proc. 01–170, Document No. 83, at 307, lines 13–25, and at 308, line 1).*

33. 8/24/99 The Lickmans file in the Pennsylvania probate court a petition to remove the executrix and substitute the debtor as executrix (Main Case Document No. 70, at 9, lines 13–23, 99, Debtor's Exhibit No. 9, Defendants' Exhibit No. 11, Plaintiff's Exhibit No. 128). The bankruptcy estate incurs $16,131.77 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095, 2095C, 2095E, and 2095–7).

34. 8/30/99 D'Ambrosio files in the bankruptcy court a notice of appearance as counsel for the debtor (Main Case Document No. 20, Plaintiff's Exhibit No. 78). The bankruptcy estate incurs $38 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*He does not file a statement of compensation as required by F.R.B.P.2016(b). See In re Whaley, 282 B.R. 38, 42 (Bankr. M.D.Fla.2002) [requiring attorney to disgorge undisclosed fees].*

35. 8/31/99 The bankruptcy court enters an order directing D'Ambrosio's compliance with L.B.R.2090–1 because the clerk's records do not reflect that D'Ambrosio is a member of the bar of the United States District Court for the Middle District of Florida (Main Case Document No. 21, Plaintiff's Exhibit No. 79). The bankruptcy estate incurs $95 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

36. 9/1/99 D'Ambrosio sends a letter to the trustee stating, "I trust by now that you have satisfied yourself that, despite figures listed in the 'account' of attorney Segal, that only $100,000 remains in the Estate of Tibey Pfeiffer, together with the now two worthless limited partnerships . . . ." The letter concludes, "[p]erhaps you will want to bring Ms. Lickman's legal expenditures [in the amount of $16,000] to the attention of your unsecured creditors." (Defendants' Exhibit No. 10, Plaintiff's

Exhibit No. 132). The bankruptcy estate incurs $57 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

*The letter makes no mention of the $400,000 bond that the executrix has posted in the probate estate.*

| | | |
|---|---|---|
| 37. | 9/7/99 | The trustee files in the Pennsylvania probate court a pro se notice of appearance and substitution of trustee for the debtor as beneficiary and party in interest in the Tibey Pfeiffer probate estate (Defendants' Exhibit No. 13, Plaintiff's Exhibit No. 133). The bankruptcy estate incurs $532 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7). |
| 38. | 9/9/99 | The bankruptcy court enters an order approving the employment of Lynnea Concannon as counsel for the trustee ("L. Concannon") L. Concannon is assisted by her associate, S. Concannon (Main Case Document No. 22). The bankruptcy estate incurs $46.92 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144: 2095 and 2095–7). |
| 39. | 9/13/99 | Segal files in the Pennsylvania probate court the executrix' petition for leave to amend the petition for adjudication and schedule of proposed distribution of the Tibey Pfeiffer estate. The petition seeks to amend the schedule of proposed distribution to eliminate the interests of the Lickmans on the basis that their petition to remove the trustee implicates the in terrorem clause in Tibey Pfeiffer's will (Main Case Document No. 99, Debtor's Exhibit No. 9, Adv. Proc. 01–170, Document No. 81, at 110, lines 11–15, Plaintiff's Exhibit No. 129). |
| 40. | 9/13/99 | D'Ambrosio sends a letter to the trustee stating, "there is simply no section 541 property available to you as Trustee, and in fact, no property at all according to the account filed by the executrix." The letter then states, "[t]o the extent that any attempt by you to frustrate [the debtor's litigation in the probate estate] results in a monetary loss to my client or the loss of her rights to pursue this matter, you may be held liable." The letter also states, "I will shortly move in the Orlando bankruptcy court for an Order revoking your ex parte order reopening the case as well as seeking Rule 11 sanctions against you." (Plaintiff's Exhibit No. 4). |

*The letter makes no mention of the $400,000 bond that the executrix has posted in the probate estate.*

| | | |
|---|---|---|
| 41. | Mid 9/99 | Daniels holds himself out as a "representative of and from the office of . . . D'Ambrosio" during several telephone calls to the trustee. In these communications, Daniels refers to the debtor as "his client" and generally objects to the trustee's reopening of the debtor's bankruptcy case (Adv. Proc. 01–170, Document No. 81, at 61, lines 11–14). |
| 42. | Mid 9/99 | In one of these telephone calls, Daniels asserts that the trustee "had no business reopening the [bankruptcy] case" and that the trustee is "going to be very sorry if [she] continu[es] on this track." The trustee feels that Daniels manner toward her |

during this telephone call is "extremely vile and abrasive." (Adv. Proc. 01–170, Document No. 81 at 62, lines 10–14).

43.　Mid 9/99—10/99　Daniels also makes several telephone calls to S. Concannon echoing the assertions that D'Ambrosio has enumerated in his letters to the trustee.　Daniels promises to "make fools out of [the trustee and her attorneys]" and that the estate will be "too costly to . . . administer."　S. Concannon feels Daniels manner toward him during these telephone calls is "profane" and "abusive."　(Adv. Proc. 01–170, Document No. 83, at 266, lines 14–25, and at 267, lines 1–8).

Daniels calls S. Concannon regularly and sometimes terminates the conversations prematurely (Adv. Proc. 01–170, Document No. 83, at 268, lines 9–13).　Concannon feels that Daniels is making "some type of a threat" in "virtually" every conversation they have (Adv. Proc. 01–170, Document No. 83, at 268, lines 18–25).　The bankruptcy estate incurs $152 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095A).

44.　9/17/99　The trustee's counsel files in the bankruptcy court an adversary proceeding against the debtor to determine that the debtor's interest in the probate estate is property of the bankruptcy estate (Adv. Proc. 99–227, Document No. 1, Plaintiff's Exhibit No. 54).　The bankruptcy estate incurs $12,746.01 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095A and 2095D).

45.　9/20/99　D'Ambrosio sends a letter to S. Concannon that refers to Concannon's conversations with D'Ambrosio's "assistant" Daniels (Adv. Proc. 01–170, Document No. 82, at 239, lines 22–25, Plaintiff's Exhibit No. 131).

46.　9/22/99　D'Ambrosio sends a letter to the bankruptcy judge advising her that he is not admitted to the bar for the Middle District of Florida and cannot comply with L.B.R.2090–1 and will therefore withdraw as debtor's counsel (Plaintiff's Exhibit No. 5).　The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

47.　9/22/99　The trustee's counsel files in the bankruptcy court the trustee's two emergency motions for sanctions for willful violation of the automatic stay against the debtor and Segal for their actions taken in the Pennsylvania probate court.　The motions seek to void all actions taken in violation of the automatic stay and also seek sanctions and attorney's fees and costs (Main Case Documents Nos. 25 and 26, Defendants' Exhibit No. 21).

48.　9/23/99　The debtor files in the bankruptcy court a pro se motion to revoke the court's order reopening her bankruptcy case because "there is simply no money . . . ." and "if I am awarded surcharges, it is unlikely that any judgment will ever be collectible."　(Main Case Document No. 27, Plaintiff's Exhibit No. 80).　The bankruptcy estate incurs $206.12 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095).

*The motion makes no mention of the $400,000 bond that the executrix has posted in the probate estate.*

| 49. | 9/24/99 | The bankruptcy court notices an evidentiary hearing for October 14, 1999, of the trustee's motions for sanctions (Main Case Document No. 29). |

50. Late 9/99–Early 10/99

S. Concannon attempts to locate counsel admitted to the bar of Pennsylvania to provide services for the benefit of the bankruptcy estate in the Pennsylvania probate court (Plaintiff's Exhibit No. 144–2095–7). The bankruptcy estate incurs $290.12 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

51. 9/24/99—early 10/99

S. Concannon and Segal negotiate as to the probate and bankruptcy court's jurisdiction to determine issues relating to the executrix' petition to eliminate the debtor (and possibly the bankruptcy estate) from the probate estate (Adv. Proc. 01–170, Document No. 83, at 263–264, Defendants' Exhibit Nos. 6 and 23, Plaintiff's Exhibit Nos. 6, 7, 14, and 130).

Ultimately they are unable to reach an accord as to jurisdiction (Adv. Proc. 01–170, Document No. 83, at 264, lines 9–18).

52. 9/27/99

The debtor sends a letter to S. Concannon asking him to advise her as to whether he and the trustee are admitted to practice law in Pennsylvania and stating that, if no answer is provided, she will "assume the answer is in the negative and proceed accordingly." (Plaintiff's Exhibit No. 8). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

53. 9/28/99

The debtor sends a letter to S. Concannon requesting all correspondence and the date and substance of all communications between the trustee and Segal (Defendants' Exhibit No. 19, Plaintiff's Exhibit No. 9). The bankruptcy estate incurs $38 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

54. 9/29/99

S. Concannon sends a letter to the debtor stating his willingness to provide copies if the debtor pays for each copy. The letter states that Concannon declines to provide information about his communications with Segal because it is "attorney work product." The letter also asks if the debtor is represented by an attorney. The letter warns the debtor that, "if you continue to frustrate the efforts of the trustee to administer your case, we will be forced to move for revocation of your discharge . . . ." (Defendants' Exhibit No. 20, Plaintiff's Exhibit No. 11).

55. 9/29/99

The debtor sends a letter to the bankruptcy judge asking her to rule on the debtor's motion to revoke the order reopening her bankruptcy case prior to the October 14th emergency hearing of the trustee's motions for sanctions because "there is no section 541 property, and in fact, no money at all" in the probate estate (Plaintiff's Exhibit No. 10). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*The letter makes no mention of the $400,000 bond that the executrix has posted in the probate estate.*

| | | |
|---|---|---|
| 56. | 9/30/99 | The debtor sends a letter to S. Concannon asserting that there is no attorney-client privilege between Concannon and Segal and again requests copies of all communications (Plaintiff's Exhibit No. 12). |

57. 9/30/99 The debtor and S. Concannon speak by telephone about the debtor's demand for copies of all communications between Segal and Concannon (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $57.06 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

58. Late 9/99 Daniels leaves a message on the trustee's answering machine complaining that the trustee is contacting the debtor directly without going through her attorney and that "the Florida Bar [will] hear about it . . . ." (Adv. Proc. 01–170, Document No. 81, at 64, lines 1–10).

*The debtor is not represented by counsel in her bankruptcy case at this time. In addition, F.R.B.P. 9014 provides that the debtor must be served and noticed of any motion in which relief is sought against the debtor regardless of whether the debtor is represented by counsel. Similarly, F.R.B.P. 2002(a) requires that specific notices must be served on the debtor regardless of whether the debtor is represented by counsel.*

59. 9/99 The debtor prepares to file in the Pennsylvania probate court a petition to strike the trustee's notice of substitution for the debtor (Main Case Document No. 59A, at 36, lines 4–14).

60. Late 9/99 or early 10/99 The trustee employs William O'Connell ("O'Connell") to represent the estate's interest in the Pennsylvania probate estate. O'Connell begins to negotiate with Segal to sell all or part of the debtor's interest in the probate estate (Defendants' Exhibit No. 24, Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $596.71 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

61. 10/1/99 S. Concannon sends a letter to the debtor stating that his objection to the production of communications between Segal and himself is based upon relevance and work product and not attorney-client privilege. The letter states, "I must once again urge you to seek counsel concerning your interference with the administration of this bankruptcy case and the very real possibility that you will face revocation of your discharge." (Defendants' Exhibit No. 20, Plaintiff's Exhibit No. 13).

62. 10/1/99 S. Concannon sends an e-mail to Segal in connection with his negotiations of the probate and bankruptcy court's jurisdiction to determine issues relating to the executrix' petition to eliminate the debtor (and possibly the bankruptcy estate) from the probate estate. The e-mail states, "Obviously, we [the bankruptcy estate] have no interest in whether Stephen Lickman's interest is forfeit, other than some potential benefit in the form of some increased pro rata distribution [to the bankruptcy estate if Stephen Lickman's interest is forfeit]." (Defendants' Exhibit No. 27).

*The defendants rely upon this e-mail as support for their contention that the trustee and her counsel conspired with Segal to eliminate Stephen Lickman as a beneficiary of the Tibey Pfeiffer probate estate. To the contrary, this e-mail simply recognizes that if the Pennsylvania probate court were to grant the executrix' petition to eliminate Stephen Lickman as a beneficiary of the probate estate, the bankruptcy estate's interest might potentially increase in value.*

| | | |
|---|---|---|
| 63. | 10/5/99 | The bankruptcy court notices an evidentiary hearing on October 14, 1999, of the debtor's motion to revoke the order reopening the bankruptcy case (Main Case Document No. 30). |
| 64. | 10/6/99 | The debtor sends a letter to S. Concannon requesting that he immediately withdraw the notice of appearance and substitution of the trustee for the debtor filed in the Pennsylvania probate court. The letter states, "I gave [the trustee] no permission to file [the notice of substitution]." The letter further states "[a]ny additional action by you will likewise constitute the unauthorized practice of law. As for the [the trustee] I plan to notify the Philadelphia Country District Attorney of her unauthorized practice of law in the state of Pennsylvania in violation of their penal code. \* \* \* \* If [the trustee's] ill-filed substitution is not removed promptly both you and she will be held liable for any damages caused to me . . . ." (Plaintiff's Exhibit No. 15). |
| 65. | 10/9/99 | The Lickmans file in the Pennsylvania probate court an answer to the executrix' petition to amend the distribution of the probate estate (Main Case Document No. 99, Debtor's Exhibit No. 9). |
| 66. | 10/12/99 | O'Connell files in the Pennsylvania probate court a notice of appearance on behalf of the trustee (Defendants' Exhibit No. 32). |
| 67. | 10/13/99 | D'Ambrosio faxes to the trustee a copy of the debtor's petition to strike the trustee's notice of substitution for the debtor that is to be filed in the Pennsylvania probate court. (Main Case Document No. 59A, at 36, lines 7–14, at 48, lines 11–25, and at 49, lines 1–3). |
| 68. | 10/13/99 | The debtor files in the bankruptcy court a pro se opposition to the trustee's motion for sanctions. The opposition characterizes the trustee's actions in trying to administer the probate asset as a "fraudulent scheme." The opposition also asserts that the debtor has contacted the Pennsylvania District Attorney about the trustee's notice of appearance in the probate estate and "was informed that [the trustee's] notice of appearance is a misdemeanor, 42 SCA 2524, as practicing law [in Pennsylvania] without a license." (Main Case Document No. 31, Plaintiff's Exhibit No. 81). |
| 69. | 10/13/99 | The debtor files in the bankruptcy court a change of address reflecting a Texas address (Main Case Document No. 32). |
| 70. | Early or mid 10/99 | Gary L. Armstrong ("Armstrong"), a personal friend of the debtor, commences representation of the debtor. He has no |

agreement with the debtor as to payment for services (Adv. Proc. 01–170, Document No. 82 at 132, lines 21–25, and at 133, lines 1–5).

The debtor pays to Armstrong "a little money to help pay for phone calls and things like that." (Adv. Proc. 01–170, Document No. 82, at 132–133).

*Armstrong was evasive and less than candid with the court as to his payment arrangements for services performed on behalf of the debtor. He was initially asked, "Now, Mr. Armstrong you have testified that you agreed to represent Ms. Lickman, did you say without pay?" to which he replied, "I—I didn't say without pay." Plaintiff's counsel then asked directly, "Were you paid for you (sic) representation?" to which he replied, "I don't believe this is attorney-client. I never asked or expected payment from Ms. Lickman. She had been a friend for many years . . . . But, no, there was never an agreement to pay me." (Adv. Proc. 01–170, Document No. 82, at 132–33).*

71. Early or Mid 10/99

Armstrong discusses "the case and potential causes of action" with Daniels (who he knows as Robert Dizak) and the debtor. Armstrong understands that Daniels has a "legal background." Daniels proposes courses of action to Armstrong. Armstrong communicates with Daniels in Boca Raton at his house or his office (Adv. Proc. 01–170, Document No. 82, at 123–124).

72. 10/14/99

The bankruptcy court enters an order of deficient filing on the debtor's notice of change of address for insufficient service. The order states that the court will take no further action on the notice (Main Case Document No. 33).

73. 10/14/99

Armstrong files in the bankruptcy court a notice of appearance as attorney for the debtor (Main Case Document No. 35).

*He does not file a statement of compensation as required by F.R.B.P. 2016(b). See Whaley, 282 B.R. at 42 [requiring attorney to disgorge undisclosed fees].*

74. 10/14/99

The bankruptcy court conducts an evidentiary hearing of the debtor's motion to revoke the order reopening the bankruptcy case and the trustee's motions for sanctions. (Main Case Document No. 59A).

During the evidentiary hearing, Armstrong tells the bankruptcy court that "it is not so much the assets [of the probate estate] that [the debtor] is trying to protect but her rights against the executrix and [the executrix' attorney] for their actions over the last four and a half years." (Main Case Document No. 59A, at 13, lines 14–18).

During the evidentiary hearing, the bankruptcy court states to Armstrong, "I'm really trying to just explain to you that this estate holds these claims [against the executrix]. [The debtor] does not hold these claims. I know that she is upset with Mr. Segal and the executrix. Those, however, are not her claims. They are the estates claims and I don't care if there's fifty cents or five hundred thousand dollars, Mrs. Lickman does not

hold that interest. This estate does." (Main Case Document No. 59A, at 64, lines 1–13).

75. 10/14/99 During the evidentiary hearing, the trustee testifies that "a gentleman by the name of Daniels . . . called me I think on two occasions. To say he was rude is being courteous to him. And he called me on behalf of [the debtor], told me that he was an attorney and that he worked with D'Ambrosio, and just unbelievable things that he was saying over the phone to me." (Main Case Document No. 59A, at 17, lines 4–10).

76. 10/14/99 At the conclusion of the evidentiary hearing the bankruptcy court makes oral findings of fact and conclusions of law as follows:

"The Chapter 7 Trustee, Marie Henkel, is the only party authorized to assert the rights of the Debtor in connection with any distributions from that estate. And I really need to stress that because you really need to explain this to Mrs. Lickman, Mr. Armstrong." (Main Case Document No. 59A at 89, lines 14–19).

" . . . under 362(a)(3) of the Bankruptcy Code all parties in interest, including Ms. Lickman as well as Mr. Segal were prohibited from taking any action to exercise any control over property of the estate. This claim constitutes property of the estate." (Main Case Document No. 59A at 90, lines 2–8).

"[A]t this point those claims [against the executrix] are managed [by] this Chapter 7 Trustee. I don't know how the Chapter 7 Trustee intends to proceed in the probate proceeding. I do not know if she is going to retain counsel, take it up or a specific role. I don't know but that is her decision. It is not the Debtor's decision." (Main Case Document No. 59A at 93, lines 14–20).

"[A]ny person taking any action including the executrix in Ms. Pfeiffer's probate estate, the attorney for the executrix, David Segal, or the Debtor, Paula Lickman, to divest, deny, alter or in any way affect the right of the Debtor to receive a distribution under Ms. Pfeiffer's estate is subject to that injunction under Section 362(a)(3)." (Main Case Document No. 59A at 90, lines 9–15).

"Prior to any party taking any such action to exercise control in the probate case of Ms. Pfeiffer's estate, they need to obtain court approval here first. Failure to obtain Court approval can result in sanctions and damages as well as a determination that any improper actions were void ab initio." (Main Case Document No. 59A at 90, lines 15–21).

77. 10/14/99 At the evidentiary hearing, the bankruptcy court does not assess sanctions against the debtor or Segal for their violations of the automatic stay but reserves jurisdiction to do so in the future, warning them that should they continue to take any further actions without first obtaining modifications of the automatic stay monetary sanctions and damages will be awarded (Main Case Document No. 59A at 92, lines 18–23).

78. 10/14/99 At the conclusion of the evidentiary hearing, the bankruptcy court specifically enjoins the debtor, Segal, and any parties in interest in the probate estate "from taking any further action to divest this [bankruptcy] estate of their entitlement to the distributions to the probate estate without first obtaining leave of court." (Main Case Document No. 59A at 92, lines 13–17).

79. 10/14/99 At the evidentiary hearing, the bankruptcy court also determines that all papers filed in the probate estate by Segal or the debtor in violation of the automatic stay are void ab initio, including the executrix' petition to amend distribution, the debtor's petition to remove trustee, and the debtor's petition to strike the trustee's notice of appearance. (Main Case Document No. 59A, at 91, lines 20–25, at 92, lines 17, and at 95–96).

80. 10/14/99 Immediately after the evidentiary hearing, Armstrong reports the court's ruling to the debtor and Daniels (Adv. Proc. 01–170, Document No. 82, at 124, lines 14–24).

81. Mid 10/99 Sometime thereafter, Armstrong calls D'Ambrosio and tells him, "I lost." (Adv. Proc. 01–170, Document No. 82, at 126, lines 21–25, and at 127, lines 1–2).

 *The court does not credit Armstrong's testimony that he did not discuss with D'Ambrosio the "ramifications" of the court's ruling that the probate asset was property of the estate, that the debtor's actions in Pennsylvania violated the automatic stay, and that the debtor was enjoined from taking further actions against the probate asset.*

82. 10/18/99 The bankruptcy court enters an order on the trustee's motions for sanctions ("October 18, 1999 sanctions order"). The order provides that the debtor's interest in the probate estate of Tibey Pfeiffer is property of the estate, that all pleadings filed in the probate estate that "purport to impair or affect the interest of the bankruptcy estate" are void, and that "[a]ll parties in interest in the Tibey Pfeiffer probate estate are enjoined from taking any further action that may affect or impair the bankruptcy estate's interest in the probate estate without prior approval of the Bankruptcy Court." The order is served on the debtor at her address of record at that time, Armstrong, Segal, the trustee, Concannon, and the United States Trustee (Main Case Document No. 37, Plaintiff's Exhibit No. 113).

83. 10/19/99 The Pennsylvania probate court conducts a status hearing. The debtor is present at the hearing (Defendants' Exhibit No. 25, at 2, lines 13–14).

 O'Connell attends the hearing and presents the bankruptcy court's October 18, 1999, sanctions order to the court. The Pennsylvania probate court and the parties discuss the extent to which the debtor can participate in litigation pending in the probate court and agree that she can appear only as a witness (Defendants' Exhibit No. 25).

84. 10/19/99 The Pennsylvania probate court enters an order scheduling a trial for May 1, 2000, of the Lickmans' petition to remove executrix and the executrix' petition to amend distribution of

probate estate (Main Case Document No. 99, Debtor's Exhibit No. 9).

85. 10/22/99 The debtor files in the bankruptcy court a timely notice of appeal of the bankruptcy court's order on the trustee's motion for sanctions (Main Case Document No. 38, Plaintiff's Exhibit No. 82).

*The debtor does not seek a stay pending appeal.*

86. 10/99 5/00 O'Connell performs services in Pennsylvania probate court relating to the administration of the probate asset (Plaintiff's Exhibit No. 144–2095–7). The bankruptcy estate incurs $516.50 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095–7).

87. 10/27/99 The trustee's counsel files in the bankruptcy court the trustee's motion for summary judgment of her adversary complaint to determine property of the estate on the basis that the court determined in its October 18, 1999, sanctions order that the probate asset is property of the bankruptcy estate (Adv. Proc. 99–227, Document No. 4, Plaintiff's Exhibit No. 55).

88. 10/28/99 D'Ambrosio sends a letter to the trustee advising that he has "been retained in connection with possible litigation which may be commenced on [the debtor's] behalf against you." The letter asks the trustee to retain her files in connection with any communications she has with Segal or the executrix (Plaintiff's Exhibit No. 16). The bankruptcy estate incurs $38 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*D'Ambrosio has previously withdrawn from his representation of the debtor in her bankruptcy case.*

89. 10/28/99 D'Ambrosio sends a letter to S. Concannon advising that he has "been retained in connection with possible litigation which may be commenced on [the debtor's] behalf against you." The letter asks Concannon to retain his files in connection with any communications he has with Segal or the executrix (Plaintiff's Exhibit No. 17). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*D'Ambrosio has previously withdrawn from his representation of the debtor in her bankruptcy case.*

90. 10/29/99 Armstrong sends a letter to S. Concannon and O'Connell advising that the trustee is "obligated to protect the interest of Paula Lickman as a debtor and as a potential creditor if a surplusage exists or could have later been found to exist." The letter also states that, "We have concerns regarding your representation of [the trustee] in the probate estate." The letter includes ten interrogatories as to anticipated actions to be taken by the trustee in the probate estate. The letter concludes "my client intends to pursue supplemental recourse against certain parties involved in these actions for failure to perform certain fiduciary duties, misappropriations, and failure to protect the heirs and beneficiaries of the estate, among

other causes of action." The letter requests that Concannon and O'Connell "preserve all correspondence, notes, and records of [their] involvement . . . ." (Defendants' Exhibit No. 26, Plaintiff's Exhibit No. 18). The bankruptcy estate incurs $38 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

91. 10/29/99 Armstrong files in the bankruptcy court the debtor's designation of record and statement of issues in connection with the appeal of the October 18, 1999, sanctions order. The statement of issues includes the propriety of reopening the debtor's case, venue, as well as issues about the substantive rulings made by the court (Main Case Document No. 41, Plaintiff's Exhibit No. 114).

92. 11/3/99 The bankruptcy court notices a hearing for December 16, 1999, of the trustee's motion for summary judgment on the trustee's complaint to determine property of the estate. (Adv. Proc. 99–227, Document No. 6).

93. 11/5/99 Armstrong files in the bankruptcy court the debtor's motion to compel abandonment of the probate estate asset. The motion asserts that the "debtor's present interest consists of a negative balance . . . ." The motion also states that "it is extremely unlikely that even if surcharges are awarded in favor of debtor that same can be collected, as executrix resides outside the United States and no bond was initially filed to protect against losses." The motion further states that *should trustee carry on with the necessary litigation [in the probate case] the costs of such litigation would be burdensome to the bankrupt estate and of inconsequential (if any) value and benefit to the estate. The Trustee's claim of a share of the Debtor's interest in the decedent's estate has far less value than the cost of recovering the speculative funds.*" Finally, the motion asserts that the bankruptcy case was reopened in an improper venue (Emphasis added). (Main Case Document No. 43, Plaintiff's Exhibit No. 83). The bankruptcy estate incurs $41.16 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095).

*The debtor's position with respect to the putative claims against the executrix is inconsistent with earlier informal communications made by Daniels, the debtor, and D'Ambrosio. See App. 1 Nos. 29, 30, 31, 36, 40, 41, 42, and 43 supra.*

94. 11/5/99 D'Ambrosio sends a letter to L. Concannon stating that "Ms. Lickman and I" have received a copy of a certificate of service filed by Concannon in the Pennsylvania court. The letter asks for proof of Concannon's good standing in the Pennsylvania Bar, failing which "I will assume you are not admitted in Pennsylvania and my ethical obligation [will] require me to immediately notify the Florida Bar of your action." (Plaintiff's Exhibit No. 19). The bankruptcy estate incurs $48 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*D'Ambrosio has previously withdrawn from his representation of the debtor in her bankruptcy case.*

95. 11/8/99 L. Concannon sends a letter to D'Ambrosio stating that the certificate of service that she signed and submitted for filing in the Pennsylvania probate court was miscaptioned and erroneously submitted for filing. The letter further states that the certificate of service was not accepted by the Pennsylvania probate court but was instead returned to her.

The letter further brings to D'Ambrosio's attention the bankruptcy court's October 18, 1999, sanctions order finding the debtor and Segal to be in violation of the automatic stay. The letter states Concannon's intention to seek sanctions against D'Ambrosio if he continues to "assert threats of criminal and ethical violations in the hope of obtaining a monetary advantage" for the debtor. (Defendants' Exhibit No. 1).

96. 11/15/99 The trustee's counsel files in the bankruptcy court an adversary proceeding to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 1, Defendants' Exhibit No. 36, Plaintiff's Exhibit No. 68). The bankruptcy estate incurs $3,249.12 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095 and 2095B).

97. 11/15/99 The trustee's counsel files in the bankruptcy court the trustee's objection to the debtor's motion to compel abandonment stating that there are assets of at least $20,000 to be administered (Main Case Document No. 44).

98. 11/15/99 The debtor sends a letter to the Florida Bar initiating a complaint against the trustee and L. Concannon for "numerous acts of both unethical conduct and dishonesty . . . ." The letter states that the trustee and L. Concannon "have attempted to defraud me of an inheritance now pending in the Philadelphia, Pennsylvania probate court . . . ." (Plaintiff's Exhibit No. 20).

The letter also asserts that the trustee and her counsel filed "Notices of Appearances in Philadelphia, which indicates they are appearing as an attorney in the Pennsylvania matter, when in fact neither of these attorneys are admitted to the Pennsylvania Bar." The letter complains that, "the Notices of Appearances . . . were filed on my behalf, without [my] knowledge and consent . . . ." (Adv. Proc. 01–170, Plaintiff's Exhibit No. 20, Document No. 81, at 75, lines 14–25).

The Florida Bar ultimately concludes that there is "no cause to investigate the matter further" and that the complaint will be purged "from their files within a year." (Adv. Proc. 01–170, Document No. 81, at 76, line 1–9, Plaintiff's Exhibit No. 144).

99. 11/17/99 Armstrong files in the bankruptcy court the debtor's response and motion to dismiss the trustee's complaint to determine property of the estate. The motion seeks dismissal of the adversary proceeding because it fails to join an indispensable party, fails to state a claim upon which relief can be granted, and because it was filed in an improper venue. The motion asserts that venue is proper only in Texas or Pennsylvania (Adv. Proc. 99–227, Document No. 13, Plaintiff's Exhibit No. 56).

100. 11/17/99 Armstrong files in the bankruptcy court the debtor's certificate seeking an emergency hearing. The certificate seeks an emergency hearing of the debtor's motion to dismiss the trustee's complaint to determine property of the estate because "[a]ll issues are subject to the Debtor's Motion for Abandonment and the venue issue." (Adv. Proc. 99–227, Document No. 11, Plaintiff's Exhibit No. 57). The bankruptcy estate incurs $19 in attorney's fees and costs in relation to this event (Plaintiff's Exhibit No. 144–2095).

101. 11/19/99 The debtor sends a letter to The Florida Bar initiating a complaint against Sean Concannon for "improperly serving" her with papers in her bankruptcy case while she is represented by counsel (Plaintiff's Exhibit No. 21). The bankruptcy estate incurs $1,322.35 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–6).

*F.R.B.P. 9014 provides that the debtor must be served and noticed of any motion in which relief is sought against the debtor regardless of whether the debtor is represented by counsel. Similarly, F.R.B.P. 2002(a) requires that specific notices must be served on the debtor regardless of whether the debtor is represented by counsel.*

102. 11/19/99 S. Concannon reviews the bankruptcy case file and drafts a motion for sanctions (Plaintiff's Exhibit No. 144–2095). The bankruptcy estate incurs $323 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

103. Between 12/6/99—2/3/00 Daniels calls S. Concannon to inform him that Daniels is "developing a whole new area of expertise in legal malpractice." Daniels asserts that if a plaintiff drafts a "complaint such that it alleges intentional misconduct on [sic] part of the attorney, that the carrier won't even defend that." Daniels doesn't announce any stated purpose for the call, other than to assert that the trustee should be "closing the case and terminating the bankruptcy." Concannon perceives Daniels' telephone call as "a thinly veiled threat." (Adv. Proc. 01–170, Document No. 83, at 275, lines 7–25, and at 276, lines 1–8).

104. 12/8/99 Daniels calls S. Concannon to arrange a deposition of the trustee. Daniels represents that he is with D'Ambrosio's office (Adv. Proc. 01–170, Document No. 83, at 268, lines 4–10, Plaintiff's Exhibit No. 144).

105. 12/14/99 D'Ambrosio files in the bankruptcy court a notice of appearance and substitution of counsel substituting himself for Armstrong (Main Case Document No. 48, Adv. Proc. 99–227, Document No. 16, and Adv. Proc. 99–282, Document No. 5, Plaintiff's Exhibit Nos. 84 and 85). The bankruptcy estate incurs $256.50 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*D'Ambrosio does not file a statement of compensation as required by F.R.B.P. 2016(b). See Whaley, 282 B.R. at 42 [requiring attorney to disgorge undisclosed fees].*

*The court specifically finds incredible Armstrong's testimony that he withdrew from the case in part because trustee's*

counsel threatened Armstrong with sanctions if he continued to appear in the case (Document No. 82, at 148–149). It is apparent from the record that D'Ambrosio consistently worked on the debtor's behalf throughout the pendency of the reopened bankruptcy case, even during the time in which he was not representing the debtor in the bankruptcy case, and intended to resume representation of the debtor as soon as he could reasonably do so. See App I Nos. 67, 88, and 89 supra. D'Ambrosio substituted in for Armstrong as debtor's counsel in December 1999 because he had cured the deficiency that prevented him from representing the debtor earlier—membership in the bar of the Middle District of Florida—and not because Armstrong had been threatened by trustee's counsel and as a consequence would no longer represent the debtor.

| | | |
|---|---|---|
| 106. | 12/14/99 | D'Ambrosio deposes the trustee (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $255 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095). |
| 107. | 12/14/99 | At the deposition D'Ambrosio introduces Daniels as his "assistant." Daniels assists D'Ambrosio with the deposition (Adv. Proc. 01–170, Document No. 81 at 71, lines 10–21, and Document No. 82, at 240, lines 16–23). |
| | | During the deposition, D'Ambrosio also refers to Daniels as his "associate." (Adv. Proc. 01–170, Document No. 82, at 241, lines 15–25). |
| 108. | 12/14/99 | D'Ambrosio files in the bankruptcy court an emergency motion seeking a continuance of the hearing scheduled for December 16, 1999, of the trustee's motion for summary judgment on the trustee's complaint to determine property of the estate. The motion asserts that the hearing should be continued because the debtor's motion for abandonment of the probate asset has not yet been heard and issues as to "lack of jurisdiction, both as to the subject matter and venue have not been heard or waived." (Adv. Proc. 99–227, Document No. 19). |
| 109. | 12/16/99 | The bankruptcy court conducts a preliminary hearing on the trustee's motion for summary judgment on her complaint to determine property of the estate and sets the motion for evidentiary hearing on February 2, 2000 (Adv. Proc. 99–227, Document Nos. 17 and 18). |
| 110. | 12/17/99 | D'Ambrosio sends a letter to L. Concannon noting a paucity of correspondence with executrix' attorney and asking for an explanation (Plaintiff's Exhibit No. 23). |
| 111. | 12/17/99 | D'Ambrosio files in the bankruptcy court the debtor's motion to dismiss the trustee's complaint seeking to revoke the discharge. The motion seeks Rule 9011 sanctions in the amount of $3,100 as "the amount the Debtor has thus far expended in attorney's fees and disbursements . . . ." (Main Case Document No. 49, Plaintiff's Exhibit No. 86). |
| | | *D'Ambrosio improperly files this motion in the main bankruptcy case.* |

112. 12/20/99 O'Connell sends a letter to D'Ambrosio in which he states his willingness to "review whatever evidence [the debtor] may be willing to submit for [O'Connell's] consideration." The letter cautions, however, that "[D'Ambrosio's] letter suggests that I represent Paula Lickman. As you will [sic] know, I am acting as local counsel for Marie Henkel, the bankruptcy trustee. Any actions taken [as to litigation in the probate estate] will be subject to approval by the Bankruptcy Court." (Defendants' Exhibit No. 2). The bankruptcy estate incurs $38 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

113. 12/22/99 The bankruptcy court enters an order approving the trustee's employment of special Pennsylvania counsel, O'Connell (Main Case Document No. 51, Defendants' Exhibit No. 32).

114. 12/22/99 DAmbrosio files in the bankruptcy court the debtor's application for payment of administrative expense in the amount of $17,000 on account of attorney's fees the debtor and her brother allegedly paid prior to the reopening of her bankruptcy case (Main Case Document No. 52). The bankruptcy estate incurs $5,491 in attorney's fees and costs in relation to this event and related events (Plaintiff's Exhibit No. 144–2095 and 2095–3).

115. 12/27/99 The debtor sends a letter to The Florida Bar in connection with S. Concannon's response to her grievance against him. The letter asserts that "Concannon and [the trustee] were required by Court order to preserve the assets of the Probate estate, which might inure to me, and to take action, as I have done, to attempt to recover the Probate estate's dissipated funds." The letter further asserts that as a consequence of the trustee's and Concannon's failures "the losses might be upwards of as much as $500,000." (Plaintiff's Exhibit No. 24).

116. 1/6/00 D'Ambrosio files in the bankruptcy court the debtor's emergency motion for relief from stay requesting that the stay imposed in her case be "annulled and/or terminated" and she be given relief from the October 18, 1999, sanctions order. The motion states that the trustee "has done *nothing* to attempt to collect and preserve the assets and pursue the claims in the Probate Court . . . ." and that the trustee and her counsel have "entered into a deplorable agreement with the executrix to completely *foreclose* every possible claim Debtor and her creditors might have in the Probate estate." The motion asserts that the court will be "a party to this mischief" if the court doesn't annul the stay (Main Case Document No. 53, Plaintiff's Exhibit No. 87). The bankruptcy estate incurs $76 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

117. 1/6/00 D'Ambrosio files in the bankruptcy court the debtor's motion for sanctions against S. Concannon. The motion seeks sanctions in the amount of $711 for Concannon's alleged failure to comply with discovery requests. The motion states, "Debtor has paid [D'Ambrosio] $350 for the almost two hours conducting the deposition and additional time spent reviewing the files in preparation." The motion also states that, "Debtor has also needlessly expended over $4000, most of it borrowed, in fees

and disbursements in a case which should never have been reopened." (Adv. Proc. 99–227, Document No. 20, Plaintiff's Exhibit No. 59). The bankruptcy estate incurs $253.14 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095).

| 118. | 1/14/00 | The trustee's counsel files in the bankruptcy court a notice of the trustee's intention to sell property of the estate. The notice states that the trustee is selling all of the debtor's interest in the probate estate, including any causes of action against Shain, individually or as executrix, for the sum of $23,500. The bankruptcy estate incurs $2,404.42 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095, 2095-4, and 2095-7). |

The notice states that "[t]he sale price is the approximate value of the BP Amoco Stock." The notice further states that the trustee "has retained special counsel knowledgeable in the field of Pennsylvania probate law and is satisfied that the claims against Marcy Shain Messa are valueless to the bankruptcy estate . . . ." and that the sale is in the best interests of the estate "because any higher sale price is unlikely."

With respect to the debtor's putative claims against Shain, the notice states that "[t]he potential claims against Marcy Shain Messa would require very extensive discovery and substantial litigation expenses in order to determine the value and merit of said claims. The probate estate would continue to expend estate assets in defending such causes of action with the likely result that the estate would be exhausted. In addition, Paula Lickman has caused the bankruptcy estate to incur substantial expenses defending and responding to frivolous claims and accusations. The limited partnership interests do not have sufficient value to justify further expense and risk of delay in liquidation of this asset. The proposed sale will terminate any risk of further diminution of the probate estate and will permit the trustee to expedite the closing of the case."

The notice provides a procedure by which other parties can bid for the estate asset (Main Case Document No. 55, Defendants' Exhibit No. 38).

*The basis upon which the trustee relies for her contention that the sale is in the best interests of the estate is almost identical to and consistent with the position that the debtor has adopted in her motion to compel abandonment. See App. I No. 93 supra.*

*The debtor does not bid on the probate asset.*

| 119. | 1/19/00 | A deputy clerk in the bankruptcy court calls D'Ambrosio and offers to "properly file [the debtor's motion to dismiss the complaint to revoke the debtor's discharge] in the related adversary proceeding file." D'Ambrosio treats her in a "rude and uncivil manner." |

The bankruptcy court strikes the debtor's motion to dismiss the complaint to revoke the debtor's discharge as procedurally deficient and directs D'Ambrosio to "maintain a civil, courteous

behavior towards all parties, the clerks, and the Court in connection with this case." (Main Case Document No. 57, Plaintiff's Exhibit No. 88).

120. 1/24/00 The trustee's counsel files in the bankruptcy court the trustee's notice of assets and a notice to file claims (Main Case Document Nos. 58 and 59, Defendants' Exhibit No. 33). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095).

Pursuant to this notice, creditors file unsecured claims in the total amount of $28,553.37 (Main Case Proofs of Claims Nos. 1–4).

121. 2/1/00 The debtor files in the bankruptcy court a pro se sworn opposition to the trustee's intention to sell property of the estate. The opposition asserts that "[o]nce the probate court enters an order for a further accounting I will have the opportunity to file objections and seek surcharges. * * * * My share, 15% would entitle me to $150,000, far more than the $23,000, which the Trustee has agreed to settle the bankruptcy claim in the Orphans Court." The opposition further asserts that "[t]he $400,000 bond and what assets remain in the account [in the probate estate] are available to satisfy any possible surcharges." (Main Case Document No. 60, Plaintiff's Exhibit No. 89).

*The debtor's calculations of her putative and estimated share of the probate estate are based upon an assumed $1,000,000 probate estate rather than the actual value reflected in the executrix' preliminary accounting. The debtor's calculations also do not take into account that she received predeath distributions in the amount of $42,500. Most importantly, the debtor's calculations do not take into account the costs of litigating her putative claims against the executrix.*

*This is the first time that the debtor relies upon the bond posted by the executrix in the probate estate as a means of recovery for damages or surcharges in the probate estate that might result because of the executrix' alleged malfeasance.*

122. 2/2/00 D'Ambrosio files in the bankruptcy court the debtor's objection to the trustee's notice of sale of property of the estate asserting that the proposed sale is the "product of a fraud and a deliberate course of misconduct upon this Court and borne of a conflict of interest and designed for no other purpose other than to enrich the Trustee herself, with absolutely no benefit whatsoever to the creditors, and destruction to the surplusage of the Debtor." (Main Case Document No. 61, Plaintiff's Exhibit No. 90).

123. 2/2/00 D'Ambrosio files in the bankruptcy court the debtor's motion to dismiss the trustee's complaint to revoke the debtor's discharge and for sanctions. The motion seeks $5,400 in attorney's fees and disbursements that "the Debtor has thus far expended" in this case (Adv. Proc. 99–282, Document No. 6A, Plaintiff's Exhibit Nos. 60 and 69).

124. 2/2/00 D'Ambrosio files in the bankruptcy court the debtor's answer to the trustee's complaint to determine property of the estate that denies the allegations in the trustee's complaint and reiterates the grounds set forth in the debtor's earlier motion to dismiss (Adv. Proc. 99–227, Document No. 26, Plaintiff's Exhibit No. 61).

125. 2/3/00 The bankruptcy court conducts an evidentiary hearing of numerous motions filed in the main case and related adversary proceedings, including the trustee's notice of Sale. D'Ambrosio and Armstrong represent the debtor at the hearing (Main Case Document No. 70).

The trustee testifies at the evidentiary hearing as to her reasoning and belief that the sale of the debtor's share in the Tibey Pfeiffer estate is in the best interests of creditors. In addition to the reasons set forth in her notice, the trustee testifies that she also wants to foreclose the possibility that parties in the probate estate could file claims in the bankruptcy case (Main Case Document No. 70, at 26, lines 11–22).

126. 2/3/00 Daniels assists D'Ambrosio at the evidentiary hearing by carrying boxes in for D'Ambrosio but leaves the hearing after the debtor is called as a witness (Adv. Proc. 01–170, Document No. 81 at 71, lines 20–25, and at 72, lines 1–11).

The hearing is not concluded and is adjourned to February 22, 2000.

127. 2/3/00 After the hearing Daniels is observed in the parking lot standing with the debtor, Armstrong, and D'Ambrosio. (Adv. Proc. 01–170, Document No. 81, at 73, lines 6–9, and Document No. 82, at 133, lines 24–25, and at 134, lines 1–3).

128. 2/00 Subsequent to the February 3, 2000, hearing, Armstrong gives to the debtor the majority of his original files relating to his representation of the debtor in her bankruptcy case. The debtor is supposed to copy the files and return them to Armstrong. The debtor does not return the original files to Armstrong (Adv. Proc. 01–170, Document No. 85, at 541, lines 7–25, and at 542, lines 1–15).

129. 2/7/00 The debtor sends a letter to The Florida Bar providing additional information in furtherance of her bar complaint against S. Concannon (Plaintiff's Exhibit No. 25).

130. 2/7/00 The bankruptcy court transmits to the Florida federal district court the debtor's appeal of the October 18, 1999, sanctions order. The district court assigns the appeal Case No. 6:00–CV–165–ORL–22B. The district court notes Armstrong as the debtor's attorney (Main Case Document No. 65).

131. 2/22/00 The bankruptcy court resumes the February 3rd hearing. At the conclusion of the hearing, the court makes findings of fact and conclusions of law approving the trustee's notice of sale and denying the debtor's motions (Main Case Document No. 67).

As part of its findings of fact and conclusions of law, the court states: The debtor "wants this Trustee to simply walk away so she can continue [her litigation against the executrix] without providing any type of recovery, even acknowledging the validity of the claims of her own creditors in this case. Rather she says it's her money, she should keep it, and the creditors should just go away because they were, as she stated in an earlier hearing on October 14, 1999, they were just credit card debts."

The court evaluates the proposed sale, *acknowledging that the purchaser is the person who is the target of the alleged claims for misconduct.* The court then finds that, in the absence of a higher and better offer, the record establishes that "no matter how you cut the probate pie" the sale is "a good deal for the creditors in this estate . . . even in light of the very distressing and troubling facts that in the end of this case, these creditors probably aren't going to get much because of the extraordinarily high administrative expenses necessary to be incurred to get to this point." The court states that "Most of these inflated administrative costs are attributable to the nature of the litigation instituted by the debtor who in this case I would find has—seems to have an apparent lack of concern for paying the debt that she incurred and for which she filed this bankruptcy." (Emphasis added) (Adv. Proc. No. 99–227, Document No. 45, at 11–121).

132. 2/22/00 After the continued evidentiary hearing concludes, Daniels is observed "yelling at the top of his lungs into his cell phone that the judge [is] crooked . . . . ." (Adv. Proc. 01–170, Document No. 81, at 73, lines 10–16).

133. 2/24/00 The bankruptcy court enters an order denying the debtor's motion to revoke the order reopening the debtor's bankruptcy case (Main Case Document No. 69).

134. 2/28/00 The bankruptcy court enters an order granting the trustee's motion for summary judgment of her complaint to determine property of the estate. The court grants summary judgment based upon its October 18, 1999, sanctions order determining that the debtor's interest in the probate estate, including all causes of action thereto, is property of the bankruptcy estate. The court also denies the debtor's motions to dismiss and for sanctions against S. Concannon. (Adversary Proceeding No. 99–227, Document No. 29, Plaintiff's Exhibit Nos. 62 and 103).

135. 2/28/00 The bankruptcy court enters an order approving the trustee's notice of sale, overruling the debtor's objections made pro se and through counsel, and denying the debtor's motions for relief from stay and to compel abandonment of estate property (Main Case Document No. 71, Plaintiff's Exhibit No. 92).

136. 2/28/00 The bankruptcy court enters an order denying the debtor's motion to dismiss the trustee's complaint to revoke the debtor's discharge (Adversary Proceeding No. 99–282, Document No. 9, Plaintiff's Exhibit No. 71).

137. 2/29/00 D'Ambrosio files in the bankruptcy court the debtor's amended notice of appeal purporting to add "judgments/orders of [bank-

ruptcy judge]" to the pending appeal of the October 18, 1999, sanctions order (Adv. Proc. 99–227, Document No. 30, Plaintiff's Exhibit No. 63).

138. 2/29/00 The Florida federal district court enters an order to show cause why the appeal of the October 18, 1999, sanctions order should not be dismissed for the debtor's failure to file a brief—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit No. 115).

139. 3/6/00 The debtor files in the Florida federal district court a response to the district court's order to show cause stating her intention not to file a brief because she is going to be appealing numerous orders of the bankruptcy court—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit Nos. 118, 120, and 157).

140. 3/8/00 D'Ambrosio files in the bankruptcy court attachments to the debtor's notice of appeal. The attachments are two orders entered in the main case on the trustee's notice of sale and the debtor's motion to revoke the order reopening the bankruptcy case. The attachments also include the court's order granting summary judgment in favor of the trustee and denying the debtor's motions to dismiss and for sanctions (Adv. Proc. 99–227, Document No. 31, Plaintiff's Exhibit No. 72).

141. 3/8/00 D'Ambrosio files in the bankruptcy court a notice of appeal of the court's order denying the debtor's motion to dismiss complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 10).

142. 3/16/00 The bankruptcy court enters an order of conditional dismissal, conditionally dismissing the debtor's appeal as to the main case orders unless the debtor files the appropriate pleadings and pays the requisite fees (Adv. Proc. 99–227, Document No. 32, Plaintiff's Exhibit No. 64). The bankruptcy estate incurs $39.80 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*The debtor does not pay the requisite fees necessary to initiate appeals of the court's orders approving the trustee's notice of sale and denying the debtor's motion to revoke the order reopening her bankruptcy case.*

143. 3/17/00 D'Ambrosio files in the bankruptcy court the debtor's amended designation of record and statement of issues on appeal. The statement of issues includes numerous issues of the court's bias in addition to a legal issue relating to the court's denial of the debtor's motion to dismiss trustee's complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 13, Plaintiff's Exhibit No. 76).

144. 3/20/00 D'Ambrosio files in the bankruptcy court the debtor's answer to the trustee's complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 14, Plaintiff's Exhibit No. 74).

145. 3/23/00–6/28/01 S. Concannon prepares to meet with the Assistant U.S. Trustee to discuss the debtor's bankruptcy case (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $580.75 in attorney's

fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

146. 3/24/00 D'Ambrosio files in the Florida federal district court a notice of substitution for Armstrong as counsel for the debtor—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit Nos. 117 and 157).

147. 3/24/00 The Florida federal district court puts D'Ambrosio on the service list but does not remove Armstrong (Plaintiff's Exhibit No. 157).

148. 3/24/00 D'Ambrosio files in the Florida federal district court appeal of the October 18, 1999, sanctions order the debtor's motion for stay pending appeal. The motion asserts that the bankruptcy court is "attempting to frustrate Debtor's ability to take an appeal .... [because appeals of individual orders] will not be transferred to [the district court] unless a separate additional appeal fee of $105 is paid for *each* order ...." The motion asks the district court to "invoke its powers and stay all proceedings and orders of the bankruptcy court."—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit Nos. 116 and 157).

149. 3/27/00 D'Ambrosio files in the bankruptcy court the debtor's attachments to the notice of appeal in response to the court's order of conditional dismissal. The attachments reflect that the debtor appeals the court's orders on summary judgment, motion to dismiss, and motion for sanctions (Adv. Proc. 99–227, Document No. 34).

150. 3/27/00 D'Ambrosio files in the bankruptcy court motions to withdraw as counsel for the debtor, stating that "[i]t now appears that any efforts to assist the Debtor before this Court would be futile." The motions state that the debtor "is unable to pay any further fees ...."

The motions are supported by the debtor's affidavit in which she states, "I have expended substantial sums in attorneys fees in this case as well as in Pennsylvania. I am now out of work and unable to pay any further attorney's fees." (Main Case Documents No. 72, Adv. Proc. 99–227, Documents Nos. 37 and 39, Adv. Proc. 99–282, Documents Nos. 16 and 18, Plaintiff's Exhibit Nos. 65, 75, and 93). The bankruptcy estate incurs $95 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

151. 3/31/00 The trustee receives a cashier's check from Segal in payment for the debtor's interest in the Pennsylvania probate estate (Plaintiff's Exhibit No. 144).

152. Early 4/00 The Florida Bar decides to take no action on the debtor's complaint against S. Concannon (Plaintiff's Exhibit No. 144).

153. 4/3/00 The Florida federal district court enters an order dismissing the debtor's appeal of the October 18, 1999, sanctions order for her failure to timely file a brief. The order denies as moot the debtor's motion for stay pending appeal but notes that the motion was improperly brought in the district court in violation

of F.R.B.P. 8005—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit Nos. 118 and 157).

*The order is captioned in the district court and contains district court and bankruptcy court case numbers. The last two paragraphs of the order provide for the dismissal of the appeal and direct the district court clerk to close the appellate case—Case No. 6:00–CV–165–ORL–22B.*

154. 4/5/00 The bankruptcy court receives a Notice of Transmittal of Case Paper indicating service to the bankruptcy judge, the bankruptcy clerk's office, and the assistant U.S. trustee of the Florida federal district court's order dismissing the debtor's appeal of the October 18, 1999, sanctions order and attaching a copy of the April 3, 2000, order dismissing the appeal (Main Case Document No. 74).

*The order is captioned in the district court and contains district and bankruptcy court case numbers. The order is three pages in length. The last two paragraphs of the order provide for the dismissal of the appeal and direct the district court clerk to close the appellate case—Case No. 6:00–CV–165–ORL–22B.*

155. 4/5—4/6/00 L. Concannon, the trustee's counsel, receives a copy of the April 3, 2000, Florida federal district court's order that is identical in form to the bankruptcy court's copy—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit No. 158).

*The order is captioned in the district court and contains district court and bankruptcy court case numbers. The last two paragraphs of the order provide for the dismissal of the appeal and direct the district court clerk to close the appellate case—Case No. 6:00–CV–165–ORL–22B.*

156. 4/5—4/6/00 Armstrong receives a copy of the April 3, 2000, Florida federal district court's order dismissing appeal either through the mail or by obtaining a copy from the district court (Adv. Proc. 01–170, Document No. 85, at 544, lines 1–16).

*Armstrong testified that he could not remember whether the district court order dismissing the debtor's appeal of the October 18, 1999, sanctions order that he received or obtained from the district court was the same or different from the order received by the bankruptcy court and Concannon (Adv. Proc. 01–170, Document No. 85, at 520, lines 10–21).*

*The court does not credit Armstrong's testimony to the extent it supports a conclusion that Armstrong received an order from the district court that was different from the order received by the bankruptcy court and Concannon.*

157. 4/5—4/6/00 Armstrong faxes the April 3, 2000, Florida federal district court order to the debtor or Daniels (Adv. Proc. Doc. No. 85, at 542–544).

*Although Armstrong could not remember to whom he faxed the district court order dismissing the debtor's appeal of the October 18, 1999, sanctions order, D'Ambrosio testified with-*

out objection that Armstrong faxed the order to Daniels (Adv. Proc. 01–170, Document No. 85, lines 11–21). The court credits this testimony.

158. 4/5—4/6/00 D'Ambrosio receives a copy of the April 3, 2000, Florida federal district court order (Adv. Proc. 01–170, Document No. 85, at 474, lines 8–13).

*The court does not credit and finds incredible D'Ambrosio's repeated testimony that the district court April 3, 2000, order that he received was different in its form to the order received by the bankruptcy court and Concannon (Adv. Proc. 01–170, Document No. 85, at 472, lines 6–21, at 477, lines 15–19, at 489, lines 1–14, and at 504, lines 6–23).*

*D'Ambrosio testified that during the trial he examined the order that the district court sent to him to verify his testimony that the style of that order was inconsistent with the order received by the bankruptcy court and Concannon (Adv. Proc. 01–170, Document No. 85, at 504, lines 1–23). Yet, D'Ambrosio was very evasive as to whether he had possession of the order that he received directly from district court, that was purportedly different in its style to the order received by the bankruptcy court and Concannon (Adv. Proc. 01–170, Document No. 85, at 475, lines 21–23, at 447, lines 20–23). Notably, D'Ambrosio did not offer his copy of the order that he received from district court into evidence during the trial (Emphasis added)(Adv. Proc. 01–170, Document No. 85, at 478, lines 20–23).*

159. 4/19/00 The trustee's counsel files in the bankruptcy court a motion to reschedule the trial of the trustee's complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 20).

160. 4/24/00 D'Ambrosio files in the bankruptcy court a notice of filing that states, "PLEASE TAKE NOTICE, that the Debtor–Appellant, Paula Lickman files an Order of the United States District Court entered April 3, 2000, which order directed that the above-styled case [the bankruptcy case] be closed." (Main Case Document No. 76, Plaintiff's Exhibit No. 94). The bankruptcy estate incurs $57 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

*D'Ambrosio testified that he prepared and filed this notice because he had a good faith belief that the final decretal paragraph of the district court order attached to the notice was directed at the bankruptcy court and required the bankruptcy court to close the debtor's bankruptcy case. (Adv. Proc. 01–170, Document No. 82, at 245–46).*

*The court specifically finds that D'Ambrosio's testimony was incredible on this point. D'Ambrosio practices in the bankruptcy field (Adv. Proc. 01–170, Document No. 82, at 220, lines 8–14). Nobody with even a rudimentary knowledge of bankruptcy would accept at face value and without further investigation an order by the district court that purportedly directed the bankruptcy court to close a bankruptcy case in which matters were pending.*

*Although D'Ambrosio conceded that he filed the notice of filing because he wanted the bankruptcy court to close the case, he was adamant that the notice of filing was unrelated to the debtor's actions that had been or were to be taken in the Pennsylvania probate court (Adv. Proc. 01–170, Document No. 85, at 490–91). The court does not credit this testimony. The totality of the evidence and testimony supports a conclusion that D'Ambrosio filed the notice of filing at the direction of or upon consultation with Daniels or the debtor, or both of them, for the express purpose of facilitating actions that Daniels and the debtor were taking or would be taking in Pennsylvania.*

161. 4/24/00 Attached to D'Ambrosio's notice of filing is a version of the April 3, 2000, Florida federal district court order ("altered district court order") that omits the "vs" and the district court case number in the style (these appear on the same line of text). The altered district court order has a fax legend for Armstrong law office on the bottom of the document (Main Case Document No. 76, Plaintiff's Exhibit No. 94).

*D'Ambrosio was markedly evasive and less than candid in his testimony with respect to the provenance of the altered district court order. The totality of the evidence and testimony, however, supports the conclusion that Daniels or the debtor, or both of them, altered the April 3, 2000, district court order dismissing the debtor's appeal of the October 18, 1999, sanctions order specifically for the purpose of using the altered order in furtherance of closing the debtor's bankruptcy case, dismissing the pending adversary proceeding, and facilitating Daniels and the debtor's actions and planned actions in the Pennsylvania courts. The totality of the evidence and testimony further supports a determination that D'Ambrosio knew when he submitted for filing the notice of filing that the order he attached had been altered.*

*In reaching this conclusion the court credits Armstrong's testimony that he did not alter the district court order dismissing the debtor's appeal of the October 18, 1999, sanctions order (Adv. Proc. 01–170, Document No. 85, at 514, lines 6–7). The court finds significant D'Ambrosio's failure to attach the order he concededly received directly from the district court to his notice of filing rather than a faxed copy of the district court's order; his use of a notice of filing as a means to file the altered order rather than a motion that he would have signed subject to F.R.B.P. 9011; his later filing of a motion to close case (that he signed) that did not reference or attach the altered district court order as the basis for or in support of the requested relief; and his failure to produce at trial a copy of the order he received directly from district court. The court also finds significant Armstrong's testimony that he was "surprised" by the absence of a fax legend on the second and third pages of the altered order (Emphasis added)(Adv. Proc. 01–170, Document No. 85, at 532–3)*

*The court also finds significant D'Ambrosio's production at trial of a second version of the altered district court order that has been reduced and contains a fax legend on the top of the page with a date stamp and two fax legends on the bottom of the page (Defendants' Exhibit No. 37)(Emphasis added).*

D'Ambrosio produced this exhibit during his examination of Armstrong for the purpose of refreshing Armstrong's recollection of the date on which he sent the fax (Adv. Proc. 01–170, Document No. 85, at 532–35). D'Ambrosio conducted this examination late in the trial after the provenance of the altered district court order became an issue in this proceeding. D'Ambrosio represented that he obtained the second version of the altered order from Daniels and that Daniels had possession of the original (Adv. Proc. 01–170, Document No. 85, at 534).

| | | |
|---|---|---|
| 162. | 4/28/00 | The debtor files in the Florida federal district court a notice of appeal of the district court's April 3, 2000, order dismissing the appeal—Case No. 6:00–CV–165–ORL–22B (Plaintiff's Exhibit No. 157). |
| 163. | 4/28/00 | O'Connell files in the Pennsylvania probate court a petition to withdraw his appearance in the probate estate stating that Shain "now owns the former interest of [the debtor] . . . [and the trustee] no longer has any interest in the" probate estate (Defendants' Exhibit Nos. 29 and 32). |
| 164. | 5/1/00 | D'Ambrosio files in the bankruptcy court the debtor's amended designation of record and statement of issues on appeal. The statement contains issues of due process and bias and the court's substantive decision in denying the debtor's motion to dismiss the trustee's complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 25, Plaintiff's Exhibit No. 119). |
| 165. | 5/1/00 | D'Ambrosio files in the bankruptcy court the debtor's designation of record and statement of issues on appeal. The statement contains issues of bias, jurisdiction, and venue as well as issues relating to the court's substantive decisions in connection with the trustee's complaint to determine property of the estate (Adv. Proc. 99–227, Document No. 42, Plaintiff's Exhibit No. 66). |
| 166. | 5/1/00 | The debtor files in the bankruptcy court a pro se response to the trustee's motion to reschedule trial opposing the motion and requesting that the adversary proceeding be closed. The response states, "I understand that the district court, by Order of April 3, 2000, has ordered that this case be closed. A copy of said order was entered on April 3, 2000, and forwarded to the bankruptcy clerk. The order applies to this Court, *as such order listed only the bankruptcy case number, not the district court case number.*" The response requests that "this case be closed in accordance with the Order of the district court." |

The debtor attaches a copy of the altered district court order and circles the bankruptcy case caption and the final paragraph directing the clerk to close the case (Adv. Proc. 99–282, Document No. 26).

*The debtor relies upon the lack of the district court case number in the court's caption as support for her request that the bankruptcy court close her bankruptcy case and dispose the trustee's complaint to revoke the debtor's discharge. But*

for the altered district court order, the debtor would have had no basis to seek this relief.

*The totality of the evidence and testimony supports a conclusion that the debtor knew when she submitted for filing her pro se response that the order she attached had been altered. The totality of the evidence and testimony further supports the conclusion that the debtor filed the altered district court order in furtherance of closing her bankruptcy case and facilitating Daniels' and the debtor's actions and planned actions in the Pennsylvania courts.*

167. 5/3/00 The bankruptcy court conducts a hearing of D'Ambrosio's motions to withdraw as debtor's counsel. The court denies the motions (Main Case Documents Nos. 77 and 78, Adv. Proc. 99–227, Document No. 44, Adv. Proc. 99–282, Document No. 28A, Plaintiff's Exhibit Nos. 67 and 95).

168. 5/1/00 The Florida federal district court transmits to the court of appeals the debtor's appeal of the April 3, 2000, order dismissing the debtor's appeal of the October 18, 1999, sanctions order. The court of appeals assigns Case No. 00–12329–DD (Plaintiff's Exhibit No. 157).

169. 5/19/00 At the conclusion of trial, the bankruptcy court makes findings of fact and conclusions of law with respect to the trustee's complaint to revoke the debtor's discharge.

The court finds that "[t]he Debtor is a difficult litigant. She has filed several frivolous pleadings. She has asserted unfounded ethical grievances against the Trustee and her counsel. She alleges that the Court is biased and prejudiced. These outlandish types of litigation practices are frustrating to the Trustee and indeed to this Court. However, abusive litigation strategies do not prove that the Debtor acted deceptively or fraudulently in hiding assets before the case was reopened. Sanctions may be appropriate . . . ." Adv. Proc 99–282, (Document No. 32).

170. 5/19/00 The bankruptcy court enters judgment on the trustee's complaint to revoke the debtor's discharge in favor of the debtor (Adv. Proc. 99–282, Documents Nos. 32 and 33, Defendants' Exhibit No. 28, Plaintiff's Exhibit No. 77).

171. 5/00 The Pennsylvania probate court conducts a trial of the Lickmans' petition to remove executrix and appoint the debtor in her stead and the executrix' motion to eliminate the Lickmans as beneficiaries of the Tibey Pfeiffer probate estate. The probate court takes the matter under advisement (Adv. Proc. 01–170, Document No. 104, Plaintiff's Exhibit Nos. 18 and 30).

172. 6/9/00 The debtor files in the court of appeals her initial brief in the appeal of the order dismissing her appeal of the October 18, 1999, sanctions order. The brief states that the debtor "strongly suggests that the district court dismissed her appeal because, after becoming aware of the facts of the case, it chose not to put itself in the position of having to rule upon it."

The brief also suggests that the bankruptcy judge "seemingly went to great lengths to intentionally frustrate Appellant's statutory right to appeal, in what Appellant believes was a calculated attempt to hide the court's own improper actions during this much heated litigation."

The brief further states that, "Appellant posits that the actions of both the bankruptcy and district court to prevent Appellant's appeal was designed to keep this case from ever reaching this Court. Appellant also notes the paucity of bankruptcy cases from the Orlando Division of the Middle District of Florida to have been heard by this court."—Case No. 00–12329–DD (Plaintiff's Exhibit No. 120).

173. 7/5/00 The bankruptcy court enters an order dismissing as moot the debtor's appeal of the court's order denying debtor's motion to dismiss trustee's adversary complaint to revoke the debtor's discharge (Adv. Proc. 99–282, Document No. 34).

174. 7/17/00 The debtor files in the court of appeals a reply brief. The brief states that the district court's "outright dismissal of this Appellant's entire appeal ... demonstrate the district court's bias and hostility and further affords Appellant cause to have her appeal remanded before another district court judge *outside* of the Orlando division." The brief also alleges "that the Bankruptcy Judge ... deliberately ordered the Clerk to withhold transmittal to the district court while she attempted to thwart Appellant's appeal."—Case No. 00–12329–DD (Plaintiff's Exhibit No. 121).

175. 7/18/00 The debtor files in the court of appeals a motion to strike the trustee's appellee brief because of incorrect point size—Case No. 00–12329–DD (Plaintiff's Exhibit No. 122).

176. 7/31/00 The bankruptcy court transmits to the Florida federal district court the debtor's appeal of the court's orders granting summary judgment on the trustee's complaint to determine property of the estate in favor of the trustee and orders denying the debtor's motions to dismiss and for sanctions—Case No. 00–CV–978–ORL–18A (Adv. Proc. 99–227, Document No. 46).

177. 8/10/00 The debtor files in the court of appeals a motion to consolidate her appeal transmitted to the district court on July 31, 2000, with Case No. 6:00–CV–165–ORL–22B—Case No. 12329–DD (Plaintiff's Exhibit No. 123).

178. 9/11/00 The Florida federal district court enters an order to show cause why the appeal transmitted on July 31, 2000, should not be dismissed for the debtor's failure to file a brief—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 104).

179. 9/13/00 The court of appeals enters an order denying the debtor's motion to consolidate, construing it as a motion to direct the district court to consolidate under a single docket number appellant's separate appeals from the bankruptcy court and to supplement the record with the district court record—Case No. 00–12329–DD (Plaintiff's Exhibit No. 124).

180. 9/20/00 The debtor files a response to the Florida federal district court's order to show cause stating that the pending appeal should be redocketed in Case No. 6:00–CV–165–ORL–22B and "any further action in this case be held in abeyance pending a decision from the 11th Circuit [on the district court's dismissal of Case No. 6:00–CV–165–ORL–22B]." The response states that the debtor is now proceeding pro se—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 105).

181. 10/2/00 D'Ambrosio files in the court of appeals a notice of appearance on behalf of the debtor—Case No. 00–12329–DD (Plaintiff's Exhibit No. 125).

182. 10/4/00 The Florida federal district court enters an order directing the clerk to terminate D'Ambrosio as attorney for the debtor and directing the trustee to respond to the debtor's request to consolidate the pending appeal with Case No. 6:00–CV–165–ORL–22B—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 106).

183. 10/10/00 The debtor files in the Florida federal district court a supplemental response to the district court's order to show cause requesting that the district court consolidate her appeals and sanction the trustee in the amount of $344.50—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 107).

184. 10/12/00 The trustee's counsel files in the Florida federal district court the trustee's response to the district court's order directing response, requesting that the debtor's motion to consolidate be denied and citing the court of appeals' order denying the debtor's motion to consolidate—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 108).

185. 11/10/00 The Florida federal district court enters an order denying the debtor's request to consolidate appeals and finding that the pending appeal "was properly docketed as a separate appeal." The order directs the debtor to file a brief no later than December 8, 2000, failing which the appeal will be dismissed for lack of prosecution—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 110).

186. 12/7/00 The debtor files in the Florida federal district court a motion for disqualification of the district judge. The motion alleges bias because the district judge and the Orlando Bankruptcy Judge "are personal and social friends ... [who have] been observed having lunch" together. The motion alleges that the district judge is "determined to suppress ... evidence of misconduct on the part of the Trustee and abuse of discretion by the Bankruptcy Judge."—Case No. 00–CV–978–ORL–18A (Plaintiff's Exhibit No. 110).

187. Mid–December 2000 S. Concannon and the trustee evaluate what is needed to close the debtor's bankruptcy case (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

188. 1/24/01 The Florida federal district court dismisses with prejudice the debtor's appeal of orders entered in Adversary Proceeding No. 99–227 for the debtor's "deliberate refusal to obey a court

order" to file a brief. The district court also denies the debtor's motion for recusal—Case No. 00–CV–978–ORL–18A (Adv. Proc. 01–170, Document No. 47, Plaintiff's Exhibit No. 112).

189. Early 2001 Daniels contacts James F. Wiley, III ("Wiley") in relation to possible malpractice litigation against the debtor's Pennsylvania attorneys (Adv. Proc. 01–170, Document 84, at 404–405).

190. Early 2001 The debtor retains Wiley for this purpose. The scope of Wiley's employment later expands to include litigation in the probate estate and actions against the trustee and her attorneys. Wiley agrees to accept a contingency fee as payment for all of his services. This agreement is informal only and is not reduced to writing (Adv. Proc. 01–170, Document No. 84, at 406, lines 18–25, and at 407, lines 1–24).

*Wiley testified that he has received no payment for any of the legal services he has performed on behalf of the debtor (Adv. Proc. 01–170, Document No. 84, at 406, lines 10–11). Wiley was evasive and less than candid with the court as to his payment arrangements for services performed on behalf of the debtor.*

191. Early 2001 Wiley meets with Daniels and the debtor in his office in Pennsylvania and speaks with them on the telephone numerous times (Adv. Proc. 01–170, Document No. 84, at 413, lines 1–5).

Wiley communicates primarily with Daniels rather than the debtor (Adv. Proc. 01–170, Document No. 77, at 8, lines 1–3).

192. Early 2001 Wiley does not review the bankruptcy court file or contact the debtor's bankruptcy attorney for information about the debtor's bankruptcy case. Instead, he relies upon Daniels and the debtor for information about events that have occurred in the bankruptcy case (Adv. Proc. 01–170, Document No. 84, at 411, lines 12–16, at 414–416, and at 443, lines 12–25).

193. Early 2001–Forwards The papers that Wiley files are drafted first by Daniels and then reviewed and edited by Wiley before signing (Adv. Proc. 01–170, Document No. 84, at 439, lines 1–8, and Document No. 85, at 604, lines 13–15).

194. 3/1/01 The following advertisement appears in *The Florida Bar News,* Classified Section of the March 1, 2001, edition under "Other Personnel" "ORLANDO BANKRUPTCY Court. Do any attorneys or litigants have any instances of serious unethical conduct by any bankruptcy judge who are willing to join in the filing of a formal complaint under 28 U.S.C. 372? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Document No. 175, Plaintiff's Exhibit Nos. 26 and 144, *The Florida Bar News,* March 1, 2001, at 41). The bankruptcy estate incurs $247 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

195. 3/27/01 Wiley files in the Pennsylvania probate court the Lickmans' petition to withdraw their petition to remove trustee and to determine as a matter of law whether the in terrorem clause

was triggered by the Lickmans' petition to remove trustee. (Defendants' Exhibit Nos. 22 and 31).

196. 3/28/01 The court of appeals enters judgment affirming the Florida federal district court's dismissal of the debtor's appeal of the October 18, 1999, sanctions order and denying the appellee's motion for sanctions. The judgment further provides that each party is to bear its own costs—Case No. 00–12329–DD (Main Case Document No. 79).

197. 4/1/01 An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personnel" with the following text: "ORLANDO BANKRUPTCY Court. Do any attorneys or litigants have any instances of serious unethical conduct by any bankruptcy judge who are willing to join in the filing of a formal complaint under 28 U.S.C. 372? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Document No. 176, *The Florida Bar News,* April 1, 2001, at 40).

198. 4/16/01 O'Connell begins to prepare his fee application for services performed for the benefit of the bankruptcy estate (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $209.20 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095 and 2095–7).

199. 4/27/01 The Pennsylvania probate court grants the Lickmans' petition to withdraw their petition to remove the executrix. The court also denies the executrix' petition to amend her statement of distribution. The court finds as a matter of law that the Lickmans' petition to remove the trustee did not trigger the in terrorem clause.

The order refers to the debtor by name followed by the words "as her interest may appear" (Defendants' Exhibit Nos. 22 and 31).

*The debtor cites this order as support for her contention that the Pennsylvania probate court recognizes her standing to assert rights in the Tibey Pfeiffer estate. To the contrary, this order merely recognizes that the debtor's standing in the Tibey Pfeiffer estate is questionable.*

200. 5/24/01 Wiley files in the Pennsylvania probate court a petition to show cause why the agreement between the trustee and Shain to sell the bankruptcy estate's interest in the probate asset should not be voided. The petition cites the October 18, 1999, sanctions order and quotes language contained in the order enjoining the debtor from taking any action to interfere with the trustee's administration of the probate asset (Plaintiff's Exhibit No. 126). Daniels has drafted all or substantially all of this petition. *See* App. I No. 193 *supra.* The bankruptcy estate incurs $460.20 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095–7).

201. 6/1/01 S. Concannon sends a letter to Wiley giving Wiley an opportunity to immediately withdraw the petition to void the sale. The letter informs Wiley of the bankruptcy court's October 18, 1999, sanctions order. The letter states that the "only possible result of the relief that [Wiley] seek[s], i.e. voiding the sale of

the debtor's interest in the estate of Tibey Pfeiffer, is that purchaser [sic] will seek return of property of the bankruptcy estate." (Plaintiff's Exhibit No. 27).

| | | |
|---|---|---|
| 202. | 6/1/01 | S. Concannon advises the trustee to delay the filing of the trustee's final report in the debtor's bankruptcy case. (Plaintiff's Exhibit No. 144, 2095). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095). |
| 203. | 6/8/01 | Wiley sends a letter to the Pennsylvania probate court judge "asking that no further action be taken [on the petition to void sale]." The letter states that Wiley "can't withdraw the petition" because a response has been filed and asks the court's advice as to how to handle the matter (Plaintiff's Exhibit No. 28). |

At this point, Wiley knows about the October 18, 1999, sanctions order and understands "the essence of the order and ... what had been precluded." (Adv. Proc. 01–170, Document No. 84, at 439, lines 10–13).

*The court does not credit Wiley's testimony to the extent that it suggests Wiley did not know about the bankruptcy court's October 18, 1999, sanctions order and the acts that it enjoined until after he filed in the Pennsylvania probate court the debtor's petition to void the trustee's sale of the probate asset. Wiley clearly had knowledge of the existence and terms of the bankruptcy court's October 18, 1999, sanctions order when he filed the debtor's petition to void the sale because the motion quoted from the order. See App. I No. 200 supra.*

| | | |
|---|---|---|
| 204. | 6/11/01 | D'Ambrosio files in the bankruptcy court the debtor's motion to close her bankruptcy case. The motion states that the case should be closed because "this case has been fully administered 15 months ago ... any and all appeals having been abandoned." (Main Case Document No. 80, Plaintiff's Exhibit No. 96). The bankruptcy estate incurs $164 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095). |

*Notably, D'Ambrosio does not cite the altered district court order in support of the motion.*

*D'Ambrosio testified that his motion to close the debtor's bankruptcy case was unrelated to Daniels' and the debtor's actions that had been or were to be taken in the Pennsylvania probate court (Adv. Proc. 01–170, Document No. 85, at 484–88, and at 490–91). The court does not credit this testimony. The totality of the evidence and testimony supports a conclusion that D'Ambrosio filed the motion to close the debtor's bankruptcy case at the direction of or upon consultation with Daniels or the debtor, or both of them, for the express purpose of facilitating actions that Daniels and the debtor were taking or would be taking in Pennsylvania.*

| | | |
|---|---|---|
| 205. | 6/11–6/14/01 | Wiley learns of the filing of debtor's motion to close her bankruptcy case shortly after it is filed (Adv. Proc. 01–170, Document No. 84, at 416, lines 13–31, at 420, lines 17–25, and at 421, lines 1–4). |

206. 6/14/01 The Pennsylvania probate court enters an order dismissing the Lickmans' petition to show cause why an agreement should not be voided *without prejudice to the petitioners' right to challenge the validity of the agreement in the audit of accounts.* The court also denies the executrix' exceptions to its order determining as a matter of law that the Lickmans' petition to remove executrix does not trigger the in terrorem clause without prejudice to the executrix' right to reassert the exceptions in the audit of accounts (Emphasis added) (Adv. Proc. 01–170, Document No. 84, at 444, lines 16–21, Defendants' Exhibit No. 22).

207. 6/15/01 Wiley files in the Philadelphia federal district court the debtor's complaint for compensatory and punitive damages against the trustee, the trustee's attorneys, the executrix, and the executrix' attorney. The complaint alleges civil conspiracy to defraud, breach of fiduciary duty, abuse of process, and intentional interference with right of access to courts arising out of the trustee's sale of the probate asset to Shain. ("Pennsylvania damages action"). The complaint asserts that the district court has diversity jurisdiction over the parties in part based upon the debtor's residence in Texas rather than Florida. The complaint alleges that the debtor "was needlessly caused to expend the sum of $13,000 in legal fees and disbursements in defending the frivolous Bankruptcy court proceedings." Case No. 01–CV–2949 (Plaintiff's Exhibit No. 137). The bankruptcy estate incurs $12,798.12 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit Nos. 144–2095–8 and 146).

*The court has excluded $5,231.75 from its calculation of attorney's fees and costs incurred by the estate relating to this event because there is insufficient evidentiary support for those fees (Plaintiff's Exhibit No. 145).*

There are additional attorney's fees and costs of $66,694.43 relating to this event for services performed by attorneys whose employment was not approved by the bankruptcy court (Plaintiff's Exhibit Nos. 145–48).

208. 6/15/01 Although the complaint does not name the bankruptcy judge as a party, the complaint alleges that the bankruptcy judge "knowingly assisted," and aided the defendants "in their conspiratorial schemes" by entering orders that were adverse to the debtor. The complaint also alleges that the bankruptcy judge "with the intent to assist the defendants, refused to then rule on [the debtor's motion to reclose the bankruptcy case] and ignored same." The complaint further alleges that the bankruptcy judge "destroyed . . . without responding to or docketing" a letter sent to the judge by the debtor—Case No. 01–CV–2949 (Plaintiff's Exhibit No. 137). Daniels has drafted all or substantially all of this complaint (Adv. Proc. 01–170, Document No. 84, at 437, lines 13–20).

209. 6/19/01 Segal files in the Pennsylvania federal district court a motion to dismiss the complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12).

210. 6/20/01 Wiley serves on the trustee the summons of the debtor's complaint for damages—Case No. 01–CV–2949 (Plaintiff's Exhibit No. 137).

211. 6/20/01 The trustee's counsel files in the bankruptcy court the trustee's emergency motion for sanctions against Daniels, the debtor, D'Ambrosio, and Wiley for willful violation of the automatic stay based upon the debtor's filing of the Pennsylvania district court action. The trustee attaches a copy of the complaint filed by the debtor in the Pennsylvania district court (Main Case Document No. 82). The bankruptcy estate incurs $2,137.54 in attorney's fees and costs in relation to this event and related events. (Plaintiff's Exhibit No. 144–2095).

212. 6/22/01 The presiding judge in the bankruptcy case enters in the bankruptcy court an order of recusal on her own motion. The other resident bankruptcy judge in the Orlando division joins in the order (Main Case Document No. 83). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

213. 6/22/01 The trustee's counsel files in the bankruptcy court an objection to the debtor's application for administrative expense (Main Case Document No. 84).

214. 6/27/01 The chief judge of the bankruptcy court reassigns the debtor's bankruptcy case to the undersigned bankruptcy judge (Main Case Document No. 85). The bankruptcy estate incurs $95 in attorney's fees and costs relating to this event (Plaintiff's Exhibit No. 144–2095).

215. 6/29/01 D'Ambrosio files in the bankruptcy court the debtor's motion to dismiss the trustee's emergency motion for sanctions. The motion states that the "Plaintiff/Debtor has needlessly been caused to expend thousands of dollars defending the improper and illegal actions of the trustee." (Main Case Document No. 90, Plaintiff's Exhibit No. 97).

216. 7/2/01 Wiley files in the Pennsylvania federal district court the debtor's opposition to Segal's motion to dismiss the complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12).

217. 7/9/01 The bankruptcy court notices an evidentiary hearing of all pending motions (Main Case Doc. No. 92).

218. 7/10/01 The Pennsylvania federal district court enters an order approving a stipulation extending the deadline by 30 days for S. and L. Concannon to file a responsive pleading or motion as to the debtor's complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12).

219. 7/13/01 D'Ambrosio sends a letter to S. Concannon stating that D'Ambrosio will afford Concannon a "timely opportunity to withdraw both your Objections to Administrative Claims filed by my client over 18 months ago as well as you (sic) Motion for

Sanctions ...[or] I will seek appropriate monetary sanctions against both you and the Trustee as the law permits." (Plaintiff's Exhibit No. 29).

220. 7/16/01 The trustee's counsel files in the bankruptcy court a response to the debtor's motion to close her bankruptcy case stating that the case cannot be closed because matters are pending. The response states that the trustee began her review of claims, including the debtor's claim for administrative expense, following the disposition of the last appeal in April 2001. The response also notes that the debtor filed a petition in the Pennsylvania probate court seeking to void the trustee's sale of estate assets before the trustee concluded her claims review (Main Case Document No. 93).

221. 7/16/01 Wiley files in the bankruptcy court a response to the trustee's motion for sanctions. The response asserts that the trustee's motion for sanctions is "a bald faced attempt to circumvent the filings in the [Pennsylvania federal] district court and to deny [the debtor] her constitutionally guaranteed right of access to the court." (Plaintiff's Exhibit No. 99).

222. 8/1/01 The Pennsylvania probate court enters a supplemental decree providing that its decree as to the in terrorem clause is interlocutory and the executrix' appeal of that order is therefore not ripe. The decree further notes that because no permission to appeal has been sought or obtained by the executrix, the probate court will retain jurisdiction over the Tibey Pfeiffer probate estate (Defendants' Exhibit Nos. 22 and 31).

223. 8/2/01 The trustee's counsel files in the bankruptcy court a notice of withdrawal of her motion for sanctions stating her intention to "file a Complaint for declaratory relief, injunctive relief, and sanctions against the parties named in the motion for sanctions." (Main Case Document No. 95).

224. 8/7/01 Wiley files in the Pennsylvania probate court the Lickmans' petition to compel the executrix to file a final account, to permit discovery, and for partial distribution (Plaintiff's Exhibit No. 127).

The petition alleges that only $67,000 remains in the probate estate as a consequence of improper distributions, including $60,000 in legal fees. The petition requests a partial distribution in the amount of $10,000 each to be paid to the debtor and her brother. The petition states that the Lickmans need the distribution because they "have expended over $25,000 in legal fees to their former counsel, most of it borrowed" and "have been financially unable to pay their current counsel, James Wiley, any fee at all." (Plaintiff's Exhibit No. 127). The bankruptcy estate incurs $465.50 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095 and 2095–7).

225. 8/7/01 Wiley files in the Pennsylvania federal district court a second civil action. The debtor's complaint seeks a declaratory judgment that the trustee's agreement to sell the debtor's interest in the probate estate to Shain is void—Case No. 01–CV–4014

("Pennsylvania declaratory relief action") (Plaintiff's Exhibit No. 139). Daniels has drafted all or substantially all of this complaint. *See* App. I No. 193 *supra.* The bankruptcy estate incurs $3,915 in attorney's fees and costs relating to this event and related events. (Plaintiff's Exhibit No. 144–2095-9).

| | | |
|---|---|---|
| 226. | 8/7/01 | L. and S. Concannon file in the Pennsylvania federal district court a motion to dismiss the debtor's complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12). |
| 227. | 8/8/01 | The trustee's counsel files in the bankruptcy court this adversary proceeding seeking injunctive and monetary relief against the defendants. The complaint alleges that the defendants acted in concert to initiate and prosecute actions that violated the automatic stay, the bankruptcy court's October 18, 1999, sanctions order, and the provisions of 28 U.S.C. § 959, and the *Barton* doctrine (Adv. Proc. 01–170, Document No. 1). The bankruptcy estate incurs $41,084.40 in attorney's fees and costs relating to this event and related events through October 29, 2001 (Plaintiff's Exhibit No. 144–2095 and 2095F). |
| 228. | 8/9/01 | The trustee files in the Pennsylvania federal district court a motion to dismiss the debtor's complaint or, in the alternative, to stay or transfer the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12). |
| 229. | 8/10/01 | The bankruptcy court conducts an evidentiary hearing of the debtor's motion to close the bankruptcy case and the trustee's objection to the debtor's application for administrative expense (Main Case Document No. 110). <br><br> The court hears evidence and testimony on the trustee's objection to the debtor's claim for administrative expense and then takes the matter under advisement (Main Case Document No. 110, at 89–91). |
| 230. | 8/10/01 | D'Ambrosio asks the court to abate the debtor's motion to close her bankruptcy case. The court grants the request and directs D'Ambrosio to submit a proposed order (Main Case Document No. 110, at 90, lines 17–25). |
| 231. | 8/10/01 | After the hearing, Daniels approaches the trustee and thrusts a copy of the debtor's complaint in the declaratory relief action on top of other papers that the trustee is holding close to her body. A week later a process server serves the trustee with the complaint (Adv. Proc. 01–170, Document No. 81 at 73, lines 19–25, and at 74, lines 1–17, Document No. 84, at 16–18). |
| 232. | Mid to late 8/01 | Wiley files in the Pennsylvania federal district court a notice of dismissal of his complaint in the declaratory relief action. Wiley files the notice of dismissal before answers are due—Case No. 01–CV–4014 (Adv. Proc. 01–170, Document No. 84, at 444, lines 1–24). |
| 233. | 8/15/01 | O'Connell files in the Pennsylvania federal district court a motion to dismiss the debtor's complaint in the Pennsylvania |

damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12).

234. 8/15/01 Wiley files in the Pennsylvania federal district court the debtor's notice of voluntary dismissal of her complaint as to defendant CGU Insurance Company—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12).

*CGU Insurance Company is surety on the executrix's bond in the Pennsylvania probate case.*

235. 8/16/01 During the pendency of the bankruptcy case, the trustee's counsel performs services and incurs costs in connection with matters pending in the debtor's bankruptcy case (Plaintiff's Exhibit No. 144). The bankruptcy estate incurs $351.36 in attorney's fees and costs for these services. (Plaintiff's Exhibit No. 144–2095 and 2095–7).

*The court does not credit these fees and costs because the plaintiff has not provided sufficient evidentiary support to connect them with specifics events.*

236. 8/20/01 The debtor files and properly serves in the bankruptcy court a notice of change of address reflecting a Texas address (Main Case Document No. 104). The bankruptcy estate incurs $19 in attorney's fees and costs relating to this event. (Plaintiff's Exhibit No. 144–2095).

*The debtor's new address is the residence of Stephen Lickman. Notwithstanding the change of address, the debtor spends time in Boca Raton, Florida. Daniels resides in Boca Raton.*

237. 8/22/01 D'Ambrosio sends a letter to L. Concannon stating that Concannon has "72 hours from the receipt of this letter to withdraw the complaint [in Adv. Proc. 01–170] or [D'Ambrosio] will seek sanctions . . . ." (Plaintiff's Exhibit No. 31).

238. 8/23/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion for temporary restraining order and preliminary injunction without notice against the defendants on the basis of papers that the debtor has filed in Pennsylvania (Adv. Proc. 01–170, Documents Nos. 4 and 5).

239. 8/23/01 The bankruptcy court enters an order denying the trustee's motion for temporary restraining order and preliminary injunction without notice because the motion fails to satisfy the requirements of F.R.Civ.P. 65(b) (Adv. Proc. 01–170, Document No. 6).

240. 8/24/01 The bankruptcy court schedules a hearing of the trustee's motion for temporary restraining order and preliminary injunction with notice to be held on August 31, 2001, and directs the trustee to serve the motion on all defendants. (Adv. Proc. 01–170, Document No. 7).

241. 8/27/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's and his motion for continuance and request for costs. The motion seeks a continuance of the August 31st

hearing. The motion also states that the "Debtor has needlessly been caused to expend tens of thousands of dollars to defend against Trustee's repeated frivolous filings in her attempt to retain her ill-gotten gains." The motion further states that D'Ambrosio has "expended 18 hours in responding to Trustee's prior 'emergency motion' for the same injunctive relief [the trustee] now seeks . . . ." The motion requests $5,000 in attorney's fees (Adv. Proc. 01–170, Document No. 9, Plaintiff's Exhibit No. 33).

| | | |
|---|---|---|
| 242. | 8/27/01 | The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's consent to the debtor's and D'Ambrosio's request for continuance (Adv. Proc. 01–170, Document No. 10). |
| 243. | 8/28/01 | The bankruptcy court enters an order granting in part the motion for continuance. The order continues the hearing to September 14, 2001, and denies the movants' request as to any other relief (Adv. Proc. 01–170, Document No. 11). |
| 244. | 9/5/01 | Wiley files in the bankruptcy court adversary proceeding his answer to the trustee's complaint for injunctive and monetary relief (Adv. Proc. 01–170, Document No. 13, Plaintiff's Exhibit No. 34). |
| 245. | 9/5/01 | The trustee's counsel files in the bankruptcy court adversary proceeding at 11:48 p.m., using the after hours filing procedure provided in General Order 96–0002–ORL, the plaintiff's second motion for temporary restraining order without notice. The motion states that, "Wiley ha[s] given [trustee's counsel in the Pennsylvania federal district court action] notice that [Wiley] intends to file a motion for temporary restraining order in [the Pennsylvania federal] Civil Suit, on September 6, to prevent the bankruptcy court from determining the matters in this adversary proceeding on the merits" (Adv. Proc. 01–170, Document No. 14). The motion is supported by a memorandum of law and S. Concannon's affidavit (Adv. Proc. 01–170, Documents Nos. 15 and 16). |
| 246. | 9/6/01 | The trustee's counsel timely files in the bankruptcy court adversary proceeding originals of the motion for temporary restraining order and supporting papers filed the night before under the after hours filing procedure (Adv. Proc. 01–170, Documents Nos. 15 and 16). |
| 247. | 9/6/01 | At 9:00 a.m. counsel for the trustee presents copies of her motion for temporary restraining order to the undersigned bankruptcy judge in chambers. The court enters a temporary restraining order without notice at 9:50 a.m. |

Pending the hearing scheduled for September 14, 2001, the temporary restraining order enjoins the debtor and Wiley, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, from:

"a. prosecuting in any way (1) the action or proceeding pending in the Pennsylvania Orphans' Court to void the bankruptcy

sale approved by this court, (2) Civil Action No. 01–CV–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–CV–4014 pending in the United States District Court for the Eastern District of Pennsylvania, including, without limitation, seeking temporary or preliminary relief from either of those courts; and

b. initiating any new action or proceeding in any court, except this court, against the plaintiff and her attorneys on account of their service and actions as trustee in this bankruptcy case and as counsel to the trustee." (Adv. Proc. 01–170, Document No. 17, reported at 282 B.R. 709, 721–22).

| | | |
|---|---|---|
| 248. | 9/6/01 | Wiley receives by fax a copy of the bankruptcy court's temporary restraining order. Notwithstanding his receipt of the TRO, Wiley submits to the Pennsylvania federal district court a motion for temporary restraining order to preclude the bankruptcy court's determination of this adversary proceeding. Wiley informs the district court of the bankruptcy court's temporary restraining order. The district court conducts a telephonic conference at which the judge expresses concern over his jurisdiction of the parties—Case No. 01–CV–2949 (Adv. Proc. 01–170, Document No. 84, at 430–432). |
| 249. | 9/6/01 | D'Ambrosio files in the bankruptcy court the debtor's motion to remove the trustee. The motion seeks the removal of the trustee and the denial of her fees. The motion is supported by the debtor's "certification" signed under penalty of perjury (Main Case Document Nos. 106 and 107, Defendants' Exhibit No. 7, Plaintiff's Exhibit Nos. 100 and 101). The bankruptcy estate incurs $1,569.74 in attorney's fees and costs relating to this event and related events (Plaintiff's Exhibit No. 144–2095). |
| 250. | 9/6/01 | The debtor's "certification" alleges that "[t]his was a 'sham' bankruptcy, an abuse of process and outright fraud and manipulation upon both this Court and the probate court." The debtor's "certification" further alleges that "[t]his court, given the facts of this case, is statutorily mandated to refer this matter to the U.S. Attorney for the Middle District under 18 USC § 3507 for possible criminal prosecution. The U.S. Attorney in Orlando has already expressed an interest in reviewing the entire case upon my recent contact with them." |
| | | In the "certification", the debtor states that she has "expended tens of thousands of dollars defending against the . . . improper actions of the trustee." (Main Case Document No. 107, Defendants' Exhibit No. 7, Plaintiff's Exhibit No. 101). |
| 251. | 9/7/01 | The Pennsylvania federal district court convenes a telephone conference of Wiley's motion for temporary restraining order. During the conference the judge questions whether the dispute should be determined by the bankruptcy court. Wiley then requests that the court dismiss the case without prejudice and "without a running of the statute." (Adv. Proc. 01–170, Document No. 84, at 432, at 448–452, and at 453). In making this request, Wiley hopes to "retain a benefit of having filed [the Pennsylvania federal district court action]" (Adv. Proc. 01–170, Document No. 84, at 455, lines 1–3). |

252. 9/7/01 The Pennsylvania federal district court enters an order dismissing the matter without prejudice but providing that the "case is to remain in status quo and the Statute of Limitations is tolled." The order also provides that, "This matter is still considered ACTIVE. It is further understood that all discovery and settlement discussions will continue." Finally, the order provides that, "The parties shall keep the court advised of the status of this case and when they are ready for trial or wish a settlement conference . . . ." Case No. 01–CV–2949 (Adv. Proc. 01–170, Document No. 84, at 445, lines 7–22, Plaintiff's Exhibit No. 138).

253. 9/10/01 Daniels files in the bankruptcy court adversary proceeding a motion for extension of time until September 21st to answer the complaint. The motion states, "It is unfortunate that the thievery and perjury of Trustee and her lawyers has been tolerated by the bankruptcy judges in the Middle District of Florida, something the more sophisticated Northern courts would never permit for one minute." (Adv. Proc. 01–170, Document No. 18, Plaintiff's Exhibit No. 35).

254. 9/11/01 The bankruptcy court enters an order denying Daniels' motion for extension of time to answer the complaint because the motion was untimely filed and the motion asserts no basis for excusable neglect (Adv. Proc. 01–170, Document No. 20).

255. 9/11/01 Wiley files in the bankruptcy court adversary proceeding a motion for a stay of proceedings on the ground that he has dismissed all Pennsylvania actions and "the costs of flying to Tampa on . . . short notice are prohibitiv"e (Adv. Proc. 01–170, Document No. 21, Plaintiff's Exhibit No. 36).

256. 9/11/01 Wiley files in the bankruptcy court adversary proceeding his opposition to the trustee's motion for preliminary injunction (Adv. Proc. 01–170, Document No. 22).

257. 9/11/01 Wiley's opposition relies upon facts "set forth in Debtor's motion to remove trustee." The opposition alleges that the trustee's administration of the bankruptcy case was "for the sole benefit of the Trustee herself; the creditors were immediately sold out and surplus which would belong to the debtor was foreclosed upon in exchange for what can only be called a bribe." The opposition alleges that the trustee and her counsel were not acting within their official capacities in "committing perjury over and over again." The opposition also alleges that, "All money received [from the sale of the estate asset] was intend [sic] to and did go directly into the trustee's pocket." The opposition alleges that "[t]his case was permeated with fraud, deception, and perjury."

With respect to issues of collateral estoppel and res judicata, the opposition states "the agreement itself invites review by the Pennsylvania courts and its approval by the bankruptcy judge was merely a conditional one. [The debtor] has simply decided to accept Plaintiff's invitation." The opposition also alleges that "the validity of the agreement was never argued by [the debtor], nor did she have the opportunity to do so

...." (Adv. Proc. 01–170, Document No. 22, Plaintiff's Exhibit No. 37).

*Aside from the unfounded and unsupported factual assertions contained in the opposition Wiley's position as to collateral estoppel and res judicata is incorrect. The debtor raised the issue of the validity of the sale agreement in her opposition to the trustee's notice of sale and that issue was determined by the bankruptcy court after an evidentiary hearing at which the debtor's attorneys advocated her position.*

258. 9/12/01 The debtor files in the bankruptcy court adversary proceeding a motion for continuance of the September 14th hearing because she wants her motion to remove trustee to be considered at the same time (Adv. Proc. 01–170, Document No. 23, Plaintiff's Exhibit No. 38).

259. 9/12/01 The court conducts a telephonic hearing of Wiley's motion to stay proceedings. L. and S. Concannon, D'Ambrosio, and Wiley appear. D'Ambrosio and Wiley appear on behalf of themselves and their clients. During the telephone conference, the participants agree to continue the terms of the temporary restraining order as a preliminary injunction until the court determines the merits of the adversary proceeding (Adv. Proc. 01–170, Document No. 49, at 14, lines 7–15, at 17, lines 3–9, and at 19, lines 2–5). The parties also agree to trial dates in November (Adv. Proc. 01–170, Document No. 49, at 18, lines 11–25, a 19, lines 1–13, and at 21, lines 10–14).

Daniels does not appear at this hearing (Adv. Proc. 01–170, Document No. 49).

260. 9/12/01 D'Ambrosio files in the bankruptcy court adversary proceeding his answer to the trustee's complaint for injunctive and monetary relief (Adv. Proc. 01–170, Document No. 24, Plaintiff's Exhibit No. 39).

261. 9/13/01 The bankruptcy court enters an agreed preliminary injunction.

The agreed preliminary injunction enjoins the debtor and Wiley, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, from:

"a. prosecuting in any way (1) the action or proceeding pending in the Pennsylvania Orphans' Court to void the bankruptcy sale approved by this court, (2) Civil Action No. 01–CV–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–CV–4014 pending in the United States District Court for the Eastern District of Pennsylvania, including, without limitation, seeking temporary or preliminary relief from either of those courts; and

b. initiating any new action or proceeding in any court, except this court, against the plaintiff and her attorneys on account of their service and actions as trustee in this bankruptcy case and

as counsel to the trustee." (Adv. Proc. 01–170, Document No. 26, reported at 282 B.R. 709, 723–24).

262. 9/13/01 The bankruptcy court enters an order scheduling pretrial conference and final evidentiary hearing of the adversary proceeding for the dates in November agreed by the parties. The order consolidates the debtor's motion to remove trustee with the adversary proceeding. The order sets forth the responsibilities of the parties (Adv. Proc. 01–170, Document No. 27).

263. 9/19/01 Daniels files in the bankruptcy court adversary proceeding a motion to dismiss the trustee's complaint for injunctive and monetary relief based upon lack of subject matter and personal jurisdiction and for failure to state a claim upon which relief can be granted. The motion asserts that the plaintiff has no jurisdiction over Daniels because he "has never appeared in this Court, nor ever represented the Debtor, and have no connection with this or any other case, nor have I ever been employed by Gerald D'Ambrosio ...." The motion concedes that Daniels has placed an ad in Orlando and states "there is a certain Orlando bankruptcy judge who has an explicit dislike for debtors who retain lawyers and litigate against Trustees, and who enters orders upon improper *ex parte* communications from Trustees or their counsel." (Adv. Proc. 01–170, Document No. 28, Plaintiff's Exhibit No. 40).

264. 9/19/01 The debtor files in the bankruptcy court adversary proceeding an answer and affirmative defenses to the trustee's complaint for injunctive and monetary relief. As an affirmative defense, the debtor alleges that "had [the debtor] been allowed to proceed against the probate estate in her own name, significant recovery would have resulted for both her protection and the protection of debtor's creditors." (Adv. Proc. 01–170, Document No. 29, Plaintiff's Exhibit No. 41).

265. 9/25/01 The bankruptcy court enters an order denying Daniels' motion to dismiss the trustee's complaint for injunctive and monetary relief (Adv. Proc. 01–170, Document No. 30).

266. 9/27/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's response to the debtor's motion to remove the trustee that denies the debtor's allegations (Adv. Proc. 01–170, Document No. 30A).

267. 9/27/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion to strike the debtor's "certification" in support of the debtor's motion to remove trustee because neither D'Ambrosio or Wiley signed the certification in derogation of F.R.B.P. 9011 (Adv. Proc. 01–170, Document No. 30B).

268. 10/1/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's motion for a default judgment on her motion for fees and her motion to remove the trustee for the trustee's failure to answer. The motion seeks an order granting the motion to remove trustee or prohibiting the trustee from participating in the evidentiary hearing on the motion. The motion also requests that the preliminary injunction be dis-

solved (Adv. Proc. 01–170, Document No. 32, Plaintiff's Exhibit No. 43).

269. 10/1/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's motion to disqualify S. Concannon as counsel for trustee because the debtor intends to call him as a witness (Adv. Proc. 01–170, Document No. 33, Plaintiff's Exhibit No. 43).

270. 10/3/01 The bankruptcy court denies the debtor's motion for default judgment on her motion to remove the trustee (Adv. Proc. 01–170, Document No. 34).

271. 10/3, 10/10, and 10/12/01 The bankruptcy court notices pending motions for hearing on October 16, 2001 (Adv. Proc. 01–170, Documents Nos. 35, 40, 44, and 45).

272. 10/4/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's and his motion to dismiss the trustee's complaint on the basis that it is not a core proceeding and the court has no subject matter jurisdiction. (Adv. Proc. 01–170, Document No. 36, Plaintiff's Exhibit No. 44).

273. 10/5/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's partial consent to the debtor's motion to disqualify S. Concannon as counsel, opposing disqualification as trustee's counsel but consenting to his appearance at trial solely in the capacity of witness (Adv. Proc. 01–170, Document No. 37).

274. 10/5/01 Daniels files in the bankruptcy court adversary proceeding a motion for relief from order denying his motion to dismiss. The motion asserts that the court lacks jurisdiction over the proceeding "as Trustee, through fraud upon the court, re-opened Debtor's closed bankruptcy when, as Trustee was fully aware, the Debtor had resided outside of the Middle District for more than 180 days." (Adv. Proc. 01–170, Document No. 38, Plaintiff's Exhibit No. 45).

275. 10/9/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion to strike the debtor's demand for jury trial (Adv. Proc. 01–170, Document No. 39).

276. 10/10/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion for entry of default against Dizak/Daniels (Adv. Proc. 01–170, Document No. 41).

277. 10/11/01 The bankruptcy court enters an order denying Daniels' motion for relief from order denying motion to dismiss. (Adv. Proc. 01–170, Document No. 42).

The order provides that the court has subject matter jurisdiction of the dispute. The order also states that a trustee must reopen a case in the district in which it was filed. The order notes that no party has filed a motion to transfer venue and that once venue is established subsequent events do not destroy it and that venue is therefore proper.

278. 10/11/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's and his motion for relief from the court's order granting preliminary injunction. The motion asserts that neither D'Ambrosio nor Wiley agreed to a preliminary injunction (Adv. Proc. 01–170, Document No. 43, Plaintiff's Exhibit No. 46).

279. 10/11/01 Wiley files in the bankruptcy court adversary proceeding the debtor's response to the trustee's motion to strike the debtor's "certification." The response asserts that "Mr. D'Ambrosio signed the motion to remove the executrix and adopted the certification of Debtor." The response further asserts that "[t]he motion to remove the executrix together with debtors certification were filed as one document. The submission is signed by the attorney of record and, therefore, complies with Rule 9011." (Adv. Proc. 01–170, Document No. 43A, Plaintiff's Exhibit No. 47).

280. 10/11/01 The bankruptcy court receives from Daniels a courtesy copy of Daniels' motion for relief from order denying motion to dismiss. The motion states, *Paragraph No. 15 is deleted from original and all copies for confidentiality reasons* 15. This court should be aware that the U.S. Attorney in Orlando has very recently opened a criminal investigation of trustee and her lawyers for possible violations of 18 USC 201(c), 1621, 1341, and 1343 (look it up, Judge) and bankruptcy violations. In the likely event criminal charges are filed, this distinguished court may well find itself in an extremely embarrassing situation for having rush [sic] to the aid of these criminals by signing an injunction for them at 8:45 a.m. in the morning." (Adv. Proc. 01–170, Document No. 46).

Trustee's counsel is not served with this copy (Adv. Proc. 01–170, Document No. 83, at 276, lines 9–25, and at 277, line 1).

281. 10/12/01 The bankruptcy court enters an order disclosing ex parte communication from defendant, Robert Daniels, and directing Daniels to cease all further ex parte communications with the court (Adv. Proc. 01–170, Document No. 46, Plaintiff's Exhibit No. 48).

282. 10/15/01 Daniels files in the bankruptcy court adversary proceeding a motion for the undersigned judge's disqualification citing bias (Adv. Proc. 01–170, Document No. 51).

The motion alleges bias in part because the court denied Daniels' "motion to dismiss for the case being re-opened in the proper venue."

The motion also states, "[y]ou should be aware that numerous litigants and attorneys have and are in the process of filing complaints in the 11th Circuit under 28 USC 372 against [another bankruptcy judge]. Some of those complaints were in response to an ad I placed in the *Florida Bar News*. I have placed another ad with reference to the 'Tampa Division.'"

The motion concludes, "I'm an old military man too, and probably older than this Court. But you, sir, unfortunately

are a former military member who is less than fair." (Adv. Proc. 01–170, Document No. 51, Plaintiff's Exhibit No. 52).

283. 10/15/01 D'Ambrosio files in the bankruptcy court adversary proceeding the debtor's and his motion for disqualification citing bias.
The motion complains about the court's entry of the agreed preliminary injunction and its ruling on the debtor's motion to close the reopened bankruptcy case (Adv. Proc. 01–170, Document No. 52, Plaintiff's Exhibit No. 51).

284. 10/16/01 D'Ambrosio files in the bankruptcy court adversary proceeding a motion to withdraw as counsel for the debtor. The motion states that "[a] significant conflict of interest exists between [debtor] and myself." The motion also states that D'Ambrosio has "advised [the debtor] of my plan to withdraw and she has not articulated any objection." (Adv. Proc. 01–170, Document No. 53, Plaintiff's Exhibit No. 53).

285. 10/16/01 Pursuant to notice, the bankruptcy court conducts a hearing of all pending motions (Adv. Proc. 01–170, Document No. 60).

The debtor, Daniels, D'Ambrosio, and Wiley do not appear at the hearing (Adv. Proc. 01–170, Document No. 60).

D'Ambrosio has previously sent a letter to the court that states, "As to the motion scheduled for October 16, my client has advised me that the matter is to be heard by submission." (Adv. Proc. 01–170, Document No. 60, at 5, lines 10–24).

The court notes that "if I set [a motion] for hearing, I intend to hear it at a hearing." (Adv. Proc. 01–170, Document No. 60, at 7, lines 5–17).

286. 10/17/01 The bankruptcy court enters an omnibus order on matters heard on October 16, 2001 (Adv. Proc. 01–170, Document No. 54).

The order:

denies the debtor's and D'Ambrosio's motion for relief from the order granting preliminary injunction;

denies the debtor's and D'Ambrosio's motion to dismiss the trustee's complaint for injunctive and monetary relief;

grants in part and denies in part the trustee's motion for default against Dizak/Daniels, providing that the motion shall be granted only if Dizak/Daniels fails to file an answer by October 24, 2001;

continues until the final pretrial conference consideration of the trustee's motion to strike the debtor's demand for jury trial;

denies the trustee's motion to strike debtor's "certification" of the debtor's motion to remove trustee;

denies the debtor's and D'Ambrosio's requests for costs for lack of prosecution; and

grants in part and denies in part the debtor's motion for disqualification of counsel for the trustee, disqualifying S. Concannon from serving as an advocate at trial but providing that he can testify at trial and assist trial counsel at counsel table.

287. 10/17/01 The bankruptcy court enters a preliminary order on D'Ambrosio's motion to withdraw that provides an opportunity for the debtor to file an objection, failing which the motion will be granted. The order provides that because the "matters alleged in the motion [the conflict between attorney and client] have existed from the beginning of this adversary proceeding and were known at the time the parties agreed to the trial dates ... any withdrawal by Mr. D'Ambrosio will not constitute grounds for continuance of the trial ...." (Adv. Proc. 01–170, Document No. 55).

288. 10/17/01 The bankruptcy court enters an order denying motions for disqualification filed by Daniels, D'Ambrosio, and the debtor (Adv. Proc. 01–170, Document No. 53, reported at 284 B.R. 299, 305–08).

289. 10/17/01 The bankruptcy court enters an order abating the debtor's motion to close the bankruptcy case (Main Case Document No. 117).

*The court prepares the order because D'Ambrosio fails to submit a proposed order as directed by the court at the August 10, 2001, hearing.*

290. 10/25/01 Daniels files in the bankruptcy court adversary proceeding his answer to the trustee's complaint and a counterclaim for abuse of process seeking compensatory damages of $250,000 (Adv. Proc. 01–170, Document No. 57).

291. 10/25/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's pretrial disclosures (Adv. Proc. 01–170, Document No. 56).

292. 10/26/01 The debtor files in the bankruptcy court adversary proceeding a response to D'Ambrosio's motion to withdraw acknowledging that there is a conflict of interest between herself and D'Ambrosio and Wiley. The response also contains 16 paragraphs of allegations of the trustee's misconduct and the court's bias. In the final paragraph, the debtor requests that "this adversary proceeding be dismissed, the injunction dissolved, and the Trustee ordered to submit her report and close this bankruptcy case." The response does not state an objection to D'Ambrosio's motion to withdraw as debtor's counsel (Adv. Proc. 01–170, Document No. 58).

293. 10/29/01 The bankruptcy court enters an order granting D'Ambrosio's motion to withdraw based upon the absence of objection by the debtor. The order provides, "As stated in the preliminary order, the withdrawal of D'Ambrosio will not constitute grounds for continuance of the trial that the court presently has scheduled ...." (Adv. Proc. 01–170, Document No. 59).

*The debtor does not seek reconsideration of this order.*

294. 11/1/02 D'Ambrosio files in the bankruptcy court adversary proceeding his pretrial disclosures (Adv. Proc. 01–170, Document No. 62).

295. 11/1/01 An advertisement appears in Classified Section of *The Florida Bar News.* "Other Personnel" with the following text: "BANK-RUPTCY COURT Middle District of Florida—Do any attorneys or litigants possess instances of serious unethical conduct by any bankruptcy judge who are willing to join in the filing of a formal complaint under 28 U.S.C. 374? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Documents Nos. 177 and 83, at 277, lines 2–25, and at 278, lines 1–7, Plaintiff's Exhibit No. 26, *The Florida Bar News,* November 1, 2001, at 37).

296. 11/5/01 Daniels files in the bankruptcy court adversary proceeding a refusal to consent to entry of orders in non-core proceedings. The refusal to consent states "[t]he court has acknowledged that this adversary proceeding commenced by Plaintiff is a non-core proceeding." The refusal to consent also states that "the court has no subject matter jurisdiction whatsoever over this action, Rule 12(b)(1)." Finally, the refusal to consent states "[t]hat all orders heretofore entered in this proceeding are null and void *ab initio.*" (Adv. Proc. 01–170, Document No. 63).

*To the contrary, the court specifically found that it had subject matter jurisdiction over the dispute and the parties. See App. I No. 308 infra.*

297. 11/6/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's renewed motion for entry of default against Daniels/Dizak (Adv. Proc. 01–170, Document No. 65).

298. 11/8/01 The bankruptcy court denies the plaintiff's motion for entry of default against Daniels/Dizak (Adv. Proc. 01–170, Document No. 66).

299. 11/8/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion to compel the debtor, D'Ambrosio, and Wiley to provide contact information to the trustee. The motion states that the trustee is attempting to arrange a telephonic pretrial conference for November 13, 2001, as required by the bankruptcy rules and the court's order but that D'Ambrosio and Wiley cannot or will not provide contact information for the debtor who has changed her telephone number (Adv. Proc. 01–170, Document No. 67).

300. 11/8/01 The trustee's counsel files in the bankruptcy court adversary proceeding a joint pretrial stipulation. It is signed by the trustee only (Adv. Proc. 01–170, Document No. 68).

301. 11/8/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion to strike the answer and counterclaim filed by Daniels because the answer was filed one day after the deadline imposed by the court's order (Adv. Proc. 01–170, Document No. 69).

302. 11/13/01 The debtor files in the bankruptcy court adversary proceeding a motion for continuance to obtain substitute counsel. The motion states that the "Debtor *clearly* objected to being left without counsel." The motion states that "Counsel for the Trustee has intentionally created this conflict [between the debtor and D'Ambrosio and Wiley] to deprive Debtor of representation." The motion states that "[n]ow only two weeks before a two-day trial I am left with no lawyer to represent me. My right to representation far outweighs Trustee's right to name my lawyers as defendants." The motion states that the debtor will "require weeks, if not months to locate substitute counsel and copy the pleadings as well as bring a new lawyer 'up to speed,' assuming [the debtor] can find one who trustee's counsel will not chase away." (Adv. Proc. 01–170, Document No. 72).

The motion also contains more than ten paragraphs of allegations of misconduct on the part of the trustee, her attorneys, and the bankruptcy court.

The motion concludes "I would consent to withdrawing my motion to remove the trustee if [the trustee] will withdraw this adversary complaint against all parties, waive all fees and commissions, file her final report, and close this bankruptcy case. In the alternative, this Court has the authority to dismiss this adversary complaint in the interest of justice, or to stay this proceeding until I can obtain substitute counsel." (Adv. Proc. 01–170, Document No. 72).

303. 11/13/01 Pursuant to the court's trial scheduling order, the bankruptcy court conducts a telephonic final pretrial conference of the trustee's complaint for injunctive and monetary relief (Adv. Proc. 01–170, Document No. 77).

L. Concannon has sent notice of the hearing to Daniels by fax but cannot contact the debtor as she has changed her telephone number (Adv. Proc. 01–170, Document No. 77, at 5, lines 1–15).

304. 11/13/01 At the hearing, D'Ambrosio indicates that he has no telephone numbers for the debtor and that the only contact number he has for Daniels is the fax number for the *New York Defender Digest* (Adv. Proc. 01–170, Document No. 77, at 7, lines 2–8).

Wiley indicates that he has a cell telephone number for Lickman but that he has "been instructed not to give the number out." (Adv. Proc. 01–170, Document No. 77, at 8, lines 1–7).

The debtor and Daniels do not appear at the hearing (Adv. Proc. 01–170, Document No. 77).

305. 11/13/01 During the telephonic hearing, D'Ambrosio and Wiley orally adopt the joint pretrial statement (Adv. Proc. 01–170, Document No. 77, at 8–9).

306. 11/14/01 The bankruptcy courts enters an order on final pretrial conference (Adv. Proc. 01–170, Document No. 73).

The order states "[n]either defendant Lickman nor defendant Daniels complied with the mandatory disclosure requirements of F.R.Civ.P. 26(a), the conference requirement of F.R.Civ.P. 26(f), or the trial preparation, conference, and pretrial stipulation requirements of the court's trial scheduling order . . . [and] [t]hese failures were intentional and without substantial justification. These failures are not harmless."

The order provides that, as a consequence of their failure to comply with disclosure, conference and trial scheduling order requirements, Daniels and the debtor may not call witnesses or use exhibits at trial that are not called or used by other defendants or called or used in prior hearings. (Adv. Proc. 01–170, Document No. 73).

307. 11/14/01 Based upon D'Ambrosio's and Wiley's adoption of the joint pretrial statement at the November 13 final pretrial conference, the final pretrial order directs D'Ambrosio and Wiley to "immediately execute signature pages [to the pretrial stipulation] and forward those original signature pages to counsel for the plaintiff who shall promptly file them with the clerk." (Adv. Proc. 01–170, Document No. 73).

*The plaintiff never files signature pages containing D'Ambrosio's or Wiley's original signatures. Based upon the oral statements on the record at the hearing, the court nevertheless concludes that Wiley and D'Ambrosio are bound by the terms of the joint pretrial statement.*

308. 11/14/01 The final pretrial order also denies the trustee's motion to compel disclosure and the debtor's request for continuance. (Adv. Proc. 01–170, Document No. 73).

The order states that the court will try the following issues:

The debtor's motion to remove the trustee. . . .

Whether the defendants violated the automatic stay.

Whether the defendants violated the October 18, 1999, sanctions order.

Whether the defendants violated 28 U.S.C. § 929 and the *Barton* doctrine.

The order states, "[e]ach of these issues to be tried is within the core bankruptcy jurisdiction and is not an issue as to which any party has a right to trial by jury." The order also states in a footnote that the "court has jurisdiction of the subject matter of all of these issues and persons . . . ."

The order provides that the court will abstain from determining the non-core issues of abuse of process and contempt for "post-petition conduct that may be triable by jury upon demand" preserving those claims for future determination by another court.

The order also dismisses without prejudice Daniels' claims for abuse of prosecution treated as claims for malicious prosecution as "prematurely and improperly filed as a counterclaim."

Finally, the order states that "on September 13, 2001, the court entered an agreed preliminary injunction. That order provided that the preliminary injunction will continue 'pending the trial of this adversary proceeding on its merits.' For clarification, that phrase is intended by the court to mean pending the determination of the issues hereby scheduled for trial and the entry of judgment." (Adv. Proc. 01–170, Document No. 73).

309. 11/15/01 Wiley files in the bankruptcy court adversary proceeding a refusal to consent to entry of orders in non-core proceedings. The refusal to consent states "[t]he court has acknowledged that this adversary proceeding commenced by Plaintiff is a non-core proceeding." The refusal to consent also states that "the court has no subject matter jurisdiction whatsoever over this action, Rule 12(b)(1)." Finally, the refusal to consent states "[t]hat all orders heretofore entered in this proceeding are null and void *ab initio*." (Adv. Proc. 01–170, Document No. 75).

*To the contrary, the court specifically found that it had subject matter jurisdiction over the dispute and the parties See App I No. 308 supra.*

310. 11/16/01 The debtor files in the bankruptcy court adversary proceeding a notice of withdrawal of her motion to remove the trustee. The notice states that the debtor is withdrawing her motion to remove the trustee because:

"This court has refused to grant a continuance to allow me to obtain substitute counsel even though my lawyers only recently notified me of a conflict."

"I have never consented to proceed *pro se* in this matter."

"This adversary proceeding was commenced for the sole purpose of keeping this bankruptcy case open in violation of 11 USC § 704, and causing additional expense and hardship to all of the defendants. As Trustee conceded many times under oath, all that was left for her to do was file her report and close the case. [The trustee] has refused and continues to refuse to do so with the assistance of this Court by recently abating my motion to close the case."

"The trustee intentionally sued my lawyers in order to create a conflict of interest that would deprive me of representation."

"Substantial evidence of misconduct on the part of the Trustee and her counsel has been provided to this Court, which it has chosen to ignore. However, I will be unable to prove my case without the assistance of counsel, particularly when all of the other parties are lawyers."

"Contrary to this court's opinion that I did not comply with the mandatory disclosure requirements of F.R.Civ.P. 26(a), I did

provide my former counsel with the necessary information for the pretrial stipulation." (Adv. Proc. 01–170, Document No. 76).

311. 11/16/01 Daniels files in the bankruptcy court adversary proceeding a motion in limine to dismiss all proceedings. The motion states, "the court refused to correct its 'AGREED PRELIMINARY INJUNCTION' when brought to its attention by Mr. D'Ambrosio's Rule 60 motion. Where I come from in New Jersey, we call that a redneck dirty trick."

The motion states, "On April 2, 2001, (sic) over 18 months ago, the District Court . . . issued an Order at Docket No. 14, Case No. 6:00–CV–165–ORL–22B–ORL, directing the Clerk of the bankruptcy court to 'close this case . . . .' "

The motion goes on "[t]he very last I heard was that a District Court is a higher court than this bankruptcy court.

Thus, this court is doing nothing more than acting *ultra vires.* The case having been ordered closed, this court has no authority for continuing this case, pure and simple." (Adv. Proc. 01–170, Document No. 74).

312. 11/16/01 Daniels attaches as an exhibit to the motion a copy of the altered district court order (Adv. Proc. 01–170, Document No. 74).

*The totality of the evidence and testimony supports the conclusion that Daniels knew the altered district court order that he attached to his motion had been altered. The totality of the evidence and testimony further supports the conclusion that Daniels used the altered district court order in furtherance of closing the debtor's bankruptcy case, dismissing this adversary proceeding, and facilitating Daniels' and the debtor's actions and planned actions in the Pennsylvania courts.*

313. 11/19/01 Daniels files in the Florida federal district court in Orlando a motion requesting an order directing the trustee to show cause why she should not be held in contempt for prosecuting this adversary proceeding in "deliberate violation of the order to close this case, entered by [the district court] more than 18 months ago." The motion also states that the debtor "has read and joins this application." The debtor does not sign the motion. In support of the motion, Daniels attaches a copy of the altered district court order (Plaintiff's Exhibit Nos. 156 and 157).

*The totality of the evidence and testimony supports the conclusion that Daniels knew the altered district court order that he attached to his motion had been altered. The totality of the evidence and testimony further supports the conclusion that Daniels used the altered district court order in furtherance of closing the debtor's bankruptcy case, dismissing this adversary proceeding, and facilitating Daniels' and the debtor's actions and planned actions in the Pennsylvania courts.*

314. 11/19/01–11/28/01 The bankruptcy court conducts a three day trial of the trustee's complaint for injunctive and monetary relief. (Adv. Proc. 01–170, Document No. 81–85).

The court initially considers the debtor's motion to remove trustee and denies the motion with prejudice as a consequence of the debtor's withdrawal of the motion on the eve of trial (Adv. Proc. 01–170, Document No. 81, at 23–29).

At the conclusion of the trial, the court takes the matter under advisement (Adv. Proc. 01–170, Document No. 84).

The debtor and Daniels do not appear at the trial (Adv. Proc. 01–170, Documents Nos. 81–85).

*Although the debtor's address of record is Dallas, Texas, at the time of trial the debtor was in fact living in Boca Raton, Florida (Adv. Proc. 01–170, Document No. 82, at 242, lines 10–14).*

315. 11/20/01 The Florida federal district court in Orlando enters an order to show cause providing that "[n]o later than November 30, 2001, Robert Daniels shall file a sworn document with the Clerk of this Court showing cause why he should not be sanctioned for his misleading presentation to this Court . . . ." The order states that the exhibit that Daniel attached to his motion for contempt "has been altered to remove the district court case number that appeared above the bankruptcy case number. The effect of this alteration is to make it seem as if the April 3rd Order was directing that the underlying bankruptcy case (rather than the district court appeal case) be closed. This alteration is misleading, to say the least." (Plaintiff's Exhibit No. 157, Court's Exhibit No. 1).

316. 11/21/01—1/29/02 The parties file in the bankruptcy court legal briefs and memoranda in support of their positions. The plaintiff also files a motion to strike Daniels' and the debtor's briefs as containing facts in derogation of the court's final pretrial order (Adv. Proc. 01–170, Documents Nos. 78, 79, 86, 87, 88, 89, 90, and 91).

317. 12/1/01 An advertisement appears in the Classified Section of *The Florida Bar News* under "Personal" with the following text: "BANKRUPTCY COURT Middle District of Florida—Do any attorneys or litigants possess instances of serious unethical conduct by any bankruptcy judge who are willing to join in the filing of a formal complaint under 28 U.S.C. 374? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Document No. 178, *The Florida Bar News,* December 1, 2001, at 34).

318. 1/29/02 Daniels files in the bankruptcy court adversary proceeding a motion to strike exhibit admitted upon trial seeking to strike admission of the altered district court order asserting that the exhibit must be stricken because "it is abundantly clear that [the district court judge] herself tampered with these orders in what can only be viewed as a deliberate attempt to destroy my credibility as she is aware that [Daniels has] placed ads in *The Florida Bar News* regarding corruption going on in certain Middle District Bankruptcy Courts. The same corruption the

judge earlier claimed was 'imagined'. Certain individuals have filed charges with the 11th Circuit under 28 USC § 372. The court has now opened an investigation following my personal contact with Chief Judge Anderson." (Adv. Proc. 01–170, Document No. 92).

319. Late Jan. 2002 The undersigned bankruptcy judge receives a courtesy copy of Daniels' motion to strike exhibit admitted upon trial to chambers with an additional exhibit not included in the original pleading filed with the clerk. That exhibit is a letter from Daniels to the chief judge of the 11th Circuit on *New York Defender Digest* letterhead. The letter states that the sender has "accumulated substantial documentary evidence of what can only be categorized as corruption within the bankruptcy courts of the Middle District of Florida." The letter states that the sender is "not a litigant in these matters [and] did not represent any parties" and therefore believes he cannot "file under 28 USC § 372." The exhibit also contains a copy of a receipt for certified mailing of the letter on October 19, 2001 (Adv. Proc. 01–170, Document No. 116).

320. 2/21/02 The bankruptcy court enters its decision and order sustaining the trustee's objection to the debtor's application for administrative expense and disapproving the debtor's application (Main Case Documents Nos. 118 and 119, reported at 273 B.R. 691).

321. 3/4/02 The debtor files in the bankruptcy court a motion for relief from order sustaining the trustee's objection to the debtor's application for administrative expense (Main Case Document No. 120).

322. 3/11/02 The bankruptcy court enters an order denying the debtor's motion for relief from order sustaining the trustee's objection to the debtor's application for administrative expense (Main Case Document No. 121).

323. 3/25/02 The debtor files in the bankruptcy court a notice of appeal of the court's order sustaining the trustee's objection to the debtor's application for administrative expense (Main Case Document No. 122).

324. 3/02 Daniels files in the Florida state court a civil complaint against the undersigned judge and a district judge on account of their judicial duties in the administration of the debtor's bankruptcy estate (Adv. 01–170, Document No. 117).

325. 4/15/02 The bankruptcy court enters an order dismissing as untimely the debtor's notice of appeal of the court's order sustaining the trustee's objection to the debtor's application for administrative expense (Main Case Document No. 123).

326. 5/24/02 The debtor sends a letter to The Florida Bar initiating a complaint against Sean Concannon for his actions taken in administering the probate asset (Adv. Proc. 01–170, Plaintiff's Exhibit No. 13, August 13, 2002, sanctions hearing).

327. 6/10/02 Wiley files in the Pennsylvania federal district court the debtor's motion to amend complaint in the Pennsylvania damages

action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanction's hearing, Plaintiff's Exhibit No. 12).

| | | |
|---|---|---|
| 328. | 6/11/02 | Segal files in the Pennsylvania federal district court a motion to dismiss the debtor's motion to amend complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanction's hearing, Plaintiff's Exhibit No. 12). |
| 329. | Late 6/02 | Wiley files in the Pennsylvania probate court the Lickmans' petition to declare the sale agreement between the trustee and the executrix unenforceable (Adv. Proc. 01–170, Document No. 102). |
| 330. | 6/18/02 | Shain files in the Pennsylvania federal district court a motion to adopt the answer and response of Segal to the debtor's motion to amend complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12). |
| 331. | 6/28/02 | Wiley files in the Pennsylvania federal district court the debtor's opposition to Segal's and Shain's motions to dismiss and adopt the motion to dismiss the debtor's motion to amend complaint in the Pennsylvania damages action—Case No. 01–CV–2949 (Adv. Proc. 01–170, August 13, 2001, sanctions hearing, Plaintiff's Exhibit No. 12). |
| 332. | 7/11/02 | The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion for sanctions against the debtor and Wiley for violating the court's preliminary injunction by filing the Lickmans' petition in the Pennsylvania probate court to declare the trustee's sale agreement with Shain unenforceable (Adv. Proc. 01–170, Document No. 95). |
| 333. | 7/15/02 | The bankruptcy court notices a hearing on August 13, 2002, of the trustee's motion for sanctions (Adv. Proc. 01–170, Document No. 96). |
| 334. | 7/24/02 | Wiley sends a letter to the bankruptcy court arguing the merits of the plaintiff's motion for sanctions and requesting a telephonic conference to see if the issues in the trustee's motion for sanctions can be resolved without a hearing (Adv. Proc. 01–170, Document No. 97). |
| 335. | 7/29/02 | The bankruptcy court enters an order treating Wiley's letter as a motion seeking telephonic conference. The order notes that pursuant to local rule requests for relief and argument are not to be presented by letter unless invited by the court. The order denies Wiley's request for telephonic conference. (Adv. Proc. 01–170, Document No. 98). |
| 336. | 8/8/02 | Wiley files in the bankruptcy court adversary proceeding the debtor's and his response to the trustee's motion for sanctions (Adv. Proc. 01–170, Document No. 99). |
| | | Wiley sends a cover letter to the bankruptcy court with his response to the trustee's motion for sanctions. The letter asserts that Wiley has not "violated any rule of bankruptcy procedure whether local or Federal." The letter further states |

that, "If the court had determined that a conference would not be helpful, a simple 'no' would have sufficed." (Adv. Proc. 01–170, Document No. 100).

| 337. | 8/8/02 | Wiley files in the Pennsylvania probate court a petition for special injunction and permanent injunction seeking to enjoin the plaintiff and her counsel from pursuing her sanctions motion. The petition is based upon the alleged invalidity of the bankruptcy court's preliminary injunction (Adv. Proc. 01–170, Document No. 101, Plaintiff's Exhibit No. 4). |
|------|--------|------|
| 338. | 8/9/02 | The Pennsylvania probate court enters an order denying the debtor's petition for preliminary injunction. The order states that "no irreparable harm will result from the denial of [the debtor's petition for preliminary injunction] as petitioners may pursue appropriate remedies before the Florida Bankruptcy Court and, further, that Paula Lickman has no standing in this Court." (Adv. Proc. 01–170, Document No. 101, Plaintiff's Exhibit No. 5). |
| 339. | 8/9/02 | Wiley files in the Pennsylvania probate court a notice of appeal of the court's order denying the Lickmans' petition for special and permanent injunction (Adv. Proc. 01–170, Document No. 101, Plaintiff's Exhibit No. 11). |
| 340. | 8/12/02 | Wiley files in the Pennsylvania Superior Court an emergency motion to stay the Pennsylvania probate court order denying petition for special and permanent injunction and seeking a temporary restraining order against the trustee and her counsel (Adv. Proc. 01–170, Document No. 101, Plaintiff's Exhibit No. 6). (Adv. Proc. 01–170, Document No. 104). |
| 341. | 8/13/02 | The bankruptcy court conducts a final evidentiary hearing of the trustee's motion for sanctions. Wiley is the only defendant or defendants' attorney to appear at the hearing. The debtor does not appear. At the conclusion of the hearing the court takes the matter under advisement (Adv. Proc. 01–170, Document No. 104). |
| 342. | 8/15/02 | An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personal" with the following text: "TAMPA BANKRUPTCY Court. Do any attorneys or litigants have instances of serious unethical conduct by any bankruptcy judge who are willing to join in the filing of a formal disciplinary complaint under 28 U.S.C. 372? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Document No. 179, *The Florida Bar News*, August 15, 2002, at 37). |
| 343. | 8/19/02 | The bankruptcy court enters a decision and final order on the trustee's motion for sanctions granting the motion. The court finds that the debtor and Wiley have violated its preliminary injunction, assesses sanctions jointly and severally against the debtor and Wiley in the amount of $5,670, and directs the debtor and Wiley to withdraw all papers in Pennsylvania courts that violate the injunction no later than ten days from the date of the order, failing which the court imposes a coercive sanction of $100/day against the debtor and Wiley (Adv. Proc. 01–170, Documents Nos. 102 and 103, reported at 282 B.R. 709). |

344. 8/23/02 The undersigned bankruptcy judge receives another ex parte communication from Daniels. The envelope contains an address label that shows the sender as "Robert Daniels" and the recipient as "Hon Timothy Corcoran Associate Justice of the U.S. Supreme Court—Chambers." Inside the envelope is an article that appeared in the *National Law Journal* titled "CONDUCT INJUDICIOUS Our annual look at misdeeds from the bench." The headline is circled in red ink and words are handwritten over the printed text of the article as follows: "Hey Judge—how did they miss you? Maybe next time" (Adv. Proc. 01–170, Document No. 117).

345. 8/28/02 The debtor and Wiley file in the bankruptcy court adversary proceeding timely notices of appeal of the court's order imposing sanctions (Adv. Proc. 01–170, Document Nos. 105, 106, 108, and 112).

 *Neither the debtor nor Wiley file a motion for stay pending appeal.*

346. 8/28/02 The Pennsylvania Superior Court sua sponte enters a notice of discontinuance of the debtor's appeal of the Pennsylvania probate court's denial of the debtor's petition for special injunction and permanent injunction (Document No. 123, Exhibit No. C).

347. 9/6/02 Daniels files in the bankruptcy court adversary proceeding a second motion for recusal of the undersigned bankruptcy judge citing bias. The motion complains that "[t]his Court not only refused in its statutory duty to close the [bankruptcy] case but subsequently entered an order 'abating the closure motion.' The reasons it did so have now, unfortunately become very clear. It had 'some work to do' on the Lickmans to punish and discredit them for suing the Plaintiff and her lawyers and naming fellow [bankruptcy judge] for her assistance in the conspiracy to defraud the debtor."

 The motion further states that the trustee's complaint for abuse of process "apparently stemmed [from] the Debtor resisting the corrupt efforts of the trustee which existed throughout these now 3 year-old proceedings, including bribery, perjury and providing false documents for filing."

 The motion further asserts that the court has demonstrated bias in its judicial rulings, its alleged participation in ex parte communications, and as a result of Daniels filing a civil action against the undersigned judge and a judicial misconduct complaint against the court and "[o]thers may be forthcoming." The motion also recites that Daniels has been advertising in *The Florida Bar News* seeking persons with derogatory information about the undersigned judge to come forward (Adv. Proc. 01–170, Document No. 117).

348. 9/9/02 Wiley files in the bankruptcy court adversary proceeding a designation and statement of issues in his appeal of the court's final decision on plaintiff's motion for sanctions. The statement of issues includes issues as to jurisdiction, bias, abuse of discretion, admission of evidence, and the propriety of the

court's entry of the preliminary injunction. (Adv. Proc. 01–170, Document No. 118).

349. 9/9/02 The debtor files in the bankruptcy court adversary proceeding a designation and statement of issues in her appeal of the court's final decision on plaintiff's motion for sanctions. The statement of issues includes issues as to bias, jurisdiction, venue, interference with the probate court's jurisdiction, *ultra vires* actions of the court, and the propriety of the court's entry of the preliminary injunction. (Adv. Proc. 01–170, Documents Nos. 119 and 120).

350. 9/22/02 The bankruptcy court enters a second order denying Daniels' motion for recusal (Adv. Proc. 01–170, Document No. 122, reported at 284 B.R. 299).

351. 10/1/02 The Pennsylvania probate court enters a decree dismissing the Lickmans' petition to remove executrix, to declare sale agreement unenforceable, and to require Shain to restore $38,500 to probate estate. The probate court finds that the debtor has no standing in the probate estate. The court declines to remove the executrix "at this late juncture." The court dismisses the petitions without prejudice to Stephen Lickman's right to file objections to counsel's fees and executrix' commissions at the appropriate time (Document No. 123, Exhibit No. A).

352. 10/11/02 Wiley files in the Pennsylvania probate court the debtor's notice of appeal of the court's dismissal of the petition to remove executrix, to declare sale agreement unenforceable, and to require Shain to restore $38,500 to the probate estate. (Document No. 123, Exhibit No. B).

353. 10/15/02 An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personal" with the following text: "TAMPA BANKRUPTCY Court. Do any attorneys or litigants know of instances of unethical conduct on the part of any bankruptcy judge who are willing to step forward and file charges? Contact R. Daniels, (561) 487–0511." (Adv. Proc. 01–170, Document No. 180, *The Florida Bar News*, October 15, 2002, at 37).

354. 10/18/02 The Lickmans file pro se in the Pennsylvania probate court exceptions to decrees in the probate case. The paper contains 39 numbered paragraphs detailing the debtor's version of events occurring in the bankruptcy case and related adversary proceedings. The paper complains that, in entering its decree finding that the debtor has no standing in the Tibey Pfeiffer probate estate, the probate court "has unwittingly assisted the executrix in the theft of $500,000."

The paper also contends that Segal "agreed to give [the trustee] a $23,500 bribe not to pursue him and his client [the executrix] as [the trustee] was statutorily required to do. A bankruptcy trustee is obligated to move to collect a debtor's claims and causes of action—this meant collecting the amount of my debts, $38,500 from Shain or if unable or too costly to do so, abandoning the claim." The paper continues, "Having reopened my closed bankruptcy in August, 1999, Segal and Shain then secretly began to draft various Agreements between

themselves which provided that I again by ousted of standing in this Court, in exchange for the $23,500 Shain was to pay [the trustee]." The paper further states that, "The trustee had no authority from the bankruptcy court to do anything after re-opening my closed case." The paper states that the trustee failed to request turnover of the probate asset. The paper contends that, "A turnover, for this Court's bankruptcy law edification, is what a bankruptcy trustee is REQUIRED to do when [it] takes over a debtor's claims which were then existing." The paper further asserts that Segal planned that the debtor "would have nothing to stand on to litigate to recover the stolen estate's funds. Get it now? Further, if this Court had bothered to take the time to read these 'Agreements' which were annexed to my Petition(s) it would have seen how the parties intended to manipulate both this Court and the bankruptcy court in order to carry out their corrupt scheme."

The paper states that the trustee sent to the debtor notice of a hearing to be held on October 18, 1999, to the debtor's "invalid former Orlando address—so I would not receive it. It seems that nobody wants me around, particularly dishonest lawyers who are about to steal my money, right?" The paper also asserts that at that hearing the trustee provided "page after page of perjured testimony . . . ."

The paper asserts that a prior order entered in the probate case and referring to the debtor with the words "as her interest may appear" establishes that she has standing in the probate case. Finally, the paper contends that the Pennsylvania probate court's order finding that the debtor has no standing is inconsistent with prior orders that reserved the debtor's right to raise issues as to the sale of the debtor's share of the probate estate and the executrix and her attorney's actions in the probate estate for later consideration. The paper requests a hearing on the issue of the debtor's standing in the probate estate and promises at the hearing to adduce "testimony from my attorneys, an expert in bankruptcy law."

The paper also asks for an exception to the court's order dismissing the petition to remove executrix, to declare unenforceable the sale agreement, and to require that Shain return $23,500 to the probate estate to require an accounting of the probate estate and a partial distribution to be made to Stephen Lickman. The paper asserts that, "My brother and I have to date incurred tens of thousands of dollars in fees, involving now 2 states, 4 lawyers, 5 courts, 8 different judges and two appeals."

The paper further states, "Although not named as a defendant, the original bankruptcy judge was named in the body of the complaint for what we subsequently learned was her complicity in assisting the trustee and the executrix to defraud [the debtor], including the intentional destruction of a previously filed court order. This Judge, we have since learned, has a reputation for her hatred of those who seek bankruptcy relief, and makes her position well known on the records of the proceedings. This same Judge, it was later learned by examining other files and speaking to other attorneys and litigants

has permitted simple bankruptcies to pile up hundreds of docket entries when the same trustee ... and her attorneys ... are involved in the proceedings. It then, in case after case, strips the debtor of all property, only to turn over huge sums of money to the same parties, with rarely any distribution for creditors, in violation of bankruptcy law ...." The paper then states, "Following the institution of this action in June, 2001, the original bankruptcy judge was removed from the case."

The paper goes on, "The torch was simply passed to another judge ... [who] made it abundantly clear that he intends to punish and discredit me and my lawyers for having in effect, sued a fellow judge and in a Northern Court, no less. To that end, [the bankruptcy judge] then in August, 2001 encouraged the trustee to turn around and sue me, my Florida lawyers and even Mr. Wiley who had no connection with any bankruptcy. The trustee's suit claims that we 'interfered with the administration of the bankruptcy' What administration. First, the bankruptcy was complete with the 'sale' of my causes of action against the executrix, right back to the executrix way back in early 2000. Second, the only 'administration' was to take a bribe to accommodate Mr. Segal and executrix Shain to get '[the debtor] and Stephen out of the way' in Pennsylvania."

Among the many actions taken by the bankruptcy court that the paper complains about is included the entry of "a $5,600 money judgment against Mr. Wiley and myself for having made [a] bar complaint [against the plaintiff's attorney]—all while [the bar complaint] was pending before the Bar. [The bankruptcy judge] then saw to it that his 'decision' was sent to the Bar who then, not surprisingly knuckled under to his pressure and dismissed the complaint the next day. Corrupt? Perhaps this Court, has never practiced law in the deep South."

The paper ends with, "By entering its Decrees as it did this Court has, unwittingly or otherwise, played right into the hands of these corrupt and unethical lawyers and judges and has now openly assisted them in the theft of $500,000 and to ensure that two poor and now lawyerless people never receive what was devised to them. Perhaps the best approach [is] for this Court to recuse itself from any further proceedings as it seemingly (1) refuses to examine the file and past history of the case and (2) does not possess sufficient knowledge of bankruptcy law, conflict of laws nor contract law, all of which are required to grasp what has taken place here."

In a footnote the paper states, "Other acts pointing to widespread corruption in the Middle District Bankruptcy court has been uncovered and reported to the 11th Circuit where an investigation is pending. The F.B.I. has also taken an interest in these matters."

Although the paper is captioned as filed by the Lickmans, the paper contains a signature line and verification for the debtor's signature only (Document No. 123, Exhibit No. D).

355. 10/23/02 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's verified motion for order to show cause why the debtor and Wiley should not be held in civil contempt for their failure to comply with the court's August 19, 2002, sanctions order. The plaintiff contends that the debtor and Wiley did not take affirmative steps to withdraw papers filed in the Pennsylvania state and district courts or pay attorney's fees as required by the court's August 19, 2002, sanctions order. The plaintiff also asserts that, subsequent to the entry of the court's August 19, 2002, sanctions order, Wiley filed in the Pennsylvania probate court on behalf of the debtor an appeal of a decree entered by the Pennsylvania probate court (Document No. 123).

356. 10/30/02 The debtor files in the bankruptcy court adversary proceeding a pro se motion to dissolve the September 13, 2001, preliminary injunction. The motion alleges that there is no factual or legal basis for the court's entry of the injunction. The motion seeks to dissolve the injunction and also to vacate the court's August 19, 2002, sanctions order. (Document No. 124).

357. 10/30/02 The bankruptcy court enters an order denying without prejudice the plaintiff's motion for order to show cause because it improperly shifts the burden of proof to the defendants (Document No. 125).

358. 10/31/02 The bankruptcy court enters a preliminary order on the debtor's motion to dissolve injunction establishing a briefing schedule and stating that the matter will be determined on the papers unless the court determines that a hearing is required (Document No. 126).

359. 11/15/02 An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personal" with the following text: "TAMPA BANKRUPTCY Court. Will those interested in opposing the re-appointment of Bankruptcy Judge Corcoran contact R. Daniels? (561) 487–0511." (Adv. Proc. 01–170, Document No. 181, *The Florida Bar News,* November 15 2002, at 33).

360. 11/18/02–11/29/02 The parties file briefs as directed by the court relating their positions on the debtor's motion to dissolve preliminary injunction. The plaintiff opposes the debtor's motion on the basis that the preliminary injunction was agreed by the parties, necessary to avoid irreparable harm, consistent with settled law, and that the debtor and Wiley had acted in violation of the preliminary injunction (Adv. Proc. 01–170, Documents Nos. 127 and 129).

361. 11/27/01 The trustee's counsel files in the bankruptcy court adversary proceeding the plaintiff's motion for order of contempt. The motion seeks the entry of an order of contempt against the debtor and Wiley for their failure to comply with the court's August 19, 2002, sanctions order and for their continued violation of the agreed preliminary injunction. The motion contends that the debtor and Wiley did not take affirmative steps to withdraw papers filed in the Pennsylvania and district courts or pay attorney's fees as required by the court's August 19, 2002, sanction order. The motion also asserts that subse-

quent to the entry of the August 19, 2002, sanctions order, Wiley filed in the Pennsylvania probate court on behalf of the debtor an appeal of a decree entered by the Pennsylvania probate court (Adv. Proc. 01–170, Document No. 128).

*Although the motion refers to attached exhibits, no exhibits are filed.*

362. 12/11/02 The debtor files in the bankruptcy court adversary proceeding a motion to strike plaintiff's motion for order of contempt because the motion fails to include the exhibits referred to in the motion (Adv. Proc. 01–170, Document No. 130).

363. 12/12/02 The bankruptcy court enters an order denying the debtor's motion to dissolve preliminary injunction, determining that the present circumstances of the case establish the necessity of continuing the preliminary injunction (Adv. Proc. 01–170, Document No. 131, reported at 286 B.R. 821).

364. 12/12/02 The bankruptcy court enters an order on the plaintiff's motion for order of contempt directing the plaintiff to file and serve the exhibits referred to in her motion and denying the debtor's motion to strike the plaintiff's motion (Adv. Proc. 01–170, Document No. 132).

365. 12/12/02 The bankruptcy court enters an order directing the debtor and Wiley to file a response to the plaintiff's motion for order of contempt no later than December 31, 2002 (Adv. Proc. 01–170, Document No. 133).

366. 12/13/02 The bankruptcy clerk transmits to the Florida federal district court the record on appeal in connection with Wiley's appeal of the August 19, 2002, sanctions order. The district court assigns Case No. 6:02–CV–1492–ORl–31–JGG (Adv. Proc. 01–170, Document No. 134).

367. 12/13/02 The bankruptcy clerk transmits to the Florida federal district court the record on appeal in connection with the debtor's appeal of the August 19, 2002, sanctions order. The district court assigns Case No. 6:02–CV–1494–ORL–28–JGG (Adv. Proc. 01–170, Document No. 135).

368. 12/16/02 The trustee's counsel files and serves the plaintiff's exhibits in support of the trustee's motion for order of contempt as directed by the bankruptcy court (Adv. Proc. 01–170, Document No. 136).

369. 12/19/02 The debtor files in the bankruptcy court adversary proceeding a notice of appeal of the court's order denying her motion to dissolve injunction (Adv. Proc. 01–170, Document No. 137).

370. 12/20/2002 Wiley files in the bankruptcy court adversary proceeding a notice of appeal of the court's order denying the debtor's motion to dissolve injunction (Adv. Proc. 01–170, Document No. 139).

371. 12/23/02 Daniels files in the bankruptcy court adversary proceeding a motion to extend time until January 13, 2002, to respond to the plaintiff's motion for order of contempt against the debtor and

Wiley. The motion seeks an extension because Daniels has been "extremely busy with taking calls in response to the adds [sic][he] placed in the *Florida Bar News* [sic] concerning the many improprieties of [the bankruptcy] Judge . . . ." The motion states, "to give this very distinguished Judge a sampling of the nature of the calls [Daniels has] received will demonstrate the time [he] needs to tend to these matters." The motion goes on to state, "One attorney phoned to say [the undersigned bankruptcy judge], in his view, is a cross between Paul Pot of Cambodia—who killed thousands—and Adolf Hitler. Another Tampa attorney told [Daniels] that [the undersigned bankruptcy judge] is both anti-semitic and a racist, the 'Trent Lott of the bankruptcy court' . . . ." The motion further states that Daniels recently learned that "Plaintiff's counsel . . . formerly served as [the undersigned bankruptcy judge's] law Clerk . . . ." The motion sets forth as "most disturbing" the undersigned bankruptcy judge's "action in . . . entertaining a motion by [the bankruptcy judge's] former clerk's son to enjoin Debtor Lickman from pursuing her bar complaint against him." The motion complains that "[w]ith absolutely no authority to do so, as only the Bar itself can hear and adjudicate such complaints, the [undersigned bankruptcy judge] held a 'hearing' on the matter anyway and 'decided' that complaint 'had no merit' and then you even entered a money judgment against the debtor, and then went on to entertain [the trustee's counsel's] further motion to jail the debtor for failing to pay." The motion concludes that Daniels "is not unaware that [the undersigned bankruptcy judge's] term ends next August" and speculates on the likelihood of reappointment (Adv. Proc. 01–170, Document No. 140).

372. 12/23/02 The Florida federal district court enters an order reassigning the debtor's appeal of the August 19, 2002, sanctions order, Case No. 6:02–CV–1494–ORL–28–JGG to the district judge assigned to Wiley's related appeal. The new case number for this appeal is Case No. 6:02–CV–1494–31–JGG (Adv. Proc. 01–170, Document No. 142).

373. 12/30/02 The Florida federal district court enters an order consolidating the debtor's and Wiley's appeals of the August 19, 2002, sanctions order and directing that all papers shall now be filed in Case No. 6:02–CV–1492–ORL–31–JGG. The order also grants an extension of time until January 31, 2003, to file briefs and grants their motion to enlarge the briefs, providing that the brief may not exceed 30 pages (Adv. Proc. 01–170, Document No. 143).

374. 12/30/02 The bankruptcy court enters an order granting Daniel's motion for extension of time and providing for an extension until January 13, 2003, to file and serve his response (Adv. Proc. 01–170, Document No. 144).

*Daniels never files a response to the plaintiff's motion for contempt against the debtor and Wiley.*

375. 1/1/03 An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personal" with the following text: *"Tampa Bankruptcy Court.* Will those willing to join in seeking to oppose the re-appointment of Bankruptcy Judge

Corcoran kindly contact Bob Daniels at (561) 487–0511." (Adv. Proc. 01–170, Document No. 182, *The Florida Bar News*, January 1, 2003, at 32).

376. 1/6/03 Wiley files in the bankruptcy court adversary proceeding his response to the plaintiff's motion for order of contempt. The response states that Wiley is unable to pay the sanctions amount and has done nothing to violate the court's sanction order. The response further states that the matters that he has filed in the Pennsylvania probate court do not violate the bankruptcy court's agreed preliminary injunction (Adv. Proc. 01–170, Document No. 145).

377. 1/8/03 The debtor files in the bankruptcy court adversary proceeding a second motion for disqualification and response to the plaintiff's motion for order of contempt citing bias. The motion for disqualification is supported by five exhibits totaling 90 pages. The motion for disqualification contains 20 numbered paragraphs. The motion alleges that the bankruptcy judge is biased because he:

has "taken away [the debtor's] lawyers ... by permitting the trustee to sue [the] lawyers to intentionally create a conflict of interest."

"denied [the debtor's] motion for time to retain new counsel ...."

"stated that [the debtor's] motion to remove trustee had no merit because now [the debtor] had no lawyer."

"deliberately created a conflict of interest between [the debtor] and [her] Pennsylvania lawyer, by suing [her] lawyer and improperly enjoining [the debtor's] right to recover [her] inheritance ...."

"dismissing [the debtor's] appeal of [the bankruptcy court's] order Disallowing Administrative Expense as being untimely."

striking "Daniel's counter-claim as well as [the debtor's] demand for a jury trial."

"improperly permit[ting] trustee's counsel to sit at counsel table during the November 2001 trial ...."

determining that there was "no evidence that [the debtor's] checks to [her] Pennsylvania lawyers were ever cashed."

refusing "to correct [the bankruptcy court's] numerous factual conclusions, particularly its 'agreed' preliminary injunction, to which no one agreed except Plaintiff."

acting "as counsel for the Plaintiff ...."

denying the debtor's "constitutional right of access to be heard in *any* court."

hearing "testimony on [the debtor's] Bar complaints against the Plaintiff and her counsel" without authority

hearing and weighing [the debtor's] Bar complaint to influence the Bar's independent evaluation of [the debtor's] complaint . . . ."

" 'reward[ing]' Plaintiff and her lawyers with a money judgment against [the debtor] and attorney Wiley for 'defending' the very Bar complaint over which [the bankruptcy court] had no authority . . . . in the first instance."

"intentionally hiding well-known criminal conduct in *two* states to protect the trustee and her counsel . . . ."

"protecting its own former law clerk and her son.

The motion also contains three paragraphs in response to the plaintiff's motion for order of contempt. The response states that the debtor is financially incapable of paying the sanctions amount and that none of the papers identified by the plaintiff violate the August 19, 2002, sanctions order or the agreed preliminary injunction (Adv. Proc. 01–170, Document No. 146).

| | | |
|---|---|---|
| 378. | 1/15/03 | An advertisement appears in the Classified Section of *The Florida Bar News* under "Other Personal" with the following text: *"Tampa Bankruptcy Court.* Will those willing to join in seeking to oppose the re-appointment of Bankruptcy Judge Corcoran kindly contact Bob Daniels at (561) 487–0511." (Adv. Proc. 01–170, Document No. 183, *The Florida Bar News,* January 15, 2003, at 30). |
| 379. | 1/16/03 | The bankruptcy clerk transmits to the Florida federal district court the record on appeal in connection with Wiley's appeal of the order denying the debtor's motion to dissolve preliminary injunction. The district court assigns Case No. 6:03–CV–58–ORL–28–JGG (Adv. Proc. 01–170, Document No. 147). *The clerk transmits a limited record due to Wiley's failure to file a designation of record or statement of the issues on appeal as required by F.R.B.P. 8006 and 8007(a) and as directed by the court.* |
| 380. | 1/16/03 | The bankruptcy clerk transmits to Florida federal district court the record on appeal in connection with the debtor's appeal of the order denying the debtor's motion to dissolve preliminary injunction. The district court assigns Case No. 6:03–CV–59–ORL–31–NAB (Adv. Proc. 01–170, Document No. 148). *The clerk transmits a limited record due to the debtor's failure to file a designation of record or statement of the issues on appeal as required by F.R.B.P. 8006 and 8007(a) and as directed by the court.* |
| 381. | 1/17/03 | The bankruptcy court enters an order denying the debtor's second motion for disqualification. The court denies the motion because the debtor's allegations, based upon facts that are inaccurate or misrepresented, relate to the court's rulings and establish no basis for disqualification. The court also denies the motion because the trustee's counsel employment as law |

clerk to the bankruptcy judge more than 10 years ago is not a basis for disqualification (Adv. Proc. 01–170, Document No. 149, reported at 288 B.R. 151).

382. 1/17/03 The bankruptcy court enters an order directing the clerk to transmit the contempt matter to district court because the motion appears to seek punitive sanctions beyond the authority of the bankruptcy court. The order directs the clerk to transmit specific papers and any other paper designated by January 27, 2003, by any party (Adv. Proc. 01–170, Document No. 150, reported at 288 B.R. 291).

*Daniels never files a response to the plaintiff's motion for order of contempt, despite his request—granted by the court—for an extension of time to do so.*

383. 1/21/03 The debtor files in the bankruptcy court adversary proceeding a supplemental designation seeking to supplement the record in the district court Case No. 6:02–CV–1494–31JGG with all documents previously designated and documents Nos. 124, 129, and 131 (Adv. Proc. 01–170, Document No. 151).

384. 1/21/03 The debtor files in the bankruptcy court adversary proceeding a designation and statement of issues in her appeal of the court's order denying her motion to dissolve preliminary injunction. The statement of issues presents issues as to jurisdiction, bias, and the propriety of the court's refusal to dissolve the preliminary injunction (Adv. Proc. 01–170, Documents Nos. 152 and 153).

385. 1/28/03 The Florida federal district court enters an order denying the debtor's motion to recuse the district court judge, granting the debtor's motion to consolidate appeals, and denying the debtor's motion for extension of time to file briefs. The order consolidates Case Nos. 6:03–CV–59–ORL–31DAB with 6:02–CV–1492–ORL–31JGG to be reflected a 6:03–CV–59–ORL–31JGG. The order also consolidates Case Nos. 6:03–CV–58–ORL–31JGG with 6:02–CV–1492–ORL–31JGG. Finally, the order directs that future pleadings are to be filed in Case No. 6:02–CV–1492–ORL–31JGG (Adv. Proc. 01–170, Document No. 154).

386. 1/24/03 The bankruptcy court enters an order of instructions to the clerk. The order directs the clerk to file the debtor's supplemental designation on the left side of the file, without prejudice to the debtor's right to seek relief in the district court to supplement her designation (Adv. Proc. 01–170, Document No. 155, reported at 288 B.R. 584).

387. 1/29/03 The bankruptcy clerk transmits to the Florida federal district court the plaintiff's motion for order of contempt. The district court assigns Case No. 6:03–CV–114–ORL–190AB (Adv. Proc. 01–170, Document No. 156).

388. 2/21/03 The Florida federal district court enters an order granting the appellant's motion to enlarge record and directing the bankruptcy clerk to transmit documents Nos. 146, 149, 151, 152, and 153 the record within 10 days—Consolidated Case No. 6:02–CV–1492–ORL–31JGG (Adv. Proc. 01–170, Document No. 157).

278

*The district court order does not direct the bankruptcy clerk to transmit the debtor's motion to dissolve preliminary injunction and the debtor's response to the plaintiff's objection to that motion (Documents Nos. 124 and 129).*

389. 2/24/03 The bankruptcy clerk transmits to the Florida federal district court the debtor's supplemental record—Consolidated Case No. 6:02–CV–1492–ORL–31JGG (Adv. Proc. 01–170, Document No. 158).

390. 3/21/03 The undersigned bankruptcy judge receives another ex parte communication from Daniels. Inside the envelope is a photocopy of an advertisement in *The Florida Bar News* seeking applications for appointment as a bankruptcy judge in the middle district of Florida. Daniels has handwritten on the paper the words "Hey, buddy boy, maybe the Concannons will give you a job! Regards, Bob Daniels" (Adv. Proc. 01–170, Document No. 161).

391. 5/5/03 The Florida federal district court enters a memorandum opinion affirming the bankruptcy court's August 19, 2002, sanctions order and order denying the debtor's motion to dissolve preliminary injunction. The district court determines that the debtor and Wiley are bound by the preliminary injunction unless it is dissolved by the bankruptcy court or reversed on appeal. The district court considers the debtor's and Wiley's arguments that the preliminary injunction and August 19, 2002, sanctions order are improper on the basis of abstention, misapplication of the *Barton* doctrine, lack of jurisdiction of the bankruptcy court, insufficiency of evidence, bias of the bankruptcy court, and fraud upon the bankruptcy court and determines that the arguments are without merit. The district court affirms the preliminary injunction and August 19, 2002, sanctions order finding that the bankruptcy court's "factual determinations were based upon competent and substantial evidence" and its "conclusions of law and application of the facts to the law were correct." The district court also notes that the debtor is bound by the bankruptcy court's orders determining that the probate asset is property of the estate and approving the trustee's sale of the probate asset to Shain under "the doctrines of collateral estoppel, res judicata, and law of the case." (Adv. Proc. 01–170, Document No. 162).

392. The debtor files in the Florida federal district court a notice of appeal of the district court's order affirming the bankruptcy court's August 19, 2002, sanctions order and the order denying debtor's motion to dissolve preliminary injunction (Adv. Proc. 01–170, Document No. 163).